S. Hrg. 101-757

# THE COPYRIGHT CLARIFICATION ACT

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## PATENTS, COPYRIGHTS AND TRADEMARKS

OF THE

# COMMITTEE ON THE JUDICIARY
# UNITED STATES SENATE

## ONE HUNDRED FIRST CONGRESS

FIRST SESSION

ON

## S. 497

A BILL ENTITLED THE "COPYRIGHT REMEDY CLARIFICATION ACT"

———

MAY 17, 1989

———

**Serial No. J–101–17**

———

Printed for the use of the Committee on the Judiciary

COLUMBIA UNIVERSITY
LAW LIBRARY

SEP 0 4 1990

U. S. DEPOSITORY
COPY



U.S. GOVERNMENT PRINTING OFFICE

30–968         WASHINGTON : 1990

———

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

KF
26
.J863
1989a

## COMMITTEE ON THE JUDICIARY

JOSEPH R. BIDEN, JR., Delaware, *Chairman*

EDWARD M. KENNEDY, Massachusetts
HOWARD M. METZENBAUM, Ohio
DENNIS DeCONCINI, Arizona
PATRICK J. LEAHY, Vermont
HOWELL HEFLIN, Alabama
PAUL SIMON, Illinois
HERBERT KOHL, Wisconsin

STROM THURMOND, South Carolina
ORRIN G. HATCH, Utah
ALAN K. SIMPSON, Wyoming
CHARLES E. GRASSLEY, Iowa
ARLEN SPECTER, Pennsylvania
GORDON J. HUMPHREY, New Hampshire

MARK H. GITENSTEIN, *Chief Counsel*
DIANA HUFFMAN, *Staff Director*
JEFFREY J. PECK, *General Counsel*
TERRY L. WOOTEN, *Minority Chief Counsel and Staff Director*

### SUBCOMMITTEE ON PATENTS, COPYRIGHTS AND TRADEMARKS

DENNIS DeCONCINI, Arizona, *Chairman*

EDWARD M. KENNEDY, Massachusetts
PATRICK J. LEAHY, Vermont
HOWELL HEFLIN, Alabama

ORRIN G. HATCH, Utah
ALAN K. SIMPSON, Wyoming
CHARLES E. GRASSLEY, Iowa

EDWARD H. BAXTER, *Chief Counsel and Staff Director*
MARK DISLER, *Minority Chief Counsel*

(II)

COLUMBIA UNIVERSITY
LAW LIBRARY

DEC 1 4 1990

U.S. DEPOSITORY
COPY

# CONTENTS

## STATEMENTS OF COMMITTEE MEMBERS

Page
DeConcini, Hon. Dennis, a U.S. Senator from the State of Arizona...................... 1
Hatch, Hon. Orrin G., a U.S. Senator from the State of Utah .............................. 3
Grassley, Hon. Charles E., a U.S. Senator from the State of Iowa ........................ 4

## PROPOSED LEGISLATION

S. 497, a bill entitled the "Copyright Remedy Clarification Act".......................... 5

## CHRONOLOGICAL LIST OF WITNESSES

Ralph Oman, Register of Copyrights, Washington, DC, accompanied by Doro-
thy Schrader, chief counsel ....................................................................... 7
James Lawrence Healy, Jr., vice president of sales, Enterprise Media, Inc.,
Boston, MA............................................................................................ 43
Robert A. Schmitz, chairman, president and chief executive officer, Richard
D. Irwin, Inc., Homewood, IL.................................................................. 82
David Eskra, chairman and chief executive officer, Pansophic Systems, Inc.,
representing the Software Publishers Association and ADAPSO, Washing-
ton, DC ................................................................................................. 94
August W. Steinhilber, chairman, Educators' Ad Hoc Committee on Copyright
Law, Alexandria, VA.............................................................................. 111

## ALPHABETICAL LIST AND MATERIAL SUBMITTED

Eskra, David:
    Testimony ............................................................................................. 94
    Letter to Senator DeConcini from ADAPSO, Arlington, VA, June 1, 1989.. 97
    Prepared statement .............................................................................. 98
    Responses to supplemental questions...................................................... 106
Healy, James Lawrence, Jr.:
    Testimony ............................................................................................. 43
    Prepared statement .............................................................................. 45
    Prepared statement of the Copyright Remedies Coalition, Washington,
    DC, with attachments........................................................................... 52
    Responses to additional questions.......................................................... 79
Oman, Ralph:
    Testimony ............................................................................................. 7
    Prepared statement .............................................................................. 10
    Letters to Senator DeConcini in response to additional questions:
        June 15, 1989 .................................................................................. 39
        July 5, 1989 .................................................................................... 40
Schmitz, Robert A.:
    Testimony ............................................................................................. 82
    Prepared statement .............................................................................. 84
    Letter to Senator DeConcini in response to supplemental questions, June
    5, 1989 ................................................................................................ 90
      Enclosure: Letter from the Textbook Authors Association, Orange
      Springs, FL, to Senator DeConcini, January 16, 1989 .......................... 93
Steinhilber, August W.:
    Testimony ............................................................................................. 111
    Prepared statement on behalf of the Educators' Ad Hoc Committee on
    Copyright Law, Alexandria, VA............................................................. 114

Page

Steinhilber, August W.—Continued
    Letter to Senator DeConcini, June 5, 1989 ............................................................. 121
    Enclosure: Responses to supplemental questions .............................................. 122

## APPENDIX

### ADDITIONAL SUBMISSIONS FOR THE RECORD

Letters to Hon. Dennis DeConcini, chairman, Subcommittee on Patents, Copy-
  rights and Trademarks, from:
    American Intellectual Property Law Association, Arlington, VA, May 12,
      1989 ........................................................................................................................... 133
    Penn State, University Park, PA, May, 15, 1989 .............................................. 138
    Wyatt and Saltzstein, Washington, DC, May 30, 1989 ...................................... 139
      Attachment: Prepared statement of Maclean Hunter Reports, Inc.,
        Chicago, IL .......................................................................................................... 140
    ' Graphic Artists Guild, New York, NY, June 1, 1989 ......................................... 144
    Hunton & Williams, Washington, DC, June 5, 1989 ......................................... 146
    Abrams, Westermeier & Goldberg, P.C., Washington, DC, June 9, 1989 ...... 150
      Attachment: Prepared statement in support of S. 497 .............................. 151
    Society for Visual Education, Inc., Chicago, IL, June 12, 1989 ....................... 154
    General Counsel of the U.S. Department of Commerce, Washington, DC,
      June 16, 1989 ........................................................................................................ 158
    CBEMA, Washington, DC, July 17, 1989 ............................................................. 160

# THE COPYRIGHT CLARIFICATION ACT

---

### WEDNESDAY, MAY 17, 1989

U.S. SENATE,
COMMITTEE ON THE JUDICIARY,
SUBCOMMITTEE ON PATENTS, COPYRIGHTS AND TRADEMARKS,
*Washington, DC.*

The subcommittee met, pursuant to notice, at 10:08 a.m., in room 262, Dirksen Senate Office Building, Hon. Dennis DeConcini (chairman of the subcommittee) presiding.

### OPENING STATEMENT OF HON. DENNIS DeCONCINI, A U.S. SENATOR FROM THE STATE OF ARIZONA

Senator DeConcini. The Subcommittee on Patents, Copyrights and Trademarks will come to order.

The subcommittee convenes today to hear testimony regarding S. 497, a bill I have introduced along with my colleagues, Senator Simon and Senator Hatch.

Senator Hatch, our ranking member, is not going to be able to be here today, but he has asked that we go ahead and proceed. Also, Senator Simon advised me a few minutes ago that he can not be here this morning, but wants the record to reflect his enthusiastic support.

S. 497 clarifies what I believe to be Congress' intent that States be subject to suit under the 1976 Copyright Act for damages arising from copyright infringement. This bill has been made necessary by recent Federal circuit court opinions which have held that States are immune from suit in Federal courts for infringement of copyright material.

If these decisions are allowed to stand without further congressional action, the intolerable result will be that States are entirely immune from damages for infringement under the comprehensive scheme of copyright protection the Congress provided in the Copyright Act. This lack of protection for American copyright material cannot be allowed to continue, and I believe that Congress must act now to restore to the law the degree of protection that has been thought to exist since the Congress originally enacted the copyright laws.

On October 3, 1988, the U.S. Court of Appeals for the Ninth Circuit held that States and their instrumentalities are immune from damage suits for copyright infringements under the sovereign immunity clause of the 11th amendment to the U.S. Constitution. That decision, together with recent similar holdings in the fourth circuit, critically impairs creative incentive and business investments throughout this country's copyright industries—all of which

serve important market segments which contain at least some State entities.

The U.S. Supreme Court had denied certiorari in both of these particular cases. Particularly vulnerable to State infringements are the educational publishers among whose principal markets are State universities.

The anomalous result of these decisions is that public universities can infringe without liability upon copyright material and essentially steal information from private universities, but private universities cannot similarly infringe with immunity on public institutions. In other words, the University of California at Los Angeles can sue the University of Southern California for copyright infringement, but USC cannot sue UCLA.

A State assertion of sovereign immunity in copyright claims has a particularly devastating effect on copyright owners who—unlike others foreclosed by 11th amendment immunity only from the Federal courts—are deprived of any forum for effective relief. Following the ninth circuit decision, the Register of Copyrights reported to Congress that "Copyright proprietors have demonstrated that they will suffer immediate harm if they are unable to sue infringing States."

The ninth circuit itself concluded that:

Although we find the arguments compelling, we are constrained by the Supreme Court's mandate that we find an abrogation of immunity only when Congress has included * * * unequivocal and specific language indicating an intent to subject States to suit in Federal court. Such language is absent from the Copyright Act of 1976. We recognize that our holding will allow States to violate the Federal copyright laws with virtual impunity. It is for the Congress, however, to remedy this problem.

Congressional reimposition of State liability for damage action for copyright infringement is not a complicated matter and should not be a controversial one. The simple fact is that protecting copyright from this particular form of infringement does not render any conduct unlawful that is not already unlawful.

It does not take away any rights from States that they now possess. It does provide fair opportunity for copyright owners to have their day in court, and it does provide relief for what is now and will remain infringing State conduct.

Most importantly, congressional action to restore protection from infringement by States also serves to restore the careful, delicate balances struck by the 1976 Copyright Act—indeed restoring this form of protection is essential to restoring that balance and perfecting the Congress' clear intent.

I look forward to hearing the testimony that we are going to receive from our distinguished and knowledgeable group of witnesses today. We have gathered some real experts in this area that I think will help us understand this problem more clearly.

I am sure that my colleagues and I will learn a great deal from this, and I am confident that after we do this, we will be able to move to a markup of S. 497 with any necessary amendments.

Before introducing our first witness, let me say that we have statements from both Senator Hatch and Senator Grassley that will, without objection, be included in the record at this point.

[The statements of Senators Hatch and Grassley and a copy of S. 497 follow:]

Senator DeConcini. Our first witness today is Mr. Ralph Oman, the Register of Copyrights, accompanied by Dorothy Schrader.

Mr. Oman, would you please summarize your statement? Your full statement will appear in the record, and I do thank you for the comprehensive statement that you have submitted to us. It is very helpful.

## STATEMENT OF RALPH OMAN, REGISTER OF COPYRIGHTS, WASHINGTON, DC, ACCOMPANIED BY DOROTHY SCHRADER, CHIEF COUNSEL

Mr. Oman. Thank you very much, Mr. Chairman. It is a pleasure to be here today to testify in support of S. 497.

As you mentioned, your bill would clarify Congress' intent that the State should be subject to suit in Federal court for infringements of both copyright and mask works. As you know, Mr. Chairman, the 11th amendment generally prohibits Federal courts from entertaining damage suits brought against a State by citizens of another state or country.

The Supreme Court has extended State immunity to prohibit suits against a State by its own citizens. In recent years several courts have held that 11th amendment immunity immunizes States from suit for copyright infringement in Federal court.

This poses a great dilemma. While the Copyright Act grants to copyright owners certain exclusive rights in their works, the law dictates that all copyright suits be litigated exclusively in Federal court. Application of the 11th amendment leaves copyright owners with no effective remedy against allegedly infringing States. This result is illogical and contrary to the clear intent of Congress.

Even so, Mr. Chairman, Federal district courts in five States applying the rationale of the Supreme Court decisions in other 11th amendment cases—cases that did not involve copyright law—have uniformly held that State governments are immune to suit for infringement. In 1988, the Copyright Office issued its report on the clash between the 11th amendment and the Federal copyright law.

That study was divided into three parts. There was a factual inquiry concerning the practical enforcement problems and State practices, a legal history and historical analysis of the 11th amendment and its application in copyright infringement suits against States, and a 50-State survey of State laws. I submitted the study to the subcommittee in June of last year, Mr. Chairman.

In the report, we received only a few responses from States and their entities. Most of the comments came from copyright proprietors. They chronicled dire financial consequences if the States were given immunity from monetary damages in copyright infringement suits.

The Publishers Trade Association estimated that in 1986 alone, U.S. publishers received $1.4 billion from the sale of college and university textbooks, of which approximately $1.1 billion are received from entities with potential 11th amendment immunity.

The major concern of copyright owners, Mr. Chairman, is the widespread uncontrolled copying of their works without payment. A quarter of the responses indicated that injunctive relief is neither adequate, nor does it deter the type of illegal behavior that

they are concerned about. Small companies especially voiced fear about this prospect and said that they lacked the resources to battle State governments.

After analysis of the comments, the Copyright Office concluded that copyright proprietors demonstrated, if nothing else, at least the potential for harm unless States are held accountable in damages for the infringement of copyrighted works.

Certainly Congress can make its own judgment on this score. In any case, the Copyright Office concludes that Congress intended to expose the States to liability.

Your bill, Mr. Chairman, would clarify that States and State instrumentalities are fully subject to suit in Federal court if they infringe copyrighted works or mask works. In other words, it would cure the doubt that was raised by the Supreme Court in its 1985 decision in *Atascadero State Hospital* v. *Scanlon*. As you know, that case requires Congress expressly to abrogate 11th amendment immunity. Owners of copyright and mask works would have available to them the full panoply of civil remedies: Injunctive relief, actual statutory damages, and seizure of infringing articles.

The language and history of the Copyright Act of 1976 demonstrate that Congress in fact intended to hold States, like other users, liable for copyright infringement. Section 110 exempts certain acts of governmental bodies. The former manufacturing clause in sections 601 and 602 exempted from copyright liability certain importations by the States.

If Congress had not intended to subject the States to damage suits in Federal court, it need not have expressly exempted this State activity from copyright liability. The legislative history of the Copyright Act demonstrates that the debate focused on the extent to which Congress should exempt the States from full liability.

No one suggested at that time that the States were already immune from liability as to damages under the 11th amendment. No State official has requested total exemption from copyright liability.

I see no policy justification for full State immunity to copyright damage suits. Injunctive relief alone is inadequate.

The current legal dilemma arises from the application of the new constitutional doctrine enunciated in *Atascadero* to the copyright law. Good copyright policy requires that the States be subject to copyright liability, except to the extent that Congress legislates specific narrow exemptions for nonprofit uses.

State representatives have not disputed this legislative policy. They recognize that respect for copyright law and property rights conferred by the law is good public policy.

As a practical matter, Mr. Chairman, I suspect that States will continue to buy books rather than copy books. They will buy computer programs and other copyrighted works. They acquire licenses for the performance of music at non-exempt school events.

I doubt very much that if you failed to enact this bill that the States would launch a massive conspiracy to rip off the publishers across the board. They are all respectful of the copyright law. What State official wants to get a reputation as a copyright pirate?

No, Mr. Chairman, I suspect that they will continue to respect the law. If some might argue for limited immunity—which I

## STATEMENT OF RALPH OMAN
## REGISTER OF COPYRIGHTS

### MAY 17, 1989

The Copyright Office supports enactment of S. 497, the Copyright Remedy Clarification Act, which would amend the Copyright Act of 1976 to clarify Congress' intent that states and their instrumentalities should be subjected to suit in federal court for infringements of both copyrights and mask works.

The Eleventh Amendment has recently been interpreted as conferring immunity on the states against suit for copyright infringement in federal courts.

At the request of the House Subcommittee on Courts, Civil Liberties, and the Administration of Justice, the Copyright Office filed a report in June 1988, in which the Office recommended remedial legislation to clarify what it perceived to be the original intent of the Congress in passing the Copyright Act of 1976.

Under S. 497, owners of copyright and mask works would have available to them the full panoply of civil remedies: injunctive relief, actual and statutory damages, and seizure of infringing articles. Of course, no criminal penalties apply. In the case of copyrights, criminal penalties apply only to commercial activities. The Semiconductor Chip Protection Act contains no criminal penalties.

The bill, if enacted, would not apply to cases filed before the date of enactment. The Copyright Office supports this limited qualification on retroactivity. As we understand the qualification, the intent is to avoid interference with any pending cases.

Authors and copyright proprietors have demonstrated the potential for immediate harm from the uncompensated use by states and state entities of works protected under the federal Copyright Act. The public would lose as well--other groups of consumers would bear the brunt of increased costs; without compensation, the incentive to create would be significantly diminished and fewer works published.

There is no policy justification for full state immunity to copyright damage suits. Injunctive relief alone is inadequate. Nor would it be fair to leave the state damage-proof and require copyright owners to seek out some compensation through suits against state officials as individuals. During the information-gathering phase of preparing the Copyright Office Report, no state official made any policy argument that the states should be exempt from copyright liability. The Copyright Office knows of no opposition to this legislation.

Mr. Chairman, I welcome the opportunity to share with
the Subcommittee our strong support for your bill, S. 497, The
Copyright Remedy Clarification Act.

I am not a lawyer. I am not here today to discuss the
ins and and outs of the Copyright Act and the various court
cases interpreting it. Both the Register of Copyrights and the
CRC in its written statement have done an admirable job of
analyzing the relevant legal issues and putting them in
perspective for the Subcommittee.

I am a small businessman. I am here today to give the
Subcommittee an insider's look at S. 497 and how it would help
copyright owners, particularly those who run small businesses
that deal extensively with state colleges and universities.

The future financial well-being of companies like mine
is tied in large part to our ability to market our products to
state institutions. Approximately one-half of Enterprise
Media's overall sales are made to universities and colleges,
many of which are state-run.

It is my company's dependence on the state higher
education market that prompts me to appear today and share with
you our recent sense of vulnerability. I was stunned when my

lawyers explained to me that as a result of recent court cases, a substantial segment of our market is beyond the reach of the most important remedy provided in the Copyright Act. Every video that Enterprise Media has sold, is selling and will sell in the future, to states is at risk. I asked how it is that state universities, unlike private colleges and our corporate clients, cannot be sued for compensation when they systematically copy our product without authorization.

To me, the line drawn between state and private entities in this context is a distinction without a difference. It does not make any difference whether Enterprise Media's products are unlawfully copied by a state or a private institution. The impact on our bottom line, on the future viability of our company, is the same.

Mr. Chairman, Enterprise Media is committed to producing high quality video products. Many of these works are developed, at least in part, for institutions of higher learning. For example, one of our releases, The Modern Presidency With David Frost, has proven quite popular with political science professors and students at colleges and universities. This five-part series represents the first time that Mr. Frost's landmark interviews with Presidents Nixon, Ford, Carter, Reagan and Bush are available on videocassette.

49

- 4 -

But, such high quality products are expensive to produce, especially for a small company such as ours that is undercapitalized and creates products on speculation. Moreover, our videos are aimed at a narrow market, and realize an even narrower profit margin. Typically, we expect to sell only 1,000 copies during the life of the title. If unauthorized copying robs us of even 10% of these potential sales, the impact on our company is substantial.

Unless the current legal situation is corrected, our company will be reluctant to produce new, high quality titles for higher education. Instead of taking the risk of producing works for such vulnerable markets, we may well be forced to direct our efforts exclusively to the private, non-educational sector. Other producers of educational videos may be forced to do the same. Small businesses that do not reorient their marketing, and continue to deal extensively with colleges and universities, may be forced out of business.

Under either scenario, there will be a decrease in the number of new titles available to college students and teachers. Under either scenario, the ultimate victim is the learner.

It is my understanding that S. 497 is designed to prevent just such a result. This legislation is intended to make sure that state colleges and universities have a strong incentive not to use modern technologies to copy our copyrighted works without permission.

Make no mistake about it, Mr. Chairman. Your bill is needed to deter such activities by state universities and colleges. The current legal situation is simply not adequate for this purpose. Let me share with you some of the reasons why this is so.

First, injunctive actions are not the answer. Injunctions can only stop future unauthorized copying. They are of little help to the small business whose market has been substantially diminished before it even steps into a courtroom. Moreover, injunctive actions are expensive to pursue, particularly for small companies such as Enterprise Media.

Second, our industry has in the past relied on cease and desist letters to notify apparent infringers that they must stop copying valuable videos and films, or face a lawsuit seeking damages and injunctive relief. If copyright owners can only seek injunctive relief and not damages, our cease and desist letters will have little practical effect.

COPYRIGHT REMEDIES COALITION
SUITE 600
2000 K STREET, N.W.
WASHINGTON, D.C. 20006-1809

MICHAEL R. KLIPPER
COUNSEL

TELEPHONE
(202) 429-6970

### Summary of Statement of the
### Copyright Remedies Coalition
### on S. 497
### The Copyright Remedy Clarification Act

The Copyright Remedies Coalition (CRC) strongly supports enactment of S. 497, the Copyright Remedy Clarification Act.

S. 497 will reiterate the original intent of Congress when it enacted the 1976 Copyright Act -- that states can be sued for damages when they use without permission the valuable property of copyright owners. This legislation responds to recent court decisions holding that the Eleventh Amendment immunizes states from copyright infringement damage suits. The Copyright Office has recommended that Congress pass remedial legislation in response to these court cases to make clear that states are liable for damages under the Copyright Act. The Copyright Office has specifically endorsed the Copyright Remedy Clarification Act.

The current legal situation poses a serious threat to copyright owners who market their works to states and state entities. Copyright owners are currently deprived of access to the most effective deterrent to the unauthorized use of protected property -- damage lawsuits. Large and small businesses as well as individual authors are at risk. Ultimately, the public will be the big loser as the quantity and quality of copyrighted works now available to state universities and other state entities diminishes.

S. 497 will restore copyright owners' ability to go to court to seek effective remedies when their valuable property rights are violated. Enactment of this bill will also ensure that there is in place a strong deterrent to copyright infringements by states by making damages available once again in such cases.

On the other hand, enactment of S. 497 will not change the terms under which States are liable for copyright infringement. Nor will S. 497 expand the substantive rights of copyright owners under the law.

In conclusion, the Copyright Remedies Coalition urges the prompt enactment of S. 497 so that the problems brought about by recent court decisions can be nipped in the bud. Prompt action will help prevent the erosion of currently vulnerable markets, and ultimately help to ensure that the quality of education in our country is not diminished.

Copyright Act -- that states can be sued for damages for copyright infringements.

This legislation responds to recent federal court decisions holding that states are immune from damage infringement suits in federal courts. More specifically, the courts in these cases determined that the 1976 Copyright Act lacks the specific and unequivocal language needed to overcome the immunity from such suits afforded states under the Eleventh Amendment to the Constitution.

These judicial rulings pose a serious threat to the many copyright intensive businesses that market their works to states and state instrumentalities. Large and small businesses, as well as individual authors, are at risk. Unless these decisions are offset by congressional action, the ultimate loser will be the public, as the quantity and quality of copyrighted works now available to state universities and other state entities will inevitably diminish.

The fact that federal law preempts state jurisdiction over copyright cases means that these decisions deny copyright owners any forum in which to bring copyright infringement damage actions against states. The only relief left to aggrieved copyright owners is an injunctive action, which affords only prospective relief from infringements by the states. Because injunctive actions lack the deterrent effect inherent in damage suits, these court rulings deprive copyright owners of an effective remedy in such situations.

The first, _Johnson v. University of Virginia_,[10]/ was
decided only three months before _Atascadero_, whereas the second,
_Woelffer v. Happy States of America, Inc._,[11]/ was decided less
than two months after _Atascadero_. In the former, a federal
district court decided that Congress, in passing the Copyright
Acts of 1909 and 1976, had intended to abrogate states'
immunity, and thereby to hold them liable for damages for
copyright infringements. The _Johnson_ court concluded that the
language of Section 501(a) of the Act sufficiently defined the
defendant class so as to constitute a waiver of the states'
Eleventh Amendment immunity.[12]/

Just two months after _Atascadero_, and six months after
_Johnson_, the district court in _Woelffer_ determined that, under
the Supreme Court's new standard, states are immune under the
Eleventh Amendment from damage suits under the Copyright
Act.[13]/ The _Woelffer_ court concluded that the very language
that in _Johnson_ was sufficient to offset the Eleventh Amendment,

---

10/    606 F. Supp. 321 (W.D. Va. 1985).

11/    626 F. Supp. 499 (N.D. Ill. 1985).

12/    The Court in _Johnson_ specifically endorsed the decision in
       _Mills Music_ that states are not immune from damage suits
       for copyright violations under the 1909 Copyright Act.
       The Court reasoned that the language in Section 501(a) of
       the 1976 Act was at least as sweeping, and probably more
       so, as that found in the 1909 Act.

13/    626 F. Supp. at 505.

was not sufficient to meet the new _Atascadero_ standard:   The
Court stated that:

> The sweeping language employed by Congress arguably
> includes states within the class of copyright and
> trademark infringers. . . . Under _Atascadero_, however,
> this is not enough to abrogate sovereign immunity.[14]

Relying on _Atascadero_, every case since _Woelffer_ likewise has
been unable to hold states liable for damages for the states'
infringing activity.[15]

     To date, two of these cases, _Richard Anderson_
_Photography v. Brown_ and _BV Engineering v. UCLA_, have made their
way to the Supreme Court, only to have the Court refuse to hear
the appeals.  Thus, Congress is the only viable avenue for
copyright owners seeking prompt relief from the strict
application of the _Atascadero_ standard.  The need for copyright

---

14/   626 F. Supp. at 504 (emphasis added).

15/   See _Cardinal Industries, Inc. v. Anderson Parrish Assoc._,
      _Inc._, No. 83-1038-Civ-T-13 (M.D. Fla. Sept. 6, 1985)
      (unpublished), _aff'd without discussion_, 811 F.2d 609
      (11th Cir.), _cert. denied_, _Cardinal Industries, Inc. v._
      _King_, 108 S.Ct. 88 (1987), _discussed in_ "Copyright
      Liability of States and the Eleventh Amendment," A Report
      of the Register of Copyrights, June 1988, at 95
      (hereinafter "Copyright Office Report").  _Richard Anderson_
      _Photography v. Brown_, 852 F.2d 114 (4th Cir. 1988), _cert._
      _denied sub nom. Richard Anderson Photography v. Radford_
      _University_, 57 U.S.L.W. 3537 (U.S. Feb. 21, 1989)(No.
      88-651); _Lane v. First National Bank of Boston_, 687
      F. Supp. 11 (D. Mass. 1988), _aff'd_, ___ F.2d ___ (1st
      Cir. 1989), 10 U.S.P.Q.2d (BNA) 1268 (1989); and _BV_
      _Engineering v. UCLA_, 858 F.2d 1394 (9th Cir. 1988), _cert._
      _denied_, 57 U.S.L.W. 3614 (U.S. March 21, 1989)
      (No. 88-1099).

Federal courts have exclusive jurisdiction over
copyright infringement matters. Thus, if the Eleventh Amendment
bars copyright owners from seeking a remedy in federal court,
they have no place to turn for adequate relief. As the Court of
Appeals for the Ninth Circuit recognized in BV Engineering, "the
choice [in copyright cases] is not between the federal forum and
the state forum -- it is between the federal forum and no
forum."26/ Enactment of S. 497 will ensure that the federal
courthouse door is not closed to copyright owners seeking
effective relief. It will give them a meaningful day in
court.27/

In addition to protecting the only forum available,
S. 497 will ensure that copyright owners have effective remedies
when states violate the Copyright Act. Although state officials
and state employees may be enjoined from future violations of
the Copyright Act,28/ under recent court decisions interpreting
Atascadero, the states for which they work cannot be sued for
damages. As the comments received by the Copyright Office in

---

26/     858 F.2d at 1400.

27/     Because there is no state court jurisdiction in copyright
        infringement cases, the public policy question that
        normally arises in Eleventh Amendment matters -- whether
        congressional action will expand federal court
        jurisdiction at the expense of state tribunals -- is not
        involved here.

28/     Ex Parte Young, 209 U.S. 123 (1908).

housing project;33/ (4) computer programs;34/ and financial
data.35/

In addition, states may well confuse insulation from
damages with full immunity from any copyright liability, causing
them to believe that their activities are beyond the reach of
the Copyright Act. A recent, telling example of this problem is
illustrated by the experience of the Copyright Clearance Center,
Inc. (CCC). For several years, CCC has been trying to develop a
photocopy license for public and private universities to
parallel its existing license program for corporations. Under
this program, universities would obtain a blanket license for a
pre-arranged fee that would allow them to make a certain number
of copies of copyrighted materials. To that end, CCC held
"substantive high-level discussions with representatives of
public and private universities." However, these negotiations
took a sudden, dramatic turn:

> Following the original decision in UCLA v. BV
> Engineering [sic], one public university withdrew from
> discussions, primarily because they were not persuaded
> that they had any obligation to comply with the
> copyright law. After the appellate decision upholding
> the original finding, a second public university
> terminated discussions of a possible photocopy license,
> citing the conviction of their legal staff that the

---

33/ Cardinal Industries, Inc. v. Anderson Parrish Assoc.,
discussed in Copyright Office Report at 95.

34/ BV Engineering v. UCLA, 858 F.2d at 1395.

35/ Lane v. First National Bank of Boston, 687 F.Supp. at 13.

> copyright law did not apply to them. As a result, the
> pilot phase of this important program will include only
> private universities, which will significantly limit
> the scope and comprehensiveness of the data CCC will be
> collecting on photocopying practices.36/

This potential for unanswered violations of the
copyright laws by state entities could have a substantial impact
on publishers, software companies, and other copyright owners
whose businesses rely, in whole or in part, on public
universities or other state agencies. Small companies, in
particular non-profit scholarly presses or other small
university textbook publishers, could be put out of business if
the states engage in wholesale copying of their property with
impunity. Even if they survive, this loss of business would
ultimately result in higher costs which would have to be passed
on to consumers in the form of higher prices.

The absence of damage relief would also have a
devastating impact on individual creators, such as textbook
authors, poets, anthologists, essayists, and other writers and
researchers whose markets center on college campuses and who
rely heavily on income generated from their royalties. As the
President of the Textbook Authors Association has written:

> Most textbook authors have regular teaching jobs. In
> fact, it is almost necessary that they do. If they

36/ Letter from Eamon T. Fennessy, President of the Copyright
Clearance Center, Inc., January 3, 1989, to Ambassador
Nicholas A. Veliotes, President, Association of American
Publishers (see Attachment B).

**ATTACHMENT B**



# COPYRIGHT CLEARANCE CENTER, INC.

27 Congress Street, Salem, Massachusetts 01970

Telephone: (508) 744-3350  FAX: (508) 741-2318

January 3, 1989

<u>VIA FAX MACHINE</u>

Ambassador Nicholas A. Veliotes
President
Association of American Publishers
2005 Massachusetts Ave., NW
Washington, DC 20036

Dear Nick:

I understand that the Association of American Publishers has joined other
organizations in supporting congressional efforts to remove any appearance of
an exclusion of state entities from the copyright law.  CCC supports these
efforts; our recent experience suggests that confusion over the scope of the
law has already resulted in violations of the intent and spirit of existing
legislation.

Over the last several years, CCC has focused substantial resources on
developing a photocopy license for universities, which would parallel our
existing successful licensing program for corporations.  Substantive,
high-level discussions of the program have been conducted with major private
and public universities.  Following the original decision in UCLA v. BV
Engineering, one public university withdrew from discussions, primarily
because they were not persuaded that they had any obligation to comply with
the copyright law.  After the appellate decision upholding the original
finding, a second public university terminated discussions of a possible
photocopy license, citing the conviction of their legal staff that the
copyright law did not apply to them.  As a result, the pilot phase of this
important program will include only private universities, which will
significantly limit the scope and comprehensiveness of the data CCC will be
collecting on photocopying practices.

I trust that this information will be of value to the AAP and others who
endorse immediate clarifying action in this important domain.  Please feel
free to share it whenever and wherever it will serve our common goals.  CCC
stands ready to provide any additional support or information which may be
necessary.

Very truly yours,

Eamon T. Fennessy
President

ETF/js

DIRECTORS ■ Bradford Wiley Chairman John Wiley & Sons Inc   Peter F. Urbach Vice Chairman Reed Publishing U.S.A   Eamon T. Fennessy President ■ Desmond Reaney Elsevier Science Publishing Co., Inc   Charles A. Ellis Information Handling Services   Warren F. Kicklite III Bantam/Doubleday   George L. Finnegan The Information Industry Assoc ■ Donald Frank The Authors League of America Inc   Alexander G. Hoffman Publishing Consultant   Donald W. King Institute for   Bernard D. Hughes Consulting   Robert W. Harris Harcourt Brace Jovanovich   Robert H. Marantz Pergamon Group   Raynard E. Sumner John Wiley & Sons Inc   Ralph B. Bermel Nelson-Hall Inc   Leon L. Snyder Ray Consulting of New York and The Authors Guild Inc   David E. Boege Association of American and University Presses Inc   Bernard Udell Harcourt Brace Jovanovich Inc   Abelardo van Hagen Springer Verlag New York Inc

1.      In your opinion, why are statutory damages a necessary
        element of infringement suits against states?

Answer:

        As it discussed in the written testimony of the
Copyright Remedies Coalition (CRC) (p. 15), damages for
copyright infringement must be available because injunctive
relief is simply not sufficient to protect the interests of the
copyright owners and ultimately the public.

        Two additional points bear special mention with regard
to statutory damages.

        First, when Congress enacted the 1976 Copyright Act,
it made statutory damages an integral part of the new law's
remedy provisions. Congress recognized the difficulties
inherent in proving damages in copyright infringement cases and
it did not want plaintiffs who have proven copyright
infringements to be left with no adequate remedy under the
Copyright Act. These difficulties exist independently of the
nature of any particular defendant. Actual damages are hard to
prove with precision against an individual, corporation or
state. In the absence of statutory damages, these difficulties
will make copyright owners reluctant to bring lawsuits to
protect their property. Moreover, the harm to copyright owners
is no less because the violation was caused by a state, as
opposed to a non-state employee.

        Second, it is imperative to note that the scope and
availability of statutory damages is limited by two key
provisions in the law. The first is the so-called "innocent
infringer" provision which provides:

                In a case where the infringer sustains the burden
                of proving, and the court finds, that such
                infringer was not aware and had no reason to
                believe his or her acts constituted an
                infringement of copyright, the court in its
                discretion may reduce the award of statutory
                damages to a sum of less than $200.

Thus, in those instances where a infringer, including a state
employee, unwittingly violates the Act, the extent of monetary
liability is already limited.

        In addition, statutory damages are simply not
available in certain situations that are extremely relevant
here. Basically, under the law a court is precluded from
awarding statutory damages, for example, where an employee or
agent of certain non-profit institutions, including educational
institutions (whether or not they are state-run), acting within
the scope of his or her employment, reasonably believed that
infringing use of a copyrighted work was a fair use.

Senator DeConcini. Thank you very much, Mr. Healy.
Mr. Schmitz.

## STATEMENT OF ROBERT A. SCHMITZ, CHAIRMAN, PRESIDENT AND CHIEF EXECUTIVE OFFICER, RICHARD D. IRWIN, INC., HOMEWOOD, IL

Mr. Schmitz. Good morning, Mr. Chairman. Thank you for the opportunity to share my views on this important bill.

I am here on behalf of my company, Richard D. Irwin, which is a publisher of college textbooks and general business books, and also on behalf of its authors, the Association of American Publishers, which is an organization which represents most of the publishers in the United States, including large and small publishers, for profit, not for profit, university presses, and the Copyright Remedies Coalition, which is a group of parties interested in protecting their copyrights.

Richard D. Irwin devotes most of its attention to college publishing. It is 85 percent of our business, of which 80 percent goes to State institutions. Therefore, I have a keen interest in the passage of S. 497.

We are concerned about the impact of recent court decisions which allow the State institutions to copy textbooks and reference materials without sanction. We need meaningful sanctions to deter the inappropriate use of our books and materials.

As it is, we have enough trouble policing and protecting our copyrights. Faculty are often unaware of their responsibilities under the act. We have had several requests in the past few years from professors wishing to take part of two or more books. When we deny the approval, they tell our sales representatives that they are going to go off and do it anyway, if we will not, and they will go into competition with us. They do not recognize that in that process, they are saying that they have an intent to violate the Copyright Act.

With great frequency, we see what we call anthologies appearing on college campuses, which again are put together without our permission. Without this act, therefore, we are concerned that the State institutions may become far too casual and relaxed about our property rights, and that this will foster an attitude among faculty and students to go even beyond where they have gone in the past, so that they will reach a point where their attitude is that they can use our materials without permission for whatever they want to use it for.

In recent efforts in our industry through an organization called the Copyright Clearance Center, we have approached a number of State and private institutions to sell licenses for all of our material so that they could have ready access to that material. During those negotiations, two State institutions said, "We don't understand why we should pay a license for this, because as we now understand the impact of the precedents in some recent court cases, we really are not obligated to comply with the Copyright Act."

That attitude is one that causes us great concern. It is not highly prevalent, but its mere existence is one that leads us to be concerned about what might happen in the future.

**IRWIN**

Richard D. Irwin, Inc.
1818 Ridge Road
Homewood, IL 60430
312 206-2294

June 5, 1989

Robert A. Schmitz
Chairman, President and
Chief Executive Officer

The Honorable Dennis DeConcini
Chairman
Subcommittee on Patents, Copyrights
  and Trademarks
United States Senate
Washington, D.C.  20510

Dear Senator DeConcini:

Thank you for your letter of May 19, 1989.  I appreciate the interest
which you have shown regarding the Copyright Remedy Clarification Act (S.
497).  As you requested, following are my answers to your supplemental
questions:

1.  If the Congress fails to enact Senate Bill S. 497, I
    believe that we will see a rapid erosion in the respect
    for copyrights at major state institutions.  As I
    mentioned in my testimony, there is already evidence
    that copying of materials to avoid the purchase
    of textbooks is widespread at major state and private
    institutions in the United States.  In addition, at many
    of the state institutions the university copy centers and
    university owned bookstores are preparing to improve their
    copying services to faculty and students.  In particular,
    I am concerned about the establishment of copy centers at
    major university owned bookstores.  If these bookstore
    copy centers believe that they have no responsibility
    nor liability for copying material from our textbooks,
    they will increase their copying of our materials to
    avoid the purchase of textbooks.  They are able to produce
    these custom books at a cost to students that is below the
    retail price of our textbooks.  They can do so because
    they are not obligated to pay royalties, do not incur any
    of the expensive development costs associated with preparing
    a book, and do not incur any of the marketing/selling
    expenses that we, as publishers, incur to make faculty
    aware of our textbooks.  In addition, they do not bear any
    of the costs for the support packages that we liberally
    provide to faculty members who adopt our textbooks.  In
    other words, if S. 497 is not passed, they will provide
    copies of our books on an incremental cost basis while we
    incur the full costs of developing textbooks and providing

         Times Mirror
         Books

## *IRWIN*

The Honorable Dennis DeConcini
June 5, 1989
Page Two

service supports to faculty. I believe that within a year
there will be a serious erosion in the sale of textbooks.
Since current illegal copyright copying activities are done
in an underground way, we have no hard evidence of the scope
of such activities; but, we believe, based on our declining
sales and reports from bookstore managers, that we lost
anywhere from 5 to 10 percent of our sales in 1988 and early
1989 due to illegal copying activities.

Although I believe that the deterioration will be rapid, I am
not aware of any discussions among my colleagues of plans to
cease publication of textbooks. Don't rule that out, however.
If Richard D. Irwin, Inc. found that they were selling no copies
of a textbook, but continued to provide teaching packages to
adopters, we would certainly not have an economic incentive to
keep that book in print. I believe what will happen. Even
before publishers decide to cease publication of textbooks,
they will decide to stop providing the ancillary support
packages to teachers. I think this would put the faculty in
the awkward position of trying to conduct a course with poorly
organized materials, and without the benefit of the teaching
support packages that publishers regularly supply for most of
the major introductory and intermediate level college courses;
i.e., freshman and sophomore level courses.

2. The current situation where a state school can sue a private
   school for copyright infringement seems absolutely ludicrous.
   Although I am not a lawyer, I can hardly believe that Congress
   intended to create such a patently inequitable situation.

3. Injunctive relief is hardly a reassuring remedy for infringement
   of our copyright material. This places an incredible burden on
   us as publishers to know about the incidence of infringement.
   Frequently, copies are made without our knowledge and, if we
   find out about it at all, it may be weeks or months later -
   after the course has been completed and the negative impact on
   our sales has materialized. To provide the policing action
   implicit with injunctive relief is a remedy that would create an
   economic cost almost as onerous as the loss of sales from
   illegal infringement. We need a clear set of rules that

How can a small company like BV possibly defend itself against blatant infringement by such an economic actor? It cannot.

My own company, Pansophic, has faced a similar situation in New Jersey. Again, we must look at the odds. Although we are a $200 million company with 1,500 employees, we face an entity of 100,000 employees with a budget of around $12 billion. We are one of the larger computer software companies, but the State still dwarfs us.

Computerworld, which is an industry periodical, ran a front page story dealing with BV Engineering. We were affected immediately.

We talked earlier about issues that were affecting copyright holders. The State of New Jersey was using one of our products on a trial basis, meaning the they were attempting to decide whether or not they would install the product.

If we succeeded, the State intended to license three copies from Pansophic. After publication of this article, a senior State employee referenced the *BV* case specifically and said that the State no longer intended to license three copies, but only one. Over a month has now passed and the State has yet to purchase any Pansophic products.

We attempted to mitigate this exposure by requiring the State agencies and universities to waive immunity under contractual rights. Without exception, this slows the process significantly. Another example is that since late March we have been negotiating with the University of Oklahoma and there is no resolution in sight.

In our opinion, the State officials are clearly not grasping the fact the software is a very strategic resource of this country. To the extent that we are not fully compensated for our intellectual property, our research and development gets hurt.

We are an unusual industry, in that 15 percent of our sales dollars go back into research and development. We are far above the average of U.S. industry in general.

Third is in regard to the incentive to market. We believe that the lack of passage of S. 497 destroys the incentive of companies to market.

We can raise prices, which is clearly not in the States' best interest. We can simply withdraw and refuse to deal with the States under the current situation, but I think that really damages what the whole Copyright Act was intended to foster, which is dissemination of authorship in an orderly way.

Ultimately, the States will be deprived of use. Surely, nobody wants that.

For some types of software there is no effective defense. Most popular software for personal computers is marketed through chain stores and retail outlets such as Radio Shack, Computerland, Egghead Software, et cetera. Any State employee can simply walk into one of these stores, acquire a copy, go back to the office and simply make as many copies as he so chooses. The self-defenses in this case are useless against this sort of conduct.

Last but not least, the 11th amendment applies equally to U.S. citizens and to citizens of foreign countries who are plaintiffs against us. As I mentioned earlier, 47 percent of our revenue comes from outside the United States. We are fighting for our copyright

**2) Getting meaningful copyright remedies against the states is a paramount business issue. Wholesale taking of software by states constitutes undisguised abuse of businesses, especially small businesses, by government bodies.**

Mr. Chairman, I believe your are already familiar with the facts of the BV Engineering vs. UCLA[5] case, where the university simply duplicated the software of an SPA member company with no license, permission, or payment. The university is hiding behind the Eleventh Amendment at the expense of a very small business. Just look at the disparity in size: BV has revenues of less than $250,000, and only 8 employees. UCLA has some 30,000 students. More to the point, it is part of a university system with nine campuses and over 100,000 students. The whole state has over 300,000 employees and a budget over $40 billion. How can a small company possibly defend itself against blatant infringement by such an economic actor? It cannot. .

My own company, Pansophic, has faced a similar situation in New Jersey. Again, look at the odds: a $200 million company, 1500 employees, against an entity with over 100,000 employees and a budget around $12 billion. We are one of the larger software companies, but the state still dwarfs us.

Last month, shortly after **Computerworld** ran a front-page story detailing the BV Engineering decision,[6] Pansophic was affected immediately. The state of New Jersey was using one of our products on a trial basis. If the trial succeeded, the state intended to license three copies. After publication of the article, however, a senior state employee referenced the BV case specifically and said that the state no longer intended to license three copies but only one. Over a month has now passed and the state has yet to purchase any Pansophic products.

Pansophic attempts to mitigate its exposure by requiring state agencies and universities to waive contractually any immunity rights they may have. Without exception this slows the sales process significantly. For example, Pansophic has been negotiating with the University of Oklahoma since late March over this single issue and there is no resolution in sight.

---

5. supra note 1.

6. Mitch Betts, "Loophole lets states copy without risk," **Computerworld**, March 27, 1989, pp. 1, 6.

Questions for Mr. David Eskra:

1.   Mr. Eskra, in your opinion, how much infringement should
     Congress tolerate before it should act?

Answer:

     Mr. Chairman, I believe that there is no need for Congress to
tolerate any infringement before acting to make it clear that
there is not a duel standard for copyright liability, one for
states and another, stricter one for everyone else.

     As I indicated in my testimony, my company already is
experiencing problems in dealing with certain representatives of
state governments in negotiating sales of software, even though
the judicial precedents which are the focus of your bill are less
than a year old.

     Quite apart from the fact that we now have evidence that some
state government employees do intend to treat their copyright
responsibilities differently as a result of these recent court
decisions, I believe that the failure of Congress to act quickly,
could suggest to the public in general that copyright infringement
is not an issue to be taken seriously.  This would have a
detrimental effect on respect for copyright, even among commercial
users.  The result would be the unraveling of copyright protection
in the United States at precisely the time when it has taken on
its greatest importance, historically, as a necessary incentive to
very important industries.

2.   Mr. Eskra, do you believe that the reason that no state
     government or association representing states has opposed
     restoration of state liability either at the Copyright Office
     or in Congress, is because they realize, as you clearly point
     out in your statement, states may find themselves without
     access to the very important copyright material they need?
     The states themselves realize that they stand to lose more
     from unrestricted infringement than they stand to gain?

Answer:

     Yes, Mr. Chairman I believe that you have identified a major
reason state governments have not officially opposed this
legislation.  However, I believe that there are at least two other
reasons.

     The first reason was given to our counsel by a state

legislator who serves on the Law and Justice Committee of the National Conference of State Legislatures. Following a recent meeting at which the Law and Justice Committee considered S.497 and decided not to oppose the legislation, this particular legislator summed it all up in stating, "Sovereign immunity is not a license to steal."

The second reason is that state governments reflect the thinking of their citizens who in many cases are creators and creative industries which rely on the incentives and protection of the copyright law and in other cases are citizens who understand the unfairness and injustice which result from double standards.

Additional Questions for Panel II:

1.  In your opinion, why are statutory damages a necessary element of infringement suits against states?

Answer:

Mr. Chairman. To the extent that Congress determined many years ago that statutory damages provided the most workable system of remedies in copyright infringement cases, there is no reason to distinguish between state governments as defendants and others. Remember that a major reason for any system of damages is to make whole a plaintiff who has suffered a loss as a result of illegal or tortious conduct of another party. I can see no reason why creators who have been harmed by infringement should be denied the right to be made whole simply because the perpetrator of the infringement was an employee of state government.

A major reason for the use of statutory damages in copyright infringement cases is difficulty of determining actual losses in such cases. That is not to say that actual loss does not occur, but often it is difficult to quantify. Because of this, Congress has determined that the most efficient system of damages in copyright infringement cases is a system of statutory damages.

It also should be remembered, Mr. Chairman, that we are not talking about large amounts of money. Currently, statutory damages for non-willful infringement range from $500 to $20,000, at the discretion of the court, for each infringed work. Furthermore, if the court finds that the defendant "was not aware and had no reason to believe his or her acts constituted an infringement" damages may be reduced to $200. Under these circumstances, I do not believe that it is reasonable to relieve states from the same obligations other litigants incur in infringement suits.

2.  Do you see any difference between suing private companies and public institutions for damages? Doesn't it make some sense to you that taxpayers and state treasuries shouldn't be

liable for damages resulting from the actions of state
employees? Weren't many of the infringement cases that have
been brought the result of infringements by non-elected,
non-policy making state employees, just trying to do their
best to serve the people of the state? Why should the
taxpayers be liable for their mistakes.

Answer:

Mr. Chairman, I do not see any difference between suing
private companies and public institutions for damages. If one of
the 1200 employees of my company infringes a copyright or commits
a tort, the company and its stockholders bear the responsibility.
The same is true of governmental entities. Indeed, in many areas
of law state governments are regularly sued for the tortious
conduct of their employees. If taxpayers bore no responsibility
for the actions of state employees, then managers of those
employees would have absolutely no incentive to require prudent
conduct, including respect for copyrights.

There is a second consideration which is raised in your
question, Mr. Chairman, which I believe also requires comment.
You have raised the issue of whether actions of non-policy level
state employees should be treated differently from the actions of
policy makers. While I believe that in the case of copyright
infringement the answer is no, I would observe that the basis for
the problem addressed by your legislation is the tension between
the federal legislative power and states' rights under the
Eleventh Amendment. Certainly, to the extent that there is any
Eleventh Amendment argument in support of different treatment for
states, it lies in the area of policy making and the prerogatives
of state policy makers, rather than in the area of activities
routinely carried out by state employees.

Senator DECONCINI. Mr. Eskra, thank you very much.

Your last point is one that I think we need to follow up on. Many countries that we do business with, heavy in the area of competition and copyright material, have State enterprises. If State immunity is permitted to stand in our country, then it would certainly be a temptation for other countries to pass laws allowing immunity for any State enterprise, would it not?

Mr. ESKRA. Yes, sir. We have plenty of examples of that in countries like France and England.

Senator DECONCINI. Mr. Eskra, subsequent witnesses will testify that S. 497 is premature because there is no data available regarding infringing by States on copyright material. In your testimony you clearly gave us a couple of examples of problems that you are facing already, both in New Jersey and Oklahoma. Is it your understanding that such problems are widespread, and are they increasing?

Mr. ESKRA. They are clearly widespread and they are clearly increasing. We are talking about issues that are only within the past several months. I think the tip of the iceberg is only now beginning to show.

Basically what it is causing is that contract negotiations, as I said in my testimony, are lengthening, and the States and the universities are being deprived of the use of these products, which they clearly desire to use.

Senator DECONCINI. Mr. Healy, is it your perception that schools and teachers may infringe on your copyright material out of ignorance of the copyright law or out of inadvertence, or is it that they are carefully guided and counseled that they can infringe?

Mr. HEALY. I have had experience with both the ignorant and those who willfully and knowingly do it. Let me give you a couple of quick examples.

I visited a major metropolitan school system and the director of audiovisuals for the entire school system brought me into a room and showed me a machine that we call a macrobuster. Many of the products we put out have macrovision which protects the film from being copied, but as soon as you come up with something like that, someone finds some way to unscramble it.

He knocks them right off and has no qualms about it. He says that they can not afford it, so they copy them.

Senator DECONCINI. So you have some experience with people just blatantly using what the law now permits them to do in the sense that they are getting something for nothing?

Mr. HEALY. That is exactly right. Also, when we have a program broadcast—many of our programs are in series—and they will call up saying, "We missed the taping of two and three. When are they going to be on again so we can tape them? We only got one, five and six." You just want to say to them that this is totally illegal and you should not be copying this. It is copyrighted by us and if you want to purchase it——

Senator DECONCINI. Now who is doing that?

Mr. HEALY. People who watch television or educators.

Senator DECONCINI. Are they doing it just for their own private use?

That is that there may be some agreement for something less than S. 497.

Senator DeConcini. But you would like to wait before we pass anything to see if this is really a big problem?

Mr. Steinhilber. For S. 497 in its current form, that is correct.

Senator DeConcini. Have you got a quantity of how much infringement it would take for you to conclude that, yes, it is a problem and now we need to deal with it or negotiate, or maybe even pass S. 497?

Mr. Steinhilber. Let me bifurcate the question, if I may. If you are asking the question, what about infringing, then I have problems with my members constantly, not necessarily in issues of institutional infringing, but individuals going out and infringing. We have a regular process of telling them, no.

Indeed, we have suggested to school systems a local policy for anybody who violates copyright law. Not only is it a violation of Federal law, but it also is a violation of school policy, which means that you can have disciplinary action within the school system for violating that law, just like you would with any other violation.

I do not want to get into the violation of individual infringements, but if you are talking about institutional infringement——

Senator DeConcini. I am talking about institutional infringement. How much would it take for you——

Mr. Steinhilber. Not very much. If I saw half a dozen State AG's coming forth and saying, "We advise you that the law does not apply, so therefore, you can do anything with impunity," I would be the first one here saying you should pass it.

Senator DeConcini. If you saw 6 out of the 50 States with public entities of some nature taking the position that "the law makes us immune, nobody can do anything to us"—then that would change your mind?

Mr. Steinhilber. That would change my mind.

What we have found where we have had to do some correction is where a director of audiovisuals for a university read something in some news media that they are no longer under copyright. Then we have to inform them that they are.

What happens is that they may make a statement to a sales person saying, "We are not under copyright," but that is not an institutional decision. That happens to be one individual.

Senator DeConcini. It seems to me that approach puts the universities or the public entities that you represent in a very precarious position of waiting for advice that they can go ahead and infringe all they want because the law happens to be on your side now, even though it is not right.

Mr. Steinhilber. That is not the advice we are giving. In fact, after these last couple of decisions have come up, there have been articles both in the Chronicle of Higher Education, written by representative higher education, and also there was an article that I wrote for our own publications for every school system in the United States—not to infringe. There was a publication that was produced by the American Library Association that went out last fall—not to infringe.

Senator DeConcini. So your position is, don't do it, but don't make it against the law?

## HUNTON & WILLIAMS

Senator Dennis DeConcini
June 5, 1989
Page 3

Anderson also expected to license reproduction rights to some of the other images from the job on a case-by-case basis. Such licensing, known as "stock photography", represents an important part of the income base of many photographers. It has spawned a whole industry of "stock photography houses" which act as agents for the existing work of photographers, supplementing the photographers' assignment income and in some cases greatly exceeding it. Many photographers consider "stock" to be their retirement plan. Most successful photographers point to the cushion that stock brings as the reason for their longevity in the business.

When, after several months, the images were not returned to him, Anderson began the attempt to retrieve them. Eventually, his photographs were reproduced using a different brochure and in a mailing -- uses that were not contemplated by Anderson's agreement with the University. Anderson thereafter filed a copyright infringement suit which sought injunctive relief and monetary damages. When Radford returned the photographs, injunctive relief became unnecessary, and the dispute centered upon the question of Anderson's entitlement to damages.

Ultimately the Fourth Circuit held, as others have, that Radford University, its governing board and one of its officials sued in her official capacity were immune from damages under the Eleventh Amendment. While the state official remained amenable to a claim for damages in her individual capacity, the practical effect of the decision was to deprive Anderson of any reasonable chance of obtaining damages for the state institution's blatant and willful infringement.

Anderson's plight is unfortunately not unique. Many ASMP members take photographs for state entities, and the photographers often retain their copyright rights and simply license certain uses of the images. The rights of every one of those photographers is at risk under current law, because the state entities can and routinely do exceed the scope of the authorized uses by distributing the images for many unlicensed purposes.

Not only are photographers unable to obtain damages for these acts of infringement, the states' immunity also means that the value of the copyright rights themselves will be irretrievably damaged. No photographer can compete with his own images when they are freely distributed by a state institution for its own purposes.

confidence bounds and graphs of the dose-response functions fit to the data provided by the user. The functions which TOX__RISK can fit to the data are the Multistage, One Stage, Two Stage, Three Stage, Four Stage, Five Stage, Six Stage, Weibull, Mantel-Bryan and Log-Normal models. By the nature of the design of the program it is intended to be used by a select group of scientists rather than the general population. To date university, government and non-profit agencies account for approximately 40 percent of sales.

This entire program has been seriously impacted by the decisions in B.V. Engineering V.U.C.L.A., 657 F.Supp. 1246, Aff'd ___ F.2d ___ (9th Cir. 1988) cert. denied, ___ U.S. ___ (1989), because many research scientists who would use this product are employed by state institutions.

On several occasions various branches of the University of California have initiated purchase of TOX__RISK for use in their research work. Most efforts were thwarted by university council who refused to sign the sublicensing agreement which was negotiated between EPRI and Clement Associates, Inc. Specific campuses involved are the University of California at Riverside and the University of California at Los Angeles. We have a similar problem with Los Alamos National Laboratory which is currently operated by the University of California as prime contractor.

Because of the BV Engineering decisions, we have required state institution to obtain an effective waiver of their rights under the Eleventh Amendment before contracting for this product. The states have not been able to comply. Use of this valuable tool has been lost. Research has been impeded by the absence of this