# COPYRIGHT REMEDY CLARIFICATION ACT AND COPYRIGHT OFFICE REPORT ON COPYRIGHT LIABILITY OF STATES

# HEARINGS

**BEFORE THE**

## SUBCOMMITTEE ON COURTS, INTELLECTUAL PROPERTY, AND THE ADMINISTRATION OF JUSTICE

**OF THE**

## COMMITTEE ON THE JUDICIARY

## HOUSE OF REPRESENTATIVES

### ONE HUNDRED FIRST CONGRESS

FIRST SESSION

ON

## H.R. 1131

COPYRIGHT REMEDY CLARIFICATION ACT

APRIL 12 AND JULY 11, 1989

### Serial No. 42

COLUMBIA UNIVERSITY
LAW LIBRARY

MAR 0 9 1990

U. S. DEPOSITORY
COPY



Printed for the use of the Committee on the Judiciary

**U.S. GOVERNMENT PRINTING OFFICE**

24-606 ≈          **WASHINGTON : 1990**

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

27
.J857
1989 ;;

## COMMITTEE ON THE JUDICIARY

JACK BROOKS, Texas, *Chairman*

ROBERT W. KASTENMEIER, Wisconsin
DON EDWARDS, California
JOHN CONYERS, JR., Michigan
ROMANO L. MAZZOLI, Kentucky
WILLIAM J. HUGHES, New Jersey
MIKE SYNAR, Oklahoma
PATRICIA SCHROEDER, Colorado
DAN GLICKMAN, Kansas
BARNEY FRANK, Massachusetts
GEO. W. CROCKETT, JR., Michigan
CHARLES E. SCHUMER, New York
BRUCE A. MORRISON, Connecticut
EDWARD F. FEIGHAN, Ohio
LAWRENCE J. SMITH, Florida
HOWARD L. BERMAN, California
RICK BOUCHER, Virginia
HARLEY O. STAGGERS, JR., West Virginia
JOHN BRYANT, Texas
BENJAMIN L. CARDIN, Maryland
GEORGE E. SANGMEISTER, Illinois

HAMILTON FISH, JR., New York
CARLOS J. MOORHEAD, California
HENRY J. HYDE, Illinois
F. JAMES SENSENBRENNER, JR., Wisconsin
BILL McCOLLUM, Florida
GEORGE W. GEKAS, Pennsylvania
MICHAEL DeWINE, Ohio
WILLIAM E. DANNEMEYER, California
HOWARD COBLE, North Carolina
D. FRENCH SLAUGHTER, JR., Virginia
LAMAR S. SMITH, Texas
LARKIN I. SMITH, Mississippi
CHUCK DOUGLAS, New Hampshire
CRAIG T. JAMES, Florida

WILLIAM M. JONES, *General Counsel*
ROBERT H. BRINK, *Deputy General Counsel*
ALAN F. COFFEY, JR., *Minority Chief Counsel*

## SUBCOMMITTEE ON COURTS, INTELLECTUAL PROPERTY, AND THE ADMINISTRATION OF JUSTICE

ROBERT W. KASTENMEIER, Wisconsin, *Chairman*

GEO. W. CROCKETT, JR., Michigan
HOWARD L. BERMAN, California
JOHN BRYANT, Texas
BENJAMIN L. CARDIN, Maryland
RICK BOUCHER, Virginia
GEORGE E. SANGMEISTER, Illinois
WILLIAM J. HUGHES, New Jersey
MIKE SYNAR, Oklahoma

CARLOS J. MOORHEAD, California
HENRY J. HYDE, Illinois
HOWARD COBLE, North Carolina
D. FRENCH SLAUGHTER JR., Virginia
HAMILTON FISH, JR., New York
F. JAMES SENSENBRENNER, JR., Wisconsin

MICHAEL J. REMINGTON, *Chief Counsel*
VIRGINIA E. SLOAN, *Counsel*
CHARLES G. GEYH, *Counsel*
THOMAS E. MOONEY, *Minority Counsel*
JOSEPH V. WOLFE, *Minority Counsel*

# CONTENTS

## HEARINGS DATES

Page

April 12, 1989................................................................................................................... 1
July 11, 1989.................................................................................................................... 59

## TEXT OF BILL

H.R. 1131........................................................................................................................... 2

## OPENING STATEMENT

Kastenmeier, Hon. Robert W., a Representative in Congress from the State of
Wisconsin, and chairman, Subcommittee on Courts, Intellectual Property,
and the Administration of Justice......................................................................... 1

## WITNESSES

Kutz, Myer, vice president, Scientific and Technical Publishing, John Wiley &
Sons, Inc., on behalf of the Association of American Publishers (chairman
of the Copyright Committee) and the Copyright Remedies Coalition................ 103
Lee, Carol F., Esq., Wilmer, Cutler & Pickering........................................................ 60
Oman, Ralph, Register of Copyrights, Library of Congress, accompanied by
Dorothy Schrader, General Counsel, Copyright Office........................................ 5
Ringer, Barbara, Esq., former Register of Copyrights, Library of Congress......... 81
Steinhilber, August W., Esq., general counsel, National School Boards Asso-
ciation, on behalf of the Educators' Ad Hoc Committee on Copyright Law..... 150
van den Berg, Bert P., president, BV Engineering Professional Software, on
behalf of the Software Publishers Association and ADAPSO, the Computer
Software and Services Industry Association......................................................... 139
Wagner, Allen, Esq., university counsel, University of California, Berkeley,
CA, on behalf of the Regents of the University of California............................. 167

## LETTERS, STATEMENTS, ETC., SUBMITTED FOR THE HEARINGS

Kutz, Myer, vice president, Scientific and Technical Publishing, John Wiley &
Sons, Inc., on behalf of the Association of American Publishers (chairman
of the Copyright Committee) and the Copyright Remedies Coalition:
    Prepared statement ................................................................................................ 106
    Statement of the Copyright Remedies Coalition with attachments............... 112
Lee, Carol F., Esq., Wilmer, Cutler & Pickering: Prepared statement with
attachment..................................................................................................................... 63
Oman, Ralph, Register of Copyrights, Library of Congress, accompanied by
Dorothy Schrader, General Counsel, Copyright Office:
    Additional views...................................................................................................... 39
    Prepared statement ................................................................................................ 10
Ringer, Barbara, Esq., former Register of Copyrights, Library of Congress:
    Prepared statement ................................................................................................ 84
Steinhilber, August W., Esq., general counsel, National School Boards Asso-
ciation, on behalf of the Educators' Ad Hoc Committee on Copyright Law:
    Prepared statement with attachment................................................................... 153
    Response to question from Congressman Sangmeister..................................... 184
van den Berg, Bert P., president, BV Engineering Professional Software, on
behalf of the Software Publishers Association and ADAPSO, the Computer
Software and Services Industry Association: Prepared statement...................... 141

Page

Wagner, Allen, Esq., University counsel, University of California, Berkeley, CA, on behalf of the Regents of the University of California: Prepared statement with attachments ........................................................................................... 169

## APPENDIX

Letter from Kathie Abrams, president, Graphic Artists Guild, to Chairman Kastenmeier, April 19, 1989, with attachment ...................................................... 187
Letter from Jeff Hyche, director, Governmental Relations and Policy Services, Alabama Association of School Boards, to Hon. Glen Browder, a Representative in Congress from the State of Alabama, May 31, 1989............................... 191
Letter from Robert D. Evans, director, American Bar Association, Government Affairs Office, to Chairman Kastenmeier, March 24, 1989, with attachment ............................................................................................................... 192
Letter from John F. Heffinger, vice president/publisher, Red Book, Maclean Hunter Market Reports, Inc., to Chairman Kastenmeier, May 1, 1989, with attachment ............................................................................................................... 197
Letter from Chairman Kastenmeier to Hon. Nicholas Mavroules, a Representative in Congress from the State of Massachusetts, July 10, 1989, with attachments.............................................................................................................. 203
Statement of the Computer and Business Equipment Manufacturers Association (CBEMA)............................................................................................................... 237
Statement of Steven L. Mandell, Esq., Marshall & Melhorn, Toledo, OH, and professor of information systems, Bowling Green State University .................. 243

tive relief is neither an adequate remedy nor a deterrent. The small companies especially voice this fear and said they lacked the resources to battle States. One comment warned that if foreign publishers, as well as domestic publishers, couldn't sue the States, it would provoke retaliation by U.S. trading partners and impede efforts to acquire better protection abroad.

Finally, Mr. Chairman, several comments admonished that companies will not market or will closely monitor their sales to States if this decision holds; that prices of products to users other than States will likely increase; that the rights of third parties will be violated, particularly with regard to databases and permission fees paid to the authors; and that the economic incentive and ability to create will be diminished.

After analysis of the comments, the Copyright Office concluded, Mr. Chairman, that copyright proprietors demonstrated at least the potential for harm unless States are held accountable in damages for the infringement of copyrighted works. Certainly, Congress can make its own judgment on this score. In any case, the Office concludes that Congress intended to expose the States to this liability.

Mr. Chairman, your bill, the Copyright Remedy Clarification Act, H.R. 1131, would clarify that State and State instrumentalities are fully subject to suit in Federal court if they infringe copyrights or mask works. In other words, it would cure the doubt that was raised by the Supreme Court in its 1985 decision in *Atascadero State Hospital* v. *Scanlon,* which requires that Congress' intent to abrogate the eleventh amendment immunity be clearly expressed in the language of the statute. The Copyright Office supports enactment of H.R. 1131.

Owners of copyright and mask works would have available to them the full panoply of civil remedies: Injunctive relief, actual and statutory damages, and seizure of infringing articles. Of course, no criminal penalties apply. In the case of copyrights, criminal penalties apply only to commercial activities. In the semiconductor area, as you know as the author of the bill, Mr. Chairman, the Semiconductor Chip Protection Act contains no criminal penalties.

The bill, if enacted, would not apply to cases filed before the date of enactment. The Copyright Office supports this limited qualification on retroactivity. As I understand the provision, the intent is to avoid interference with any pending cases. This provision does not mean that States cannot be sued for past infringements, subject, of course, to the statute of limitations found in section 507 of the Copyright Act. It is entirely appropriate that the Copyright Remedy Clarification Act have limited retroactive effect since it only clarifies the intent of the Congress in 1976.

In conclusion, Mr. Chairman, let me make a few general comments. As I have said, authors and copyright proprietors have demonstrated at least the potential for harm from the uncompensated use by States and State entities of works protected under the Federal Copyright Act. Arguably, the public might lose out as well if this case law is followed. Other groups of consumers could wind up bearing the brunt of increased costs and, without compensation,

Mr. KASTENMEIER. As I understand your oral report, thus far there have not been any significant number of wholesale takings of copyright rights by States or State entities, although there may have been some instances. But there is an enormous potential that exists here; that is to say, the potential for doing so is obvious and, at the very least, reading between the lines, I would gather that the copying generally complained about by State entities, libraries, perhaps educational institutions, et cetera, seems to be on the increase with respect to fair use. And, if we do not do anything here, the very least we will see is sort of an expansive fair use doctrine in terms of reproduction of materials which may or may not exist outside of relying on the eleventh amendment

But that, I suspect, would serve at least to create an atmosphere, an environment in which we would see unwarranted reproductions of materials in a much more liberalized way than is contemplated by the law so long as one can use the eleventh amendment as an out. Would you not agree?

Mr. OMAN. I would agree. And I think it is important to make it clear that it was your intention, and that the States should be very conscious of their responsibilities under the law. There are those who argue that the opportunity for monetary damages to be assessed against the officials themselves is a sufficient deterrent. But I think unless there is the larger possibility of liability of the States the States won't take their responsibility as seriously as they should.

Let me ask Ms. Schrader to comment further on that point, as the author of the report.

Mr. KASTENMEIER. Ms. Schrader.

Ms. SCHRADER. Well, thank you very much. Of course, the author of the report is Mr. Oman; then several people on the staff assisted very ably. Ms. Andrea Zizzi is certainly one of those, and she isn't with us because she is on maternity leave.

I would really have nothing further to add to the excellent statement that the chairman has made and that Mr. Oman has agreed with. I think that the chairman's point is excellent. If one can escape into the eleventh amendment as a last resort, the chances are that there might be a tendency for the States, at least some individual State officials to engage in extremely broad interpretations of fair use.

Mr. KASTENMEIER. We sort of have a paradox here. You indicate that there is really no opposition to the legislation, as you have noted, by States or State entities, and yet at the same time, at least generally with respect to the eleventh amendment, we have seen a number of suits pursued in which States or State entities presumably have been parties, and they have been pursued rather successfully. So there seems to be, without close analysis, a difference in terms of what the States are interested in, in terms of the eleventh amendment immunity, and then whether or not they have any objection to this type of legislation.

Can you reconcile the two apparent differences?

Mr. OMAN. Based on my experience as a litigator in the Justice Department, lawyers clearly like to win and they will do whatever they can to win. You would take advantage of every opportunity in the law to win, and if this is an opportunity for them to win their

Ms. SCHRADER. At this point, of course, the two things are coming together very closely. The Supreme Court has heard oral argument. We assume that the Court will announce its decision before the end of the term, which is coming up at the end of June. So, it is really a question of whether you want to go ahead with the bill now in this time period or possibly wait until after the end of the Supreme Court term when we should have the decision in *Union Gas.*

Mr. KASTENMEIER. Do I understand that response to mean we ought to wait until after the decision?

Ms. SCHRADER. My own answer is I would go ahead and pass the legislation, because it is simply a clarification of what you intended in 1976. Let's hope, frankly, that the Court reaches the decision in *Union Gas* that you have the power to abrogate State immunity.

Mr. KASTENMEIER. Thank you. The gentleman from North Carolina.

Mr. COBLE. Thank you, Mr. Chairman.

Mr. Oman and Ms. Schrader, I arrived belatedly because of a vote on the floor, and someone may have mentioned this. If they did, I will be repetitive.

I want to commend you all for the report that you submitted last summer, Mr. Oman, under your signature. I am sure Ms. Schrader and your colleagues had a significant hand in it. But I think it was a very well written document, and it was very helpful and I thank you for having done it.

The chairman has pretty well covered the field here, I think, but let me ask a question or two.

Essentially, this bill is a reaffirmation of Congress' intent in the 1976 Copyright Act. And having said that, Mr. Oman and/or Ms. Schrader, am I correct in concluding that it in no way proposes to change or alter the substantive rights of copyright owners?

Mr. OMAN. That is a correct assumption. What you are doing is, really, clarifying your intent, which everybody understood to be the intent of Congress back in 1976. This bill really should come as no surprise to anyone, the State governments, State officials or the copyright proprietors.

Mr. COBLE. One final question, Mr. Chairman. This will extend the question that the chairman put to you regarding the States' attitude about this.

During the time that you all solicited public comments on the issue, some States submitted copies of briefs that had been filed in the defense of copyright infringement actions. Were these States advocating the position that they should in fact be immune from liability under the Copyright Act for whatever reasons?

Mr. OMAN. Yes, sir. They were defending against a suit for copyright infringement on the basis that they were immune under the eleventh amendment. This was their legal position in court. They had to be consistent with that position. They submitted copies of the briefs they had submitted to the court, and that was their position.

Mr. COBLE. Well, let me take that one step further, then. If I recall your response to the chairman's question, you don't anticipate any problems from the States. Or do you?

Mr. OMAN. As long as the bill is prospective, as it is, and it won't mean that they lose cases that are now before the courts because the rule would be changed after they have made their legal arguments, I don't think that they will come in and urge that the States be immune from suit.

Mr. COBLE. OK. That is what I am driving at. Thank you, sir. Thank you, Ms. Schrader. Thank you, Mr. Chairman.

Mr. KASTENMEIER. The gentleman from Illinois, Mr. Sangmeister.

Mr. SANGMEISTER. Thank you, Mr. Chairman. First, I would like to ask you a question because I am unfamiliar with the procedure here. When a piece of legislation like this is introduced, in addition to the regular notices that go out to everyone who wants to attend this hearing, and seeing that there is no opposition here from the States, do the respective attorneys general or whatever may be the designated office for that State, receive a particular notice that this type of legislation is pending before this committee?

Mr. KASTENMEIER. Not generally. It is assumed that parties in interest who follow this issue are aware of it.

Mr. SANGMEISTER. We don't send a direct notice to each of the States when they are affected by something like this?

Mr. KASTENMEIER. No.

Mr. SANGMEISTER. I am not saying we should. I am just trying to find out what the procedure is.

Then to the witnesses, I apologize for getting here late.

You know, when I see a piece of legislation like this, I am sure that we are not involved in this because we want some academic matter to be put before the Supreme Court again to litigate to see where the States and the Congress are going to stand on this kind of legislation. So, if you have already told the committee this, then don't repeat it just for my benefit. But my reaction here is, why do we need this? I mean, where are the abuses throughout the United States that we need this kind of legislation?

Mr. OMAN. For one thing, the legal theory is relatively recent and I suspect that, as Chairman Kastenmeier mentioned in his statement, they might start taking further advantage of the lack of liability by having broader and broader rationales or interpretations of the fair use concept. They will walk closer to the precipice since the fear of—or the consequences of, or the dangers of—falling over the edge into illegal activity won't be quite as bad as they would be if they were exposed to monetary damages. They will pull back from the precipice——

Mr. SANGMEISTER. If I may interrupt, what you are saying then is there is nothing on the scene where the States have abused or have been taking advantage of what we ought to be stopping here. This is all on the theory that the States may or could do this; is that correct?

Mr. OMAN. No. There are several suits pending in court that relate to copyright infringement by the States.

Mr. SANGMEISTER. By the States?

Mr. OMAN. Yes.

Mr. SANGMEISTER. Are those cases cited in your statement?

Mr. OMAN. They are mentioned in the statement.

Mr. SANGMEISTER. They are? I am sorry.

since the harm which took place occurred before the passage of the 1986 statute.

Mr. KASTENMEIER. One of our witnesses will testify that State sovereign immunity in the copyright area should be analogous to sovereign immunity for the Federal Government, that State and Federal doctrines ought to be precisely the same.

What is your response to that?

Ms. LEE. It is difficult to draw a precise analogy because in the case of Federal sovereign immunity, it is the same sovereign which passes the law and which consents to be sued in its own special court, the court of claims.

In the case of States being sued under the Copyright Act, it is not State law, it is Federal law.

Under the Copyright Act of 1976, a Federal forum is exclusively the place in which copyright lawsuits may be brought.

As long as one adheres to the exclusive Federal forum, it is not possible to create a direct analogy.

In addition, as was pointed out in the UCLA statement, the type of remedy that is allowed in the Federal waiver of sovereign immunity is damages and not injunctive relief, whereas the current state of the law regarding State's is that injunctive relief is allowed in suits against State officers and employees in their official capacity, but there is not yet any damages relief.

So it is almost a mirror image, the exact opposite, rather than the same.

I certainly think that from a copyright point of view, it would be undesirable to try to make them the same by abolishing injunctive relief at the same time as allowing damages, because although injunctive relief is not sufficient, it certainly is an important and useful supplement and a way of preventing future violations.

Mr. KASTENMEIER. We have talked about copyright here. Should the redraft and should the bill reach all other forms of intellectual property as well as copyright even though the incidence of a problem might be less; that is, of course, I am talking about patents, trademarks, et cetera?

Do you think that it ought to equally apply to those other areas as well as copyright?

Ms. LEE. I think that from the point of view of sovereign immunity, each abrogation is a choice for Congress to make in light of its understanding of the problems and the policies served by the Federal statute.

I am not an expert on patent or trademark. It may well be that the same policies are involved, but I do not believe these areas have had the extensive study that has already taken place on the copyright issue.

The Copyright Office report is quite extensive and was based on questionnaires and surveys and comments from the public, and it may be that without that type of background yet on the other forms of intellectual property, it is premature to legislate.

Mr. KASTENMEIER. Thank you, Ms. Lee.

The gentleman from California, Mr. Moorhead.

Mr. MOORHEAD. Thank you, Mr. Chairman.

Ms. Lee, you indicated that the discussion draft builds upon the language of the Rehabilitation Act of 1986 which was passed to

were problems a year ago and that they were likely to get worse. I have read the statements submitted to the Senate and to you in connection with these hearings, and I think they will convince you that that is the case.

I rarely have basic disagreements with the educational community and I admire them very much, Mr. Chairman. I do differ with them on this question.

Their statement takes the view that there are no problems now. I think the record probably refutes that. They also say there aren't going to be any problems in the future, because they are honest people; they say they tell their people not to infringe, and that that should take care of it.

History tells us that it doesn't work that way.

Educators and librarians are honest people and people of the utmost goodwill. They are not greedy pirates or racketeers. These are people that want to help the community. But there have been plenty of instances—and unfortunately they are going on right now even under the 1976 law—where there is a crunch between budgetary considerations and copyright, and in these cases copyright gives way.

Here there wouldn't be any budgetary considerations. States instrumentalities are given a free ride under the Supreme Court decisions, and there is no question that they would take advantage of it.

States are major users of copyrighted materials of all sorts. I don't think people realize how far this goes. I believe that there would be a drastic effect on certain segments of the copyright community—the rights and interests of major segments of copyright property owners—if this situation were allowed to continue indefinitely.

There is nothing premature about the issue that is facing you, Mr. Chairman. Congress has been considering this problem since the *Atascadero* decision, which made it apparent that there is a kind of emergency here.

I will be happy to answer questions with respect to the points made in the educators' statements about making State liability for copyright infringement equivalent to Federal liability, and whether or not to give State courts concurrent jurisdiction in suits against the State.

The former is addressed briefly in my statement, Mr. Chairman.

I would like to make a final point. If this freedom from liability for State copyright infringement is allowed to continue, there is no question that the problem will grow.

I have seen this happen time after time after time: Where there is a loophole that exists originally or is discovered later, as it would be in this case, people are certain to take advantage of it.

Once the loophole gets to be known, the cat is among the pigeons, and there is nothing you can do except to go on and legislate.

If you wait, an atmosphere of lawlessness develops. Admittedly, this is not like jukebox or record piracy where you actually had the mob moving in. This is quite a different situation, yet some of the same thinking will begin to permeate.

In the Copyright Office's fine report of June 1988, titled <u>Copyright Liability of States and the Eleventh Amendment,</u> Part II recounts the results of the Office's factual inquiry on the subject. It shows that, as of more than one year ago, copyright proprietors were already encountering very real problems as the result of what the representatives of some state instrumentalities perceived as their freedom to use copyrighted material without paying for it. The report also found no evidence of abuses by copyright owners in their dealings with state government officials. In fact, it is well known that in many cases the state is in a far stronger bargaining position than the publisher and, where the terms of licensing agreements are concerned, can call the shots.

A year ago some of the copyright cases dealing with State sovereign immunity were still in the courts, and most state instrumentalities had not yet awakened to the windfall that the Supreme Court has blown their way. The representatives of the educators say that Congressional action now would be premature, and that continuing state immunity causes copyright owners no problems now and would not cause them any problems in the future. These assertions, it seems to me, fly in the face of common sense and reality.

As Ms. Lee said, it agreed to allow itself to be sued in the Court of Claims only for actual damages—no injunctions, no attorney's fees, no statutory damages.

I think if you were going to do what the educators are asking, you would have to reexamine the question of Federal Government liability.

But leaving that aside, I think that there are many reasons why it would be difficult to fit State immunity into that kind of Federal system. They don't exactly match.

You could do it, but I can't see the reasons. And I would remind you, Mr. Chairman, that States can secure copyright and do. I really think you would have to consider—and I am not just playing games—whether to withhold protection for State works if you were going to equate Federal and State copyright liability.

Mr. KASTENMEIER. Thank you.

I have two other questions, but I am going to withhold them and yield to my colleague.

The gentleman from California.

Mr. MOORHEAD. Thank you, Mr. Chairman.

Welcome, Ms. Ringer.

On page 11 of your written testimony, you indicate that "a reality of copyright life is that, for individual authors and small entrepreneurs, statutory damages and attorney's fees are the difference between protection and loss of rights."

In your opinion, what will be the impact if the only remedy available to a copyright owner against a State were an injunction?

Ms. RINGER. Well, in making that statement, I was talking about statutory damages and attorney's fees, but I was presuming actual damages.

If the only remedy were to be an injunction, I think that it would, in effect, be giving the States a royalty compulsory license. I am not sure what terms a court could devise for an injunction, would it apply only to that particular work or group of works? Only to that particular State? Only to that particular defendant?

It seems to me that injunctions are pretty worthless in this situation.

Coming to my actual statement, which was related to statutory damages, they provide a way for a court to evaluate the overall area of damage without actually pinpointing what the monetary damage is in a particular case. Attorney's fees have emerged in recent years as the difference between rights and no rights.

The big copyright owners, the gigantic corporations, don't care that much about attorney's fees because they are paying attorneys already, but the little guy just cannot get a lawyer unless there is some prospect of recovery.

In terms of small entrepreneurs and individual copyright owners, you might as well forget copyright.

Mr. MOORHEAD. In their testimony, the Educators Ad Hoc Committee on Copyright laws asserts that there has not been sufficient harm demonstrated to justify legislation.

I would be interested in your comments on this point.

Ms. RINGER. Well, Mr. Moorhead, I did address this a little bit earlier and I will elaborate on it.

They accuse the people that cite instances of harm of being anecdotal, but what else can they do? You have had an enormous study by the Copyright Office, which is really a very fine piece of work, that points out harm and concludes that there is harm.

Common sense would tell you that if people don't have to pay, they are not going to.

If you add that to the fact that this is a really very large use of copyrighted material by the States, you are going to find harm.

You could have another expensive study and try to dredge up statistics, although what statistical norms you would use, I don't know, but it seems to me that would be worthless.

I think your common sense is more valuable.

Mr. KASTENMEIER. The gentleman from New Jersey.

Mr. HUGHES. No questions.

Mr. KASTENMEIER. The gentleman from North Carolina, Mr. Coble.

Mr. COBLE. Thank you, Mr. Chairman.

Going back to my colleague from California's statement to Ms. Lee concerning what I regard as an anomaly of a public institution being able to sue a private institution for infringement of a copyright and the reverse not being permitted—do you think there is any justification for this sort of double standard?

Ms. RINGER. Not at all, Mr. Coble.

Not only that, the educators have taken advantage of a kind of an accident of constitutional history to try to get some advantages.

What they are doing is selling out their own people, which is this great mass of educational institutions and individuals that are not State instrumentalities. They are still liable.

If this goes on, the publishers and the other copyright owners are going to have to adjust their marketing strategies, and the local people—the municipal governments and the local governments and the private and religious organizations that control a lot of educational institutions—are going to be paying more.

So it is not just a matter of one suing another, which is an extreme example, but it is a matter of hurting someone else to the benefit of what are really in some ways the fat cats.

Mr. COBLE. In recent testimony on this issue, the current Register of Copyrights testified, and I am going to quote what he said, "The legislative history of the Copyright Act demonstrates that the debate focused on the extent to which Congress should exempt the States from full liability as to damages under the eleventh amendment."

I don't know that anyone has suggested that the States were already immune from liability as to damages under the eleventh amendment, but it appears that no State official requested total exemption from copyright liability.

Now, given your background as having served in that capacity as well, do you concur with Ralph's rendition of events?

Ms. RINGER. Yes, I do, Mr. Coble.

I was around at the time, and there were State representatives—there was a State representative on CONTU—and there were many, many State representatives sitting in these chairs here at one time or another testifying, and none of them, I am quite confident, had ever any thought that they were immune.

They would not have been crying for special treatment if they hadn't said that there was liability in the first place.

Mr. COBLE. Thank you.

Thank you, Mr. Chairman.

Mr. KASTENMEIER. The gentleman from Michigan, Mr. Crockett.

Mr. CROCKETT. Thank you, Mr. Chairman.

I am almost embarrassed to ask this question because I should have read the Supreme Court decision in the Pennsylvania case and the related cases before I came to this hearing. I didn't do it, so I am not overly familiar with it.

The usual rule is that Congress cannot, by a statute, overrule a constitutional provision, but from the testimony I have heard here this morning, evidently the Supreme Court has decided that with respect to the eleventh amendment and State sovereignty, that general rule does not apply.

What was the basis for that?

Ms. RINGER. There is a long history of this, Mr. Crockett. I doubt that you would have learned the answer by reading the many, many opinions in the *Union Gas* case. You have to kind of piece it together.

As Justice Stevens said in one of his opinions, there are really two eleventh amendments.

One is the literal language of the eleventh amendment that says that the States are immune in diversity cases with respect to jurisdiction.

That is all the eleventh amendment says.

Then there is this fundamental 1890 case, *Hans* v. *Louisiana,* which held that there is lurking somewhere behind the eleventh amendment a principle of sovereign immunity that goes beyond anything that the eleventh amendment says, and that actually allows States to be immune as a general rule, unless Congress abrogates. It is only in that area, presumably, where Congress can abrogate.

Now, there is a whole bunch of jurisprudence with respect to State immunity and the fourteenth amendment, which was adopted after the eleventh amendment. It has been held—and I think, everybody on the Supreme Court now concedes—that Congress can abrogate under the fourteenth amendment any kind of State liability.

The question now is whether this applies to other plenary powers that Congress is given under the Constitution. In *Union Gas,* they held that, yes, because the statute in question was unmistakably clear, that Congress intended to abrogate, you can abrogate State immunity from liability under a statute enacted under Article I of the Constitution.

Four of the Justices said you can never abrogate at all in this situation. If you want my own opinion, for whatever it is worth, it is that the swing person here is Justice White. He is saying, yes, *Hans* v. *Louisiana* is correct. There is a principle of sovereign immunity underlying the Constitution regardless of the literal language of the eleventh amendment, but you can abrogate it if you use unmistakably clear language.

ticipate, was to have been a professor at Tufts University of Mechanical Engineering named John Sununu, whom I think you all know now.

One of the things I did as an editor was to travel both to industrial companies and to many universities talking to professors about what kinds of books were needed in the subjects in which I edited and whether they would be interested in writing them or knew other professors or people in industry who would be interested in writing.

At the same time, of course, they were being visited by what are known as college textbook travelers who were trying to sell textbooks or to get the professors to adopt textbooks so that students would buy them. I entered the business in the mid 1970's when college textbook publishing was much stronger than it is today.

The profit margins at that time were considerably higher than they are now. One of the things that has depressed those profit margins, of course, has been the large market in used books. It is estimated that that market takes perhaps a third or as much as 40 percent of the over $1 billion college textbook market away from the publishers and makes it a very expensive and difficult business.

This hasn't meant, of course, that major publishing companies have shied away from competing for the ability to gain the franchise for text books, in particular in subjects where there were many students, but it has meant that it is a more difficult and risky business with less profit potential than used to be the case.

It is such a risky business, in fact, that in the case of an attempt to enter the freshman biology textbook market, it has required the expenditure of three-quarters of a million dollars in simply making the illustrations for a book of that sort, so it is a great economic gamble in many cases with the expectation of lower rewards than had been the case in the past.

In addition, textbook companies have to provide a great many supplements for which they receive no payment, and a great many complimentary copies are sent to professors to induce them to adopt textbooks. At the same time, the books have shorter lives than they used to. A text book used to last at least 5 years and often 7 or 8. Now, it lasts, if you are lucky, 3 years and often 2 before you have to put out a revised edition.

All of this means that the legislation is being considered in an atmosphere where costs of doing business are very high. This is leading to the concentration of the ability to create and market textbooks in fewer and fewer publishing companies. What I am concerned about particularly is, as has been spoken of before here, not only the idea that there is some anthologizing and copying going on at present (the National Association of College Stores has reported declines in sales so that the used book market is attacking not only the publishing companies), but creating an atmosphere where copying will spread even beyond the textbook situation to encompass other publishing properties. For example, librarians in State universities have spoken in public meetings of waiting to see what will happen with the eleventh amendment legislation in order possibly to have more freedom to make copies of journal articles and disseminate them more widely without payment.

Summary of Statement of Myer Kutz
On H.R. 1131
The Copyright Remedy Clarification Act

Mr. Myer Kutz, Vice President – Scientific and Technical
Publishing for John Wiley & Sons, Inc., submits this statement in
support of the Copyright Remedy Clarification Act on behalf of the
Association of American Publishers for which he is Chairman of the
Copyright Committee and on behalf of the Copyright Remedies Coalition.

The interests represented by Mr. Kutz are drawn together by
their support for H.R. 1131. These groups market their copyrighted
works to states which are, under recent federal court decisions,
immune under the Eleventh Amendment from damage lawsuits for violation
of the Copyright Act. These court cases are of great concern to
companies like John Wiley & Sons that publish college textbooks and
related materials because a great deal of that market is concentrated
at state institutions.

H.R. 1131 would clarify that Congress intended, when it adopted
the Copyright Act of 1976, to hold states liable for damages in the
event they unlawfully use the valuable property of copyright owners.
If H.R. 1131 is not adopted, there will be no effective deterrent to
this type of activities by states.

Without the threat of damage lawsuits, states will have little
incentive to pay careful attention to the requirements of the
Copyright Act. An example of the type of behavior that could multiply
should states remain immune from copyright damage actions involved the
Copyright Clearance Center and public and private universities.
During discussions among these groups regarding a photocopy license,
two public universities withdrew from participation, apparently based
on their mistaken belief that, as a result of these recent court
decisions, they were not obligated to comply with the copyright law.
It was only after introduction of your bill, H.R. 1131, that these
universities returned to the negotiating table.

Another example involves pending litigation brought by my company
and seven other publishers against Kinko's Graphics for their
photocopying activities in violation of the copyright law. In the
Kinko's response to our complaint, they offer as an affirmative
defense that some of the copying was done for state colleges which are
immune from liability under the Copyright Act and that they, as
agents of the colleges, are similarly immune.

In addition to preventing further problems like this, enactment
of H.R. 1131 will eliminate a basic unfairness under the current law.
It will ensure that states, which increasingly own copyrights and
which enjoy the full benefits of the Copyright Act, are not insulated
from damage lawsuits when they infringe the copyrights of others.

In conclusion, Mr. Kutz urges prompt passage of the Copyright
Remedy Clarification Act.

-1-

Center (CCC) to set up a photocopy license for public and private universities and colleges. Under these licenses, the institutions would receive the right to make a certain number of copies of copyrighted works in exchange for a prescribed fee. Well after substantive negotiations had begun, two public universities withdrew from discussions. They did so apparently on the mistaken belief that, as a result of the recent court decisions, they were not obliged to comply with the copyright law. Mr. Chairman, it was only after introduction of your bill, that these state universities returned to the negotiating table, indicating how important these proceedings are.

Another example occurred two weeks ago when Kinko's Graphics Coproration filed its response to the copyright infringement claim against them brought by my company and seven other publishers. In affirmative defense for the alleged infringing photocopying, Kinko's claimed:

> ... some of the materials were copied by Defendant in its capacity as an agent or instrumentality of a state college or university; that such state college and universities are "arms of the state" for purposes of the Eleventh Amendment to the United States Constitution; that under the Eleventh Amendment, "arms of the state" are immune from liability under the Copyright Act (17 U.S.C. section 101 et. seq.), and that as an official agent of a state, Defendant is subject to such immunity.

In addition to putting the necessary teeth back into the remedy provisions of the Copyright Act, Mr. Chairman, your bill will also eliminate a basic unfairness under the current law. State colleges and universities are copyright owners. For example, they own copyrights in books and journals published by their university presses and in computer software produced in the course of research and

-5-

Federal courts have exclusive jurisdiction over
copyright infringement matters. Thus, if the Eleventh Amendment
bars copyright owners from seeking a remedy in federal court,
they have no place to turn for adequate relief. As the Court of
Appeals for the Ninth Circuit recognized in BV Engineering, "the
choice [in copyright cases] is not between the federal forum and
the state forum -- it is between the federal forum and no
forum."26/ Enactment of H. R. 1131 will ensure that the federal
courthouse door is not closed to copyright owners seeking
effective relief. It will give them a meaningful day in
court.27/

In addition to protecting the only forum available,
H. R. 1131 will ensure that copyright owners have effective
remedies when states violate the Copyright Act. Although state
officials and state employees may be enjoined from future
violations of the Copyright Act,28/ under recent court decisions
interpreting Atascadero, the states for which they work cannot
be sued for damages. As the comments received by the Copyright

---

26/  858 F.2d at 1400.

27/  Because there is no state court jurisdiction in copyright
     infringement cases, the public policy question that
     normally arises in Eleventh Amendment matters -- whether
     congressional action will expand federal court
     jurisdiction at the expense of state tribunals -- is not
     involved here.

28/  Ex Parte Young, 209 U.S. 123 (1908).

Office in its inquiry make clear, injunctions are a poor
substitute for damage awards:   .

- o    injunctive actions are prohibitively expensive,
       especially for small companies, if there is no
       opportunity to collect damages;

- o    injunctions do not compensate for infringements
       that have already occurred;

- o    injunctive relief is bad business because sellers
       would lose customers if they brought a systematic
       series of lawsuits against them; and

- o    although execution of damages is relatively
       simple, relief through an injunction requires a
       motion for contempt and the additional expense of
       proving performance after the injunction is
       granted.[29]/

H. R. 1131 responds to these deficiencies. It permits
aggrieved copyright owners to seek both an injunction and
damages against unlawful conduct by state governments. It
reaffirms the comprehensive scheme of copyright protection
embedded in the 1976 Copyright Act which is applicable to anyone.
who violates it.

Second, H. R. 1131 will ensure that the Copyright Act
is a strong deterrent to copyright infringements by state
governments. It will thereby prevent diminution in the
continued availability of new, creative works for state markets.

States are now fully immune from damage suits under the
recent cases applying Atascadero in the copyright context. This

---

29/    Copyright Office Report at 13-15.

$\overline{J}u_192032 \quad 2-2 \quad BLA2C)PW/4.$

### Bert P. van den Berg
### President, BV Engineering Professional Software
### on behalf of
### The Software Publishers Association
### and
### ADAPSO, The Computer Software and Services Industry Association
### Summary of Testimony on H.R. 1131

BV Engineering Professional Software (BVE) is a California-based publisher of microcomputer software. For several years, BVE was involved in a dispute with UCLA about copyright infringement. The Ninth Circuit Court of Appeals ruled that, because of the Eleventh Amendment, UCLA was immune from liability for monetary damages in copyright infringement suits. I think this is unfair.

There are many men and women in this country who have invested their time and energy in creating art, music, books, and other forms of intellectual property. Our need is the same - effective protection against the theft of our works. Effective protection does not exist if some groups can violate your copyright without being subject to monetary damages. Injunctive relief is not enough. Injunctive relief prevents further infringement, but does not provide any compensation for past copying. The Framers of our Constitution recognized that creative artists need special protection in order to give them the freedom and interest to share their works with the public. The Framers did not intend to force artists to distribute their works without compensation. That is what will happen, however, if H.R 1131 or other equivalent legislation is not enacted.

After several recent court decisions, I believe many state agencies have decided that in a sense, copyright statutes have been repealed for the states. H.R. 1131 corrects that erroneous perception. This bill makes it clear that when Congress drafted the 1976 Copyright Act, it intended to include the states as well as private individuals in every section. "Anyone" means anyone, including state governments.

Companies may not have any incentive to develop new products if the question of sovereign immunity is not resolved in favor of copyright holders. The United States leads the world in the development of innovative, productivity-enhancing software. The best software is created and maintained through careful research and development. R&D is expensive, so anything that affects a company's cash flow, necessarily affects R&D spending. When our best products can be easily stolen, and no effective recourse is available, it is not difficult to see how software companies might lose the incentive and ability to invest in more R&D.

What kind of message are we sending to our foreign competitors and foreign governments? The problem of software piracy is much more serious beyond this country's borders. The course we set for ourselves is the course many other governments may follow. How can we ask foreign governments to strengthen their intellectual property laws if our own laws say that it is acceptable for state governments to ignore copyright without fear of monetary damages?

I am obviously proud of BVE's product line, but what I would like to discuss today is what happened when we licensed those products to a state university. Up until recently, when an end user was interested in one of our products, we offered the option of a site license along with our basic license agreement. This site license option gave the user the right to make up to 50 copies of the program as his or her needs increase. The site license was triggered when a copy of the agreement is signed and returned to BVE with the required site license fee. The site license fee was $500 per product, making each copy cost only $10. As compared with the basic license agreement, this site license arrangement made copies very inexpensive.

In addition to a cost savings, this site license arrangement was very useful, because our basic license agreement states that, without express permission, only two backup copies can be made. In my years in this industry, I have discovered that many users don't actually know how many copies of a program they will need until after they have used it for a while. BVE's site license arrangement gave each user the option of evaluating a product's usefulness and then making the necessary copies as needed. The site license also gave the user protection against a claim of copyright infringement, provided of course that the necessary fees are paid.

This site license arrangement was the basis of a dispute between BVE and the University of California at Los Angeles (UCLA). Our dispute and the Ninth Circuit's interpretation of copyright law show why H.R. 1131 is absolutely necessary.

Several years ago, UCLA bought one copy each of seven different BVE programs. Somebody at UCLA signed and returned a site license agreement for all seven programs, but without the required license fee. BVE immediately sent a letter to UCLA informing the university that the money for the site license had not been received. Now, UCLA has its own version of things, and we don't agree on much, but one fact is clear - UCLA admits to making and distributing a combined total of 91 copies of our programs and instruction manuals without permission and without paying for them. Even though our site license arrangement makes copies very economical, someone at the university just assumed they had the right to make an unlimited number of free copies.

Without going into too much more detail, BVE brought an action for copyright infringement against the University. The suit was filed in federal district court in California, because that is where all matters involving copyright violations are handled. Little did I expect the court to rule that UCLA was immune from suit for monetary damages, even when the case involved what I thought was a blatant

2

violation of copyright law. The court held that UCLA could not be sued for damages, because it is a state agency and the Eleventh Amendment limits the extent to which states can be sued for monetary damages in federal court. Unfortunately, this decision was upheld on appeal by the Ninth Circuit, and the United States Supreme Court recently declined my application for a writ of certiorari.

I am a representative example of the many men and women across this country who have invested their time and energy in creating art, music, books, and other forms of creative work. We belong to many different trade groups, but our need is the same - effective protection against the theft of our works. Effective protection does not exist, however, if states and state agencies can violate your copyright without being subject to monetary damages. Injunctive relief is not enough. Injunctive relief prevents further infringement, but does not provide any compensation for past copying.

It is my understanding that the Framers of our Constitution recognized that creative artists need special protection in order to give them the freedom and interest to share their works with the public. The Framers did not intend to force artists to distribute their works without compensation. That is what will happen, however, if H.R 1131 or other equivalent legislation is not enacted.

One of the biggest markets for my products is the university community. It makes no sense to me that under current law, I am broadly protected if I license my programs to a private school like the University of Southern California, but I have to accept less if UCLA is the end user. I am obviously interested in making a profit, but not at the expense of my most valuable assets. It seems that I have one of two choices: stop selling to state agencies or accept that they can infringe my works without risk of penalty. Some software developers might not even have the first option. Quite a few programs are sold over-the-counter at retail outlets. There is nothing to prevent an employee from a state agency from purchasing the software and then making any number of copies. Should the software developer discover this infringement, be it months or years after the fact, his or her only recourse is an injunction against further infringement. I believe this is unfair.

I am not a constitutional law expert, but I believe that as far as copyright is concerned, both individuals and states should be subject to the same monetary damages for infringement. BVE is a very small business. As I mentioned, we have only eight employees and annual software sales of less than $250,000. Every state agency that might be a potential user of our programs is much, much larger. How can BVE or any small business protect itself if these large bodies are not required to pay for what they take?

3

Mr. KASTENMEIER. You have indicated, Mr. van den Berg, in your own case you have already had a negative experience in terms of UCLA. I would like you, either of you, to generalize what you see industry-wide as the financial consequences, let's say, to the copyright industry if sovereign immunity remains a bar to money damages.

Mr. VAN DEN BERG. Mr. Chairman, I wish I could give you a—I can only tell you what my opinion is because our company is very small. We are only five people. I don't have the information that you are requesting. My feeling is, however, that—and it has already happened to me, that the costs of products are going to go up and the incentive to produce products are going to go down.

Did I answer your question?

Mr. KASTENMEIER. Yes.

Mr. Kutz.

Mr. KUTZ. Well, I certainly would agree. As I tried to indicate, we are presently in a highly competitive situation. While it becomes more expensive to be in textbook publishing because unit sales are declining, there are price barriers, and you can't price up infinitely. It will restrict competition. It will make for fewer textbooks in virtually any subject area, and really the Government and its citizens will be the losers.

Mr. KASTENMEIER. Let me ask you whether there are any number of governmental entities with which your companies currently deal, are there State entities or State governments who, in fact, do give contracts with and do recognize and pay you irrespective of whether they might seek refuge in the eleventh amendment?

Do you have a number of contracts with people who—I am talking about State entities—that do, in fact, pay you fully and do not resist even though they theoretically might have a refuge in the eleventh amendment?

Mr. KUTZ. It would be my understanding that there are academic libraries of public universities and State libraries that do pay to the CCC for making copies, so that I would think there are many of those kinds of situations.

Mr. KASTENMEIER. But current contracts are, in fact, fully honored?

Mr. KUTZ. There is an implied contract or there are transactions that are legal transactions.

Mr. KASTENMEIER. Is that also, Mr. van den Berg, true in your industry?

Mr. VAN DEN BERG. In my industry the computer software business, it is not a commodity product that is used up such as other products may be, and we find that we don't often sell multiple copies to State universities, no. We have sold multiple copies to Federal Government agencies but not to State agencies.

Mr. KASTENMEIER. Thank you. I am going to yield to the gentleman from California, Mr. Moorhead.

Mr. MOORHEAD. I would like to ask both of you about what percentage of your business goes to State governments or their subsidiaries?

Mr. VAN DEN BERG. I will answer that first.

I have the data as to what goes to educational institutions because I looked it up. I did not break it down by State.

Mr. MOORHEAD. Since there is a difference between the public and the private institutions as to the enforcement of this law——

Mr. VAN DEN BERG. I honestly don't have that information, but I can get it for you.

Mr. MOORHEAD. I just wondered what you feel you are using as far as your sales to, say, a State university would be. What percent of the sales that you now have would you be able to increase if you got all of the payment that you are entitled to?

Mr. VAN DEN BERG. Thank you for the opportunity to answer that question. I think the question is a good question, but I would like to rephrase it a little bit, if I may.

Mr. MOORHEAD. Sure.

Mr. VAN DEN BERG. What do I lose? It is not just the percentage. BV Engineering produces relatively low cost software. We are working on about a 30-percent gross profit margin, of which half that goes back into R&D for new products, so my net, what I get to take home and spend on my children, my family is about 15 percent of our gross.

I ask you, what happens if only a 10-percent increase in my gross sales? I get to take home almost double, so I am saying a very small increase in our sales would result in a significant increase in my own personal income.

Mr. MOORHEAD. Are your experiences about the same?

Mr. KUTZ. Well, I understand the statistics are that I think it is 79 percent of undergraduate college students are in State universities, which means that for the college textbook business that is a very high percentage.

In addition, of course, many academic and State libraries buy our products, so it is a central part of the market for publishers in general, and at my company in particular I would hazard a guess it is probably around 30 percent of our sales.

Mr. MOORHEAD. Thank you very much.

Mr. KASTENMEIER. The gentleman from Illinois, Mr. Sangmeister.

Mr. SANGMEISTER. I suppose I should understand some of these abuses a little better. Give me the fundamentals. One of you is talking about textbooks, one about software. Literally, what do some of those libraries and schools districts do, just literally photocopy everything?

Is that where your losses directly come from? Give me some of the practical examples that are happening out there. I can understand the percentages that you are talking about. What exactly do those people do? You don't need to hesitate to tell us what in fact is happening.

I would like to have a little bit more of what is going on out there and how they are deliberately trying to get around paying the just fees that I also think you have coming.

Mr. VAN DEN BERG. In 1986 I sold the University of California at Los Angeles one copy each of seven different products, and we discovered later and by the university's own admittance in the deposition process, the university made a combined total of over 91 copies of our programs and documentation.

I consider that pretty blatant.

Mr. SANGMEISTER. So, in other words, you get a computer software program and they just duplicate it? Whoever at the university wants it or needs it, they just automatically get a copy of it?

Mr. VAN DEN BERG. I don't know what the mechanism is, all I know is you take a computer disk, a 50-cent computer disc, and you can take a $100 program and make a perfect copy of it in less than 60 seconds on any personal computer.

It is—in the textbook market at least you have to use a photocopier and stand there for half an hour.

Mr. SANGMEISTER. Going to the textbook, that is basically what is done?

Mr. KUTZ. It is not even necessarily copying the whole book. You can create anthologies by taking a chapter or two from one book and a chapter or two from another book. Where you are going to lose sales, then, is in being deprived of the opportunity to reissue, let's say, even a general trade book as an inexpensive paperback that would be used as supplemental reading or a book that would be bought in multiple copies by a library to be put on reserve by a professor, so you are facing economic loss that is somewhat more complicated.

But it is very clearly there, and these are situations which we encounter and are attempting to deal with now very, very frequently.

Mr. VAN DEN BERG. Congressman Sangmeister, I have been reminded that perhaps you would be interested in hearing about a specific situation about what happened. When we found out that some copies were being made by UCLA in this particular case, I contacted the individual directly. I did not go to an attorney. I didn't contact the university or the university attorneys because in my previous employment with General Dynamics the rule was that if you pirated a copy of a product that you were fired. There were rules there. They did not want to subject themselves to lawsuits.

So I contacted the individual directly because I could at least give him an opportunity to put it right. The individual initially denied having made the copies and, in fact, challenged me to produce the name of one person who had a copy, so I did because I had the information just purely by accident.

One of our authors was going to graduate school and saw it. At that time he became very abusive talking about not only me, but software companies in general as being greedy and so forth, and threatened to return all the products and demand their payment back, so not only were we not going to get paid for the copies they made, but we were going to lose payment for the copies they had already purchased legitimately.

These types of things happen because—we are such a small company. I spend an enormous amount of time on the telephone. These things happen with regularity. They not only will copy the products, but they have the gall to call in for technical assistance because they may not have a manual. When you start asking them about serial numbers and their name, the phone goes click. This is a constant reminder, a constant irritant.

Mr. KUTZ. Congressman Sangmeister, I should amplify on a previous comment. The publishing industry created the Copyright Clearance Center in response to the essential directive in the Copy-

hearings question what criteria or circumstances ought to apply to a congressional act of abrogation.

This statement is offered to demonstrate that the undisputed circumstances of the BV Engineering case do not support an inference of state agency copyright abuse. As the United States District Court noted (BV Engineering v. UCLA (C.D. Cal. 1987) 657 F.Supp. 1246, 1250 fn. 2), BV Engineering did not seek an injunction (or monetary relief) against any University official; rather, it sought only a monetary claim against the University. That limitation in relief sought was compelled by the University's effort to accommodate BV Engineering's claim, as the factual circumstances demonstrate. Absent any record of state copyright abuse, there is no apparent cause to enact legislation raising issues of a constitutional dimension. Additionally, the University submits two notions for your Committee's consideration: first, that Congress grant state courts concurrent jurisdiction over copyright cases, thereby providing a forum for damage claims against the states; and second, in the alternative, that parity between the federal and state governments be maintained, i.e., that state sovereign immunity abrogation be analogous and complementary to the waiver of federal sovereign immunity.

## The BV ENGINEERING Case

The following circumstances were developed through discovery proceedings (deposition, interrogatory and document production) and were undisputed in the BV Engineering case.

In 1986, the University's Los Angeles campus, Physics Department, purchased seven software items from BV Engineering, at a total cost of $597.09, for use in the Physics Department's electronic instrument design and repair shop. At that time, BV Engineering's software catalog expressly authorized reproduction of those programs, stating:

> "You may make a reasonable number of backup copies for your personal use and each copy will work just like the original."

And, their "Software Registration" cards sent with each of its products likewise expressly authorized the purchaser's reproduction for "personal use or backup purposes." The Physics Department made three copies of the software for backup and Department use and ten copies of the manuals to be read by the electronic shop personnel. Later, a copy of the software and manuals were loaned to a Physics professor and his student assistant for evaluation in connection with a new laboratory course of instruction they were developing.

In a June 5, 1986 letter, BV Engineering's counsel characterized the University's activity as unauthorized and a copyright infringement. The University's June 27, 1986 response:

-2-

expressed a belief its conduct was authorized; apologized for any
"innocent error"; offered to destroy or ship all the accused
copies to BV Engineering; and gave assurances that no further
copies would be made. (Copies of those letters are attached to
this statement for your information.) BV Engineering did not
reply or further communicate with the University until the
August 1, 1986 service of its lawsuit complaint. In an effort to
resolve the dispute, the parties discussed settlement terms. BV
Engineering demanded a $15,000 settlement payment,
notwithstanding the total cost for all accused software items was
less than $1800. BV Engineering's attorney based its settlement
demand upon a claim for "statutory damages and attorneys' fees."
Viewing BV Engineering's demand as punitive, the University
refused to pay and the litigation proceeded to cross-motions for
summary judgment.

The University's motion for summary judgment asserted
four independent grounds: (1) that state sovereign immunity
barred the action for monetary damages; (2) that BV Engineering's
claims did not arise under the federal copyright laws because the
University's copying was expressly authorized by BV Engineering;
(3) that BV Engineering's copyrights were not infringed because
the University's conduct constituted a fair and permissible use;
and (4) that there was no basis for any relief, since BV
Engineering had not been damaged and the University had ceased
the accused conduct. The opinion of the United States District
Court for the Central District of California (reported at
657 F.Supp. 1246) granted the University's motion on the first
stated ground, based upon Atascadero State Hospital v. Scanlon·
(1985) 473 U.S. 234. The Ninth Circuit Court of Appeals' opinion
(reported at 858 F.2d 1394) affirmed the district court's order
(overturning Mills Music, Inc. v. State of Ariz. (9th Cir. 1979)
591 F.2d 1278). On March 20, 1989, the United States Supreme
Court denied BV Engineering's petition for certiorari.

The University remains at a loss to explain why this
case was brought or prosecuted through the federal courts, in
light of the University's effort to accommodate BV Engineering's
claim and the expression of permission contained in their
literature. As a public institution, the University sought
cooperation and accommodation, but was met only with
confrontation and an exorbitant ($15,000) settlement demand
(notwithstanding the absence of any actual damages). In my
opinion, the case could have proceeded to trial in the district
court, had BV Engineering any basis to seek injunctive relief
against a University employee's continued conduct.

### H.R. 1131 (S. 497) AND THE
### COPYRIGHT OFFICE REPORT

The record submitted on H.R. 1131 (S. 497) does not
demonstrate any pattern, or indeed any specific instances, of
copyright abuse by state agencies. The Copyright Office Report,
"Copyright Liability of States," does recount concerns for

-3-

avoid suits for damage liability, but you have also relied on the fact that taxpayers, public funds for taxpayers, et cetera, that taxpayers are interested in how their money is used and that some people in the public systems will be asked why are you paying for materials that legally you can absolve yourself from paying by invoking immunity, and what you will, I think, procure is a rather mixed set of circumstances at a local level as to whether that entity should, indeed, follow through and make payments that it might be able to avoid if it invoked immunity and leave a very murky situation for your constituents—for your constituency in that respect—quite apart from whether any of them are authors.

We are just talking about them as users.

Mr. STEINHILBER. The question is a very difficult one, but nevertheless it is one which we have already had to face into when the first cases started coming down with to the eleventh amendment. I can speak for the National School Boards Association with a great deal of clarity on this issue because we have a part of my division is the Council of School Attorneys.

This is roughly 3,280 attorneys nationwide who represent school systems throughout the United States. I dare say there will be one in virtually every community. We did indicate to every single one of them that there is still an obligation to obey the law, and that obligation to obey the law we used the analogy with other education laws which there are no penalty provisions.

For example, there are laws on the books, there is no private right of action really relating to laws on privacies, and we said to schools that you have an obligation to obey the Family Privacies Act laws. Similarly you have an obligation to obey copyright whether or not there is any money damages because there always is injunctive relief.

Mr. KASTENMEIER. Well, of course, you have heard testimony and certainly as far as I am concerned compelling testimony that injunctive relief for authors is often a meaningless remedy. It may cost them a great deal and gain them nothing more than an injunction and therefore would likely be avoided.

In other words, if injunctive relief were available, it would probably not be used, and the result would be without money damages.

Mr. STEINHILBER. Well, that is one of the reasons we have come up in our discussions internally with the concept of actually having damages, but actual damages, not statutory damages. If anybody really has been injured they would have the responsibility to come forth like they would in any other case to actually determine the amount of injury and prove that in court.

Mr. KASTENMEIER. I appreciate your good faith, and I appreciate that offer, but you are also advocating another system—that we really abandon the system of Federal supremacy, of a single uniform system, and you have offered—as a result of these immunity cases—another system to superimpose on the pre-existing system which all of us I think, at least many of us here, yourself, Ms. Ringer and others drew up many years ago after a long history of where we were heading.

Now you would have us have a system where damages are available under some State suits, I gather, and limit the availability of attorneys' fees and ask for certain distinctions here that aren't

commonly available to other users of copyright works in terms of a defense. That gives me concern, I must say, because I think it would be simpler on the surface of it to restore the law even as the Congress did in the civil rights decision, try to restore what was intended.

Occasionally the Supreme Court acts in ways that may, within the circle of issues at the heart of the suit, make sense, but that have a far-reaching effect on other matters, including in this case copyright. Don't you think that we have an obligation to bring clarity to the situation?

One of my problems is that you think it is not time for us to act. How many more decisions do we need to wait for?

Mr. STEINHILBER. Well, obviously I have sort of gone through what we personally believe, but then we came to some what we call political practical suggestions at the very end. We do believe it is premature, but nevertheless we are realists, and in looking at what is happening and what the perceptions are.

We therefore—some of the suggested language has been—not actual language, but suggestions have been placed in the testimony. I dare say we are not looking for a dual system because unlike my colleague, we are not testifying in terms of giving dual jurisdiction in these particular kinds of cases. However, I would like to point out the fact that already we have differences within the copyright law.

For example, attorneys fees are not now permitted in cases involving the Federal Government, so it is nothing new, and there are already, as you and I both know from the length of that particular bill, there are exceptions in any number of other instances which we have been making over the years because of particular problems. We are just asking let's look at this as a separate section mainly because it is a constitutional issue that we are dealing with.

Mr. KASTENMEIER. Mr. Steinhilber, what is your comment about the case raised by my colleague and by the fact that you represent obviously—you listed a number of institutions which were not State institutions or State entities, but were, in fact, private, religious, et cetera, and you have a situation where presumably there is a difference in terms of how they are treated in terms of Southern California or maybe Stanford versus UCLA and vice-versa, with otherwise the same practical equities at issue.

How do you explain to your constituents that anomaly?

Mr. STEINHILBER. That is the meeting that took place January. The biggest issue that took place in the January meeting that I made reference to is pointing in that issue and saying that if the ad hoc committee was to proceed, that issue had to be resolved, and the groups representing other than State institutions had no objections.

Now, that is what came out in that meeting. We then discussed the entire issue again in June just to make sure that—I did not want to misrepresent the rest of my members, and they said they had no objections. That is the answer.

Mr. KASTENMEIER. I should also ask Mr. Wagner since obviously he represents a State institution, but the question of whether Southern California or UCLA should be differentially treated with