# Proskauer Rose Goetz & Mendelsohn

## 2001 L Street, N.W.
### Washington, D. C. 20036

A. BAUMGARTEN
ERT P. HUNTER
.ID C. JATLOW
RICHARD H. ROWE
RESIDENT PARTNERS

JOAN Z. McAVOY
SALLY JANE NOVAK
PETER B. ROBB

TELEPHONE:(202) 466-7300

300 PARK AVENUE
NEW YORK, N. Y. 10022
TELEPHONE:(212) 909-7000

2029 CENTURY PARK EAST
LOS ANGELES, CALIF. 90067
TELEPHONE:(213) 557-2900

150 EAST PALMETTO PARK ROAD
BOCA RATON, FLORIDA 33432
TELEPHONE:(305) 391-9700

4 ST. JAMES'S PLACE
LONDON SWIA INP
TELEPHONE:01-493-8813

GENERAL COUNSEL
OF COPYRIGHT

FEB 0 1 1988

RECEIVED

Comment Letter

RM 87-5

No. 12

Dorothy Schrader, Esq.
General Counsel
U.S. Copyright Office
Washington, D.C.

BY HAND

Re: Eleventh Amendment

Dear Ms. Schrader:

On behalf of the Association of American Publishers, Inc.
("AAP") and the Association of American University Presses, Inc.
("AAUP") we hereby respond to the Copyright Office's "Request for
Information" concerning Eleventh Amendment-copyright issues. 52
Fed. Reg. 42045 (Nov. 2, 1987).

In light of the recent line of decisions cited in the Office's
Request (n. 4), this inquiry into problems of enforcing
copyright rights against state governments is welcome. However,
AAP and AAUP belive it most important to stress one overriding
consideration at the outset: unlike other areas where the
Copyright Office has conducted studies, no "balancing" of
different legitimate interests is involved here. The Eleventh
Amendment issue raises only the question of whether a segment of
the populace -- and a vital market segment, as well as one that
should bear its "sovereign" mantle with responsibility, at that
-- should be effectively insulated from both claims of, and
meaningful remedies for, infringement of private rights. To the
AAP, the answer to this question is clearly no, and the
"practical problems" raised by decisions to the contrary are
quite ominous.

The AAP is a trade association of book publishers. Its
approximately 300 members publish between 70% and 75% of the
dollar volume of all books published in the United States. The
AAUP is a not-for-profit association of university presses. Its
80 members include the presses of virtually every distinguished
university in the United States, as well as several Canadian and
international scholarly publishers. AAP and AAUP members produce
and distribute trade, text, scientific and technical,
professional and reference, and other books; journals and
periodicals; a variety of educational materials in various media;
computer software and data bases; and engage in many other
activities at whose core are copyrighted works. They do this in

Dockets.Justia.com

myriad markets: their customers are individuals, large and small
corporations, public and private universities, and governmental
entities of all types -- federal and state agencies, military
services, school systems, libraries, and virtually every other
type of public entity.

Until recently, it has been clear that all customers (save
perhaps the federal government, see 28 U.S.C. §1498(b)), stood on
an equal copyright footing, viz., that their violations of the
exclusive rights in 17 U.S.C. §106, if not exempt by an express
provision in the Copyright Law, were subject to the full panoply
of remedies found in 17 U.S.C. §§502-505.1/ And the limitations
and exemptions in the Copyright Act were carefully crafted after
lengthy, attentive Congressional consideration to both the
legitimate needs of users of copyrighted works and their impact
upon copyright owners. Recent developments now suggest, however,
that by virtue of the Eleventh Amendment, states and state
entities may infringe copyrights in blunderbuss fashion with
substantial security against meaningful action by copyright
owners, and that the delicate structure of the Copyright Act will
be impaired.

AAP and AAUP members publish textbooks, anthologies, scholarly,
professional and reference works, workbooks and other
"consumables," and software and data bases, precisely for
educational and other institutions and agencies that commonly
include many state instrumentalities. They rely on states and
state entities for a substantial portion of their income. The
effect of Eleventh Amendment immunity is hardly ancillary or
unimportant to their interests (indeed, small specialized
publishers may find their entire businesses endangered); and it
is contrary to the public interest because it diminishes the
economic incentive and ability to publish other works in all
markets.

A brief review of the characteristics of the (thus-far)
prevailing defendants in recent Eleventh Amendment-copyright
litigation only begins to demonstrate the scope of the present
problem. In addition to one state, the following entities have
been held immune:

●    State-run universities2/

---

1/ The federal government is, however, subject to monetary
remedies for copyright infringement. Id. And the Copyright
Office has recently reaffirmed the principle that sovereign
authorities must respect the rights of copyright owners. Second
Report of the Register of Copyrights, Library Reproduction of
Copyrighted Works (17 U.S.C. § 108) 37-38. (January 1988).

2/ Richard Anderson Photography v. Radford University, 633
F.Supp. 1154 (W.D. Va. 1986).

- Boards of such universities3/
- State "cabinet" agencies,4/ and
- State officials5/

The "practical problem" posed by this immunity is substantial, and potentially immense. AAP estimates, for example, that in 1986, publishers in the United States sold $1.4 billion worth of college and university textbooks.6/ According to the Department of Education, 77.4 per cent of the university and graduate students in this country attend state-run institutions.7/ This means, assuming that book usage is the same at public and private institutions, that $1.1 billion, at a minimum, is a fair estimate of the partial volume of book sales to entities with potential Eleventh Amendment immunity, who, by photocopying or otherwise, may severely erode that market.

Additional sales to state entities of non-textbook materials, and sales to such entities outside this limited college/university market, are also most substantial, but difficult to estimate. Moreover, states could structure the ways in which local, municipal, and other subordinate units of government (e.g., school districts) are created, funded, or do business so as to cloak them with "state" authority and immunize them from liability for copyright damages, even if that immunity is not in place today. At all events, state-related markets are unquestionably large and substantially jeopardized by recent Eleventh Amendment-copyright developments.

That several state Attorneys General have issued copyright guidelines does, indeed, "suggest that these states recognized their liability under the federal copyright statutes." 52 Fed. Reg. at 42046. But this is small comfort, since almost all of the opinions cited by the Copyright Office antedate the Supreme Court's decision in Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985). Indeed, the quoted effect of the pre-Atascadero

---

3/ Richard Anderson Photography, supra; BV Engineering v. UCLA, 3 U.S.P.Q. 2d 1054 (D. Cal. 1987); Cardinal Industries v. Anderson Parrish Assocs., 811 F.2d 609 (11th Cir. 1987), cert. den. ___ U.S. ___ (1987).

4/ Mihalek Corp. v. Michigan, 595 F.Supp. 903 (E.D. Mich. 1984), aff'd on other grounds, 814 F.2d 290 (6th Cir. 1987), cert. den. ___ U.S. ___ (1988); Woelffer v. Happy States of America, Inc., 626 F.Supp. 499 (N.D. Ill. 1985).

5/ Mihalek, supra; Woelffer, supra.

6/ This estimate includes data from AAP members and estimates concerning non-AAP publishers.

7/ Department of Education Bulletin, February 1987.

opinions in Florida and California may already have been eroded
by those states' successful interposition of Eleventh Amendment
defenses to copyright infringement claims in Cardinal Industries
and BV, respectively. Of course one would hope that the
Attorneys General of those states, and other state officials,
will not confuse immunity from monetary remedies with a
principled lawfulness of conduct, and that they will not retreat
from or create new barriers to responsible adherence to copyright
law. But copyright rights are to be granted and (carefully)
limited by the Congress, not by the whim of state officials. (It
must be noted that the Eleventh Amendment copyright cases do not
purport to legitimize any activity as "non-infringing" in
substance; they do impose debilitating obstacles to effective
action against claimed infringement. In sum, the cases permit
evasion of legal obligations that themselves are not contested
or, as noted below, of claims that are at the very least entitled
to be tested in the courts. Particularly in the copyright
context, where no other road -- save for Federal courts -- or
relief --save all statutory remedies for infringement -- is
available, Eleventh Amendment immunity thus offends vital
principles of our democratic society and of our international
obligations.)

While, under the decisions, some manner of injunctive relief may
remain available in theory,[8]/ this form of relief alone is not an
adequate remedy to the "practical problems" posed by immunity:

> By their nature, injunctions can merely
> "forestall future violations." United States
> v. Oregon State Medical Society, 343 U.S.
> 326, 333 (1952). Injunctions, unlike
> damages, do not provide any degree of
> recompense to aggrieved copyright owners for
> infringements that have already occurred, or
> for markets that have been substantially
> eroded, if not destroyed. Nor are they
> available without a likelihood of repeated
> harm by the infringing party. A limitation
> to injunctive relief would eliminate any real
> possibility of favorable settlement for
> copyright owners and would permit [and,
> indeed, invite] the continuation of
> infringing activity by great numbers of
> entities, until in each separate case the
> particular infringement happens to be
> detected and an injunction obtained.
> Moreover, it should be noted that copyright

---

[8]/ The availability of injunctive relief emphasizes that
application of Eleventh Amendment immunity in copyright cases
only serves to permit evasion of legal obligations by the
principal entities that should be held responsible.

> infringement, for example of computer
> software, is particularly unsusceptible to
> detection as compared to most wrongs
> traditionally remedied by injunctive relief.
> Injunctive relief is thus likely to be even
> less effective in forestalling serious harm
> than usual. [Brief Amici Curiae of the AAP,
> AAUP, et al. in BV Engineering v. UCLA before
> the United States Court of Appeals for the
> Ninth Circuit at 11, n. 4.]

Current Eleventh Amendment developments, if sustained, will thus also present a new and unwarranted enforcement burden on all copyright owners, not just those represented by AAP. Owners whose works are used by immune entities will have to consider devising systems to monitor closely state and customer behavior since their only remedy will be an injunction that, for the most part, can only be sought after infringing activities have begun or, in some cases, upon clearly demonstrable threat of infringing conduct. Such a regime, in addition to posing unacceptable and, likely, unavailing and unworkable new enforcement burdens on copyright owners and, perhaps, unnecessary intrusion into uses of copyrighted works, reflects inappropriate and unwarranted application of Eleventh Amendment doctrine to copyright cases.

The AAP and AAUP have filed briefs amici curiae in the Court of Appeals for the Fourth and Ninth Circuits in Richard Anderson Photography and BV, respectively. Rather than repeating our arguments in detail, we have enclosed a copy of the BV brief for your use, and will simply recapitulate the major points here:

1. The copyright clause of the Constitution (Art. I, §8, cl. 8) provides Congress with the power to "abrogate" states' claims of Eleventh Amendment immunity in copyright cases. (A quite recent case, decided contemporaneously with the submission of our brief in BV, expressly holds -- in accord with earlier authority -- that the Congress may abrogate Eleventh Amendment immunity under its Article I powers. United States v. Union Gas Co., ___ F.2d ___ [1987 U.S. App. LEXIS 14575] (3d Cir. 1987)).

2. When it enacted the present copyright law, Congress unmistakably expressed its clear intention to abrogate state immunity. Numerous provisions in the copyright law reflect that intent, including:

   - §501(a): "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright."

- §118(d)(3): Government bodies[9]/ that receive a reproduction of a transmission program and fail to destroy it "shall be deemed to have infringed."

- §602(a)(1): Exemptions from infringement liability for "importation . . . under the authority or for the use of . . . any state or political subdivision of a state . . . ."

- §110(1),(2),(6), and (8): Exemptions for "governmental bodies"[10]/ and "nonprofit educational institutions" (which are often run by states and their entities).

- §111(a)(4): Exemption for "governmental body"[11]/ and

- §112(b),(c), and (d): Exemptions for "governmental bodies."[12]/

Taken together, these provisions demonstrate that Congress believed that §501's imposition of liability on "anyone" who infringes a copyright must run to states and state entities, since otherwise their exemptions would be unnecessary. Because Congress did not intend states to be immune, these provisions are not mere surplusage.

3. The fabric of the complete copyright system demonstrates Congress' intent to abrogate state immunity:

_____

[9]/ The phrase "governmental bodies" was used throughout the copyright revision program to include state entities. See House Comm. on the Judiciary, Copyright Law Revision, "Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law," 87th Cong., 1st Sess. at 129 (Comm. Print July 1961), expressly noting that the law contained "nothing to prevent governmental bodies, at least of the States, from securing copyright . . . ." (emphasis added). Cf. 11 U.S.C. §101(26) ("governmental units" in Bankruptcy Code includes states).

[10]/ See n. 9.

[11]/ See n. 9.

[12]/ See n. 9.

▼

- In <u>Goldstein v. California</u>, 412 U.S. 546, 560
  (1973), the Supreme Court described the copyright
  law's effects as "pervasive," and stated that "no
  citizen or State may escape its reach." In
  revising the Copyright Act in its entirety three
  years later, Congress took no action and left no
  trace suggesting otherwise with respect to state
  liability.

- 28 U.S.C. §1338(a) grants federal courts <u>exclusive</u>
  jurisdiction over copyright cases. In the Supreme
  Court's Eleventh Amendment cases, the effect of
  immunity has been to require plaintiffs to seek
  relief in other available <u>fora</u>. The recent
  Eleventh Amendment-copyright cases can thus be
  correct only if it is assumed Congress intended to
  divest copyright owners of meaningful relief from
  infringement against state entities, and to leave
  such entities substantially free to infringe.
  There is not the slightest shred of evidence that
  Congress so intended, and there is extensive
  evidence to the contrary.

The gravity of <u>all</u> copyright owners' <u>demonstrable</u> problems caused
by an Eleventh Amendment bar to suits for money damages must not
be in any fashion "weighed" with general allegations that "<u>some</u>
copyright owners or their representatives <u>may</u> have put undue
pressure on state governments to pay for their uses of
copyrighted works that <u>might</u>, in fact, be 'fair use' [or
otherwise exempt]." 52 <u>Fed.</u> Reg. at 42046 (emphasis added). In
<u>demonstrated, individual</u> cases of abusive or baseless assertions,
there are existing possibilities of judicial and even, if broadly
warranted, legislative redress. It must also be noted that a
maintenance of immunity on grounds of alleged, isolated conduct
will deprive the broader class of all copyright owners, as well
as state entities, of meaningful opportunity (because ineffective
relief will diminish any inducement to take action) even to test
the legality of debated conduct. The basic entitlement to one's
"day in court" will be lost.

The AAP urges the Copyright Office to make clear to Congress the
copyright law's anticipation of full state liability and
subjection to all remedies for infringement, and the unfairness
of using the Eleventh Amendment to bar copyright suits for

damages; and to support the adoption of appropriate corrective legislation if courts continue to conclude that states are immune.

Thank you for the opportunity to present these comments.

Respectfully,

Jon A. Baumgarten

**BMI**

*Broadcast Music, Inc.* △ *320 West 57th Street, New York, N Y 10019* *212 586-2000*

*Cable Address: Brocastmus NY*
*Telecopier No.: 212-489-2368*

EDWARD W. CHAPIN
VICE PRESIDENT, SECRETARY
GENERAL COUNSEL

January 29, 1988

Office of the General Counsel
Copyright Office
Library of Congress
Department 100
Washington, DC 20559

GENERAL COUNSEL
OF COPYRIGHT

FEB 0 3 1988

RECEIVED

Comment Letter

RM   87 - 5

No. 18

Attention:  Dorothy Schrader, Esq.

> Re:  Practical Problems faced by Copyright
> Proprietors who attempt to enforce their
> claims of copyright infringement against
> State Government infringers

Dear Ms. Schrader:

This is written in response to your Request for
Information issued November 2, 1987 concerning the above
captioned subject.  Docket No. RI 87-5, 52 Federal Register
42045.

Practical problems are encountered at virtually all
stages of the enforcement process.  The first of these problems
arises when answering the threshold question of whether eleventh
amendment immunity applies to a given state entity.  While the
case law appears to be settled with respect to "political
subdivisions", it is much less so with respect to entities
categorized as "states" or "arms of the state".  See, e.g., Lake
Country Estates, Inc. v. Tahoe Regional Planning Agency, 400 U.S.
391 (1979).  Consequently, properly categorizing the entity is
important to predicting the success of a damage suit.  Practical
problems are raised concerning "properly" categorizing the
entity.  The U.S. Supreme Court has provided a set of seven
criteria by which attempts to categorize an entity are guided.
Id. and Mount Healthy School District v. Doyle, 429 U.S. 274
(1977).  By virtue of their number, and in some instances their
subjectivity, these criteria raise more practical problems than
they resolve.  For example, a plaintiff must become fully
familiar with the financial arrangements between the entity and
the state, the revenue raising authority of the entity, and the
legislatively defined character of the entity before the criteria
can be effectively applied.  Each of these requirements and
others raise problems of interpretation and impose additional
costs on the plaintiff.

          Additional problems arise after a suit is commenced.
For example, the complaining party may, at anytime, by virtually
any state created entity, be challenged to prove that the
eleventh amendment does not apply. Even in suits against
municipalities and counties, which for almost one hundred years
the courts have considered outside the scope of the eleventh
amendment, such challenges arise. As recently as June of 1987,
BMI dismissed an infringement action against a county college
rather than incur the added burden and expense of contesting the
defendant's claim of eleventh amendment immunity. Indeed, it is
reasonable to expect that eleventh amendment immunity will be
raised as a defense to copyright suits with growing frequency
given the current state of the law.

          It is little consolation to know that as a matter of
fact, state universities, agencies and commissions have regularly
executed license agreements in the past. The current trend of
court decisions which have found "states" and "arms of the state"
immune from damage suits for copyright infringement provides
considerable incentive to state entities that choose for whatever
reason to delay execution of a license or to refuse to execute a
license. These possibilities suggest yet additional practical
problems. For example, it is expected that more time and expense
will have to be expended to persuade state entities of the
necessity of executing a license. It follows that additional
infringement suits will have to be commenced. Both these
eventualities will raise the cost of enforcing rights under the
Copyright Act.

          Also, because of the recent cases under the eleventh
amendment, BMI has experienced increasing difficulty in
attempting to license promoters of musical attractions in
government owned stadiums, arenas, etc. When a promoter sees the
governmental entity taking a position that there is no liability
to the governmental entity, the promoter becomes less inclined to
voluntarily and readily accept his copyright obligations. And,
of course, it is often difficult to locate the promoter after the
musical attraction has taken place.

          BMI has participated in the preparation and filing of
amicus briefs in the cases of Richard Anderson Photography, Inc.
v. Radford University, 633 F. Supp. 1154 (W.D. VA. 1986), appeal
docketed, No. 87-1610 (4th Cir. 1987), BV Engineering v. UCLA,
No. 86-4708, slip. op. (C.D. Cal. April 17, 1987), appeal
docketed, No. 87-5920 (9th Cir. 1987), Mihalek Corp. v. Michigan,
595 F. Supp. 903 (E.D. Mich. 1984), aff'd on other grounds, 814
F.2d 290 (6th Cir. 1987), cert. denied, Docket No. 87-674
(December 14, 1987). These briefs provide detailed support for

BMI's contention that congress abrogated the eleventh amendment when it passed the Copyright Act of 1976. I have not enclosed copies of these briefs, but would be happy to forward copies to you, should you so desire.

Should you have any questions or should you require additional information, please do not hesitate to contact me.

Very truly yours,

Edward W. Chapin

EWC:fh

# AMERICAN JOURNAL OF NURSING COMPANY
555 WEST 57TH STREET · NEW YORK, NEW YORK 10019 · (212) 582-8820

FEB. 01. 1988

OFFICE OF THE PRESIDENT

January 28, 1988

| GENERAL COUNSEL OF COPYRIGHT | Comment Letter |
|---|---|
| FEB 0 4 1988 | RM 87-6 |
| RECEIVED | No. 26 |

Office of the General Counsel
Copyright Office
Library of Congress
Department 100
Washington, D.C.    20559

Re:  <u>Request for Information, Eleventh Amendment</u>

Gentlemen:

          This letter is in response to your Request for
Information, published in the Federal Register on November 2,
1987, concerning states' Eleventh Amendment immunity from
suit for money damages in copyright infringement cases.  You
have asked for comments, views, and information on practical
problems faced by copyright proprietors who attempt to en-
force their claims of copyright infringement against state
government infringers.  The American Journal of Nursing
Company has first-hand experience of infringement by state
agencies and of copyright owners' impotence under the current
statutory scheme.

          Besides the journal for which it is named and five
other nursing periodicals, the American Journal of Nursing
Company publishes a broad range of educational materials for
nursing board review courses as well as for patient education
and continuing nursing education.  Last year, the company
learned that a Minnesota nursing home associated with the
Minnesota Department of Human Services was infringing the
company's copyrights.  The nursing home was operating a
so-called "information center", copying our materials and
those of our competitors and offering them for sale for a
fee.

          We alerted our competitors and sought legal coun-
sel.  We were informed that under current law we could not
seek damages for infringement of our copyright because the
"information center" would be considered a state agency and
hence be immune from suit under the Eleventh Amendment.

AMERICAN JOURNAL OF NURSING / NURSING OUTLOOK / NURSING RESEARCH / INTERNATIONAL NURSING INDEX
MCN, THE AMERICAN JOURNAL OF MATERNAL CHILD NURSING / EDUCATIONAL SERVICES DIVISION
GERIATRIC NURSING, AMERICAN JOURNAL OF CARE FOR THE AGING

Furthermore, though we might be able to obtain an injunction against future infringement, there was no prospect of recovering any of the costs or attorney's fees we would incur in stopping the infringement. We did not have the budget to support such litigation and we were compelled to abandon the matter. Many other publishers of educational materials find themselves in the same position.

We have recently learned from a competitor that a local hospital association in California has set up a free membership "lending library" which is engaged in wholesale copying of our materials and those of our competitors. Clearly the pattern is repeating itself. For all we know, this type of activity is occurring at state-affiliated institutions all over the country. We are convinced that institutions like these have been encouraged to engage in this illegal activity by recent court rulings which accord immunity to the infringers. We are equally convinced that only a measured statutory response to this situation can save our company and others like it from extensive, nationwide damage to their copyright interests. State agencies constitute a significant part of our market: state universities and nursing schools, hospitals, nursing homes, etc.

We are advised that in order for a federal statute to abrogate Eleventh Amendment immunity and provide a damages remedy against the states, there must be unmistakable language in the statute itself making it clear that the statute applies to the states. As recently as 1979 it was held that the language of the 1909 Copyright Act was sweeping and without apparent limitation, suggesting that Congress intended to include the states within the class of defendants covered by the Act. Mills Music, Inc, v. State of Arizona, 591 F.2d 1278, 1285 (9th Cir. 1979). The Mills case also recognized that in promoting the Arizona state fair the state agency was engaging in what was essentially commercial activity, that the award in the case was not so large as to interfere with the state's budget, and that an award of costs and attorney's fees under the Act was permissible. Id. at 1286, 1287. The state agency "copy mills" about which we are complaining are clearly engaging in commercial activities.

Cases decided subsequent to the Supreme Court's decision in Atascadero State Hosp. v. Scanlon, 473 U.S. 234 (1985) have called the Mills case into question in an unfortunate way. The Atascadero case held that section 504 of the Rehabilitation Act of 1973, passed under section 5 of the Fourteenth Amendment, did not permit a handicap

discrimination suit against a state agency because the intent to subject the states to suit for damages was not stated specifically in the statute.  105 S.Ct. at 3149.

As a result of Atascadero, the 1976 Copyright Act, which is as sweeping in its language as the 1909 Act, is no longer considered to include the states as defendants because the intention to do so is not stated expressly on the face of the statute.  See, e.g., B.V. Engineering v. University of - California, 3 USPQ 2d 1054 (C.D. Ca 1987).  We are advised that one court has even held that, after Atascadero, only federal statutes passed under section 5 of the Fourteenth Amendment can abrogate the states' Eleventh Amendment immunity from suit.  Richard Anderson Photography, Inc. v. Radford University, 633 F. Supp. 1154 (W.D. Va. 1986).

Under the Richard Anderson rationale, Congress would be forever prevented from passing legislation to grant relief to copyright owners injured by state agency infringement of their copyrights because the Copyright Act is authorized by Article I, Section 8, of the Constitution. Fortunately, the Seventh Circuit Court of Appeals has rejected such an analysis out of hand, concluding that there is no constitutionally significant way of distinguishing between the Article I and Fourteenth Amendment grants of plenary power and that the Congress may create a cause of action for money damages against an unconsenting state under either grant of power.  Matter of McVey Trucking, Inc., 812 F.2d 311 (7th Cir. 1987).

It is clear that under the Copyright Act in its present form, copyright holders such as ourselves have no meaningful remedy in damages against state agencies which infringe their copyrights.  Even though they can seek an injunction against further infringement, Edelman v. Jordan, 415 U.S. 651 (1964), copyright owners would be precluded from recovering costs or attorney's fees on the same grounds that forbid recovery of damages, because payment of the costs and attorney's fees would have to come from the general revenues of the state.  Educational publishers with limited budgets are at a particular disadvantage.  This is a limited and not particularly lucrative market, but a very important one to the future of this country.  After McVey, it is clear that Congress has the power to remedy this situation by an amendment to the Copyright Act.

Accordingly, section 501(a) of Title 17 of the Code should first be amended to provide expressly that states and

state agencies are covered by the Copyright Act. Recognizing that the public interest may not permit subjecting state treasuries to suits for damages and lost profits unlimited in amount, we recommend that the Section 504(c) statutory damages provisions alone be made applicable to the states. The states' budgetary authorities would then have a measurable contingency upon which to base their financial projections, and a definable cost to assign to agencies' illegal conduct.

As we noted earlier, we decided to abandon our own efforts to enjoin a state infringer's illegal activities because we could not have recovered the costs and attorney's fees which we would have incurred. If Congress concludes that the public interest will not permit an action for damages, there should at least be an amendment to permit the recovery of costs and attorney's fees incurred in seeking an injunction.

It is plain that something must be done to remedy this situation. The number of state agencies and institutions nationwide which could infringe our copyrights with impunity is legion, yet an infringement action against even one infringer would impose a serious financial burden upon us. If nothing is done, we foresee a vast potential for dilution of rights we thought were secured to us by the Constitution, with no prospect of any remedy. It is grossly inequitable for private organizations, competing in the marketplace to produce high quality educational resources, to have their materials stolen by state governments with the tax base to afford them.

We see no reason why these state agencies and institutions should continue to profit at our expense. Congress has the power to remedy this situation and should act to secure our constitutional rights.

Very truly yours,

THE AMERICAN JOURNAL OF
NURSING COMPANY

Thelma M. Schorr, President



**MOTION PICTURE ASSOCIATION**
OF AMERICA, INC.
1600 EYE STREET, NORTHWEST
WASHINGTON, D.C. 20006
(202) 293-1966

February 1, 1988

GENERAL COUNSEL
OF COPYRIGHT

FEB 0 1 1988

RECEIVED

**FRITZ E. ATTAWAY**
VICE PRESIDENT & COUNSEL

Comment Letter

RM ⠀⠀⠀⠀

No. 16

Dorothy Schrader
General Counsel
Copyright Office
Library of Congress
James Madison Memorial Building
Room 405
Washington, D.C. 20559

Re: Docket No. RI 87-51
Request for Information,
Eleventh Amendment

Dear Ms. Schrader:

Please find attached an original and ten copies of
"Comments of Motion Picture Association of America,
Inc." in the above referenced proceeding.

If you have any questions, please contact the
undersigned at (202) 293-1966.

Sincerely,

Fritz E. Attaway

FEA:vha

GENERAL COUNSEL
OF COPYRIGHT

FEB 0 1 1988

RECEIVED

Before the

**LIBRARY OF CONGRESS**

Washington, D.C.   20559

Comment Letter

RM   8 7 - 5

No. _16_

In the Matter of                      )
                                      )
Request for Information,              )          Docket No.   RI 87-51
                                      )
Eleventh Amendment                    )


## COMMENTS OF MOTION PICTURE ASSOCIATION OF AMERICA, INC.


Motion Picture Association of America, Inc., ("MPAA")
submits these comments in response to the above-referenced Notice
published in the Federal Register November 2, 1987 (Vol. 52,
p. 42046).

MPAA is a national trade association representing producers
and distributors of theatrical feature films, television programs
and home video material.  Copyrighted works produced and
distributed by MPAA member companies are frequently used by
various instrumentalities of state governments.  MPAA therefore
has a substantial interest in the outcome of this proceeding.

In its Notice, the Copyright Office states that it has been
requested by the Subcommittee on Courts, Civil Liberties and the
Administration of Justice of the House Committee on the Judiciary

to assess the relationship between the Eleventh Amendment and federal copyright law, and to conduct two inquiries:

1. An inquiry concerning the practical problems relative to the enforcement of copyright against state governments;

2. An inquiry concerning the presence, if any, of unfair copyright or business practices vis a vis state governments with respect to copyright issues.

## ELEVENTH AMENDMENT

The issue of whether states are immune from suit for money damages in copyright infringement cases under the Eleventh Amendment is presently before the United States Court of Appeals for the Ninth Circuit in BV Engineering v. University of California, CV 86-4708, slip. op., U.S.P.Q. 2d 1054 (D.C. Calif. April 17, 1987). The members of MPAA filed a brief amici curiae in this case, a copy of which is attached.

It is not necessary to recite in detail the arguments presented in this brief, which was supplied to the Copyright Office some time ago and, we trust, will be duly considered in the present proceeding. MPAA submits that this brief presents strong and convincing arguments that:

-- The Copyright Clause of the Constitution gives Congress plenary power to subject states to copyright infringement actions for damages in the federal courts, and

-- Congress has unmistakably expressed its intention to subject states to federal court jurisdiction in copyright infringement cases.

Aside from the purely legal arguments against state immunity from copyright obligations, the equitable and simple "common sense" arguments against state immunity are overwhelming. Article I, section 8, clause 8 of the Federal Consititution gives Congress the power "[t]o promote the Progress of Science and Useful Arts by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries..." It is not reasonable or logical to imagine that the Founding Fathers or the Congress might have intended that the word "exclusive" in that Consitutional provision be rendered without meaning by providing states with copyright immunity, and thereby effectively denying creators the exclusive right to their creations with respect to a large segment of copyright users.

State immunity strikes at the heart of this Constitutional provision. The Founding Fathers did not seek to promote the progress of science and useful arts by giving state institutions, including colleges and universities, free use of copyrighted material. Rather, they sought to promote science and useful arts by insuring that copyright owners are fairly compensated for the use of their works -- to provide incentive to create intellectual property. But what incentive would potential authors of textbooks, instructional films and other such works have if the principal users of their creations were exempt from copyright obligations? The suggestion that states are immune from copyright liability is simply incompatible with the Constitutional purpose and implementing copyright legislation enacted by the Congress.

- 3 -

## ENFORCEMENT PROBLEMS

As pointed out in the Notice, most state agencies
acknowledge their legal and moral obligation to recognize the
rights of copyright owners under the Copyright Act. This is
evidenced by the opinion of the attorney general of California
which is appended to MPAA members' amici brief. Enforcement
problems with state agencies do occur, however, and they have
been greatly exacerbated by the judicial decisions that have
created uncertainty with regard to the application of the
Eleventh Amendment in copyright infringement cases.

MPAA member companies own thousands of copyrighted motion
pictures which they distribute to various markets in the United
States and worldwide. The production and distribution of motion
pictures is a high-risk business; accordingly, revenues from
each market are critical to the recoupment of production costs
and, hopefully, a profit.

After initial distribution to theaters, motion pictures are
released to other markets. One subsequent market is the "non-
theatrical" market, which is dominated by state institutions such
as universities, colleges, schools, hospitals, correctional
facilities and other institutions or entities owned or operated
by states, all of which perform motion pictures. For many years
MPAA member companies or their subdistributors have licensed
public performance rights to such state institutions at
competitive license fees. These license fees total millions of
dollars annually.

- 4 -

Our experience with state correctional institutions, a major source of revenue for MPAA members, illustrates the type of enforcement problems encountered in the non-theatrical market. Such institutions may have extensive programs to entertain inmates and employees by publicly performing copyrighted motion pictures without authority in a variety of ways, including:

1.  Video cassettes are rented or purchased from retail stores and are performed in places where a substantial number of inmates and employees are gathered. Retail video stores are not licensed or authorized to grant public performance licenses.

2.  Such rented video cassettes may also be transmitted via closed circuit television either to individual cells or other quarters, or to places where a substantial number of inmates and employees are gathered.

3.  Television and cable signals not intended for reception by the general public are received by satellite dishes and further transmitted either to individual cells or other quarters, where a substantial number of inmates and other persons are gathered.

Reports of unauthorized public performances at state correctional facilities are frequently received by MPAA member companies. Most states, when informed that they are engaging in infringing activity, advise that they will obtain public performance licenses in the future. Some state facilities continue unauthorized public performances in their correctional facilities pending review.

Two states, North Carolina and Wisconsin, have asserted immunity under the Eleventh Amendment.

### North Carolina

In a Memorandum dated February 24, 1987, Kaye R. Webb,
Assistant Attorney General, concluded that video cassettes rented
from video outlets "[c]annot be shown to a large group such as
the inmate population of a prison facility without some type of
permission from the copyright owner." The Memorandum did not
refer to the Eleventh Amendment.

In a subsequent Memorandum dated March 16, 1987, Lucian
Capone, III, Special Deputy Attorney General, relied upon the
Eleventh Amendment to bar liability, stating:

> However, there is another point which may be more important
> to the issue of liability. Several courts have recently
> held that the Eleventh Amendment bars suit in federal court
> against the States for alleged violation of the copyright
> laws. (citations ommitted)

He then concluded "[t]he showing of video tapes to prison
inmates will not subject the State to liability under the federal
copyright laws."

### Wisconsin

The State of Wisconsin maintains a correctional facility at
Waupun, Wisconsin. Officials of that facility rented video
cassettes from local retail stores and publicly performed them
without authorization by transmitting them over a closed circuit
system for reception by television sets in inmates' cells. After
fruitless requests that the Waupun correctional facility cease

and desist such performances, litigation ensued. Nine motion
picture companies instituted a copyright infringement action
against the State of Wisconsin Department of Health and Social
Services, and three Wisconsin officials in August, 1983.

The defendants, in their Answer, asserted the following
affirmative defense:

The defendants hereby affirmatively assert in response to
the complaint the defense of constitutional immunity under
the Eleventh Amendment and the defense of sovereign
immunity.

The litigation was settled by the entry of an Order, on
consent, which set forth the relevant facts, found that
defendants had infringed plaintiffs' copyrighted motion pictures
and enjoined defendants from future unauthorized transmissions
and other performances of plaintiffs' films.


Such problems are likely to spread as a result of the lower
court decisions cited in the Notice. We are confident that the
courts will ultimately uphold the right of copyright owners to
obtain damages from state agencies in infringement actions.
However, until all uncertainty has been removed, infringements by
state agencies can be expected to increase.

Money damages are essential to the enforcement of
copyrights, and when the threat of such damages is clouded, the
rights of copyright owners will suffer. Injunctions are not an
adequate remedy to prevent wholesale infringement by those few

irresponsible state agencies that see nothing to lose by trampling on the rights of copyright owners. For the motion picture industry, a large part of the multimillion dollar "non-theatrical" market could be lost. Moreover, unauthorized performances of motion pictures on university campuses and other public places under state authority will damage theatrical, home video and television markets. The potential cost of this damage cannot be predicted, but it surely will be substantial.

## UNFAIR BUSINESS PRACTICES

If some copyright owners have placed "undue pressure on state governments," such abuses should be remedied. However abuses, if they exist, cannot justify across-the-board immunity from copyright liability. The newspapers all too frequently report fraud and abuse on the part of private suppliers to state as well as federal agencies. But even in the face of proven abuse costing public treasuries hundreds of millions of dollars, no one has seriously suggested that government agencies should be allowed to expropriate private property without compensation.

Immunity from damages in infringement actions is in practical effect an invitation to expropriate the property of copyright owners without compensation. Allegations of abuse on the part of some copyright owners cannot possibly justify that

- 8 -

result. MPAA would therefore respectfully suggest that an
inquiry into unfair business practices is not germane to the
question of whether states may claim Eleventh Amendment immunity
in infringement suits.

## CONCLUSION

MPAA urges the Copyright Office to make clear in its report
to the Congress that Eleventh Amendment theories of state
immunity from money damages in infringement actions are
inconsistent and incompatible with the Consitutional objective of
promoting science and useful arts. The Copyright Office should,
moreover, strongly recommend to the Congress that it consider
corrective legislative action if the courts do not quickly remove
the uncertainties which presently exist in this area.

Respectfully submitted,

Fritz E. Attaway, Esq.
Vice President & Counsel
Motion Picture Association of
    America, Inc.
1600 Eye Street, N.W.
Washington, D.C.   20006
(202) 293-1966

DATED:     February 1, 1988

- 9 -



| BOX 1601 | HARRISBURG | 17105 |

Library Development Division
March 22, 1988
717-783-5737

Dorothy Schader, General Counsel
Copyright Office
Library of Congress
Department 1000
Washington, DC 20559



Comment Letter

RM 87-5

No. 44

GENERAL COUNSEL
OF COPYRIGHT

MAR 2 8 1988

RECEIVED

Dear Ms. Schader:

This is in response to your request for information relating to copyright and state agencies.

I contacted Mr. Clifford Parris, Chief of the Pennsylvania Department of Corrections' Activities Division. Mr. Parris stated that their legal counsel had indicated it was appropriate to pay a fee for public performance for the use of videotaped films which are rented to show to inmates in state prisons. Mr. Parrish currently has a statewide contract with Films, Inc. which includes a negotiated fee of $2.18 per inmate. He indicated that even if he uses another disbributer next year, he anticipates negotiating a similar agreement.

I was unable to find a central contact in the Pennsylvania Department of Public Welfare. I did speak with several librarians from both state mental hospitals and mental retardation centers. They indicated that their facilities have not been paying a fee for public performances since they have been verbally told that showing videotapes to their residents is a type of "home use." One librarian does have on file a letter dated June 3, 1985 from the sales manager of Clem Williams, a Pittsburgh based distributer, indicated the necessity for paying such a fee. The letter cites an injunction against the Wisconsin Department of Health and Social Services and the Wapum Correctional Institution.

I hope this inforamtion will be of assistance.

Sincerely,

Elizabeth A. Funk, Advisor
Advisory Services and
    Continuing Education Section

EAF:rao

cc: Trish Skaptason

---

COMMONWEALTH OF PENNSYLVANIA     •     DEPARTMENT OF EDUCATION

# HBJ

## HARCOURT BRACE JOVANOVICH, INC.

1250 SIXTH AVENUE, SAN DIEGO, CALIFORNIA 92101   TELEPHONE: 619-699-6263   TELEX: 181726

PETER JOVANOVICH
Executive Vice President

Chairman and Chief Executive Officer
WILLIAM JOVANOVICH

Office of the President
PETER JOVANOVICH
J. WILLIAM BRANDNER
RALPH D. CAULO
JACK O. SNYDER

GENERAL COUNSEL'
OF COPYRIGHT

FEB 0 1 1988

RECEIVED

Comment Letter

RM  87 - 5

No. 13

January 18, 1988

Dorothy M. Schrader, Esq.
General Counsel
Copyright Office
Library of Congress
Washington, D.C.   20540

Dear Ms. Schrader:

If the states are allowed to claim sovereign immunity from copyright liability, this will cause publishers and authors great harm. Among the consequences will be:

1. Wholesale copying by state university libraries of scientific journals and books.

2. The establishment of textbook copying mills by which literature anthologies can be created without paying permissions to authors and publishers.

3. The creation of "cut and paste" textbooks in which selections from different textbooks are put together to make up one textbook, thereby damaging author's and publishers' rights to present their works in the manner they see fit.

All three of these activities have been found by the courts to violate the U.S. copyright law. Granting states immunity from copyright will destroy what are now good working relationships among authors, publishers, libraries, and universities. These relationships serve

Dorothy M. Schrader, Esq.
January 18, 1988
Page Two

the interests of all parties "to promote the progress or
science and useful arts" and thereby the cause of
education. After reaching a practical compromise in the
Act of 1976, all parties should urge the Copyright Office
to defend the Act and to reaffirm its application to the
states.

Sincerely,

Péter Jovanovich

PJ/vrk

 **Information Handling Services**

15 Inverness Way East • P.O. Box 1154
Englewood, Colorado 80150, U.S.A.
Telephone (303) 790-0600

**Michael J. Timbers**
President

February 17, 1988

Office of General Counsel
Copyright Office
Library of Congress
Department 100
Washington, D.C.   20559

GENERAL COUNSEL
OF COPYRIGHT

FEB 19 1988

RECEIVED

Comment Letter

RM  87 - 5

No. 41

Dear Sir,

In response to your request for information regarding the Eleventh Amendment published on November 2, 1987, in the Federal Register, I am pleased to respond on behalf of Information Handling Services.

Your office is investigating the issue of the states' immunity from suit for money damages in copyright infringement cases. The issues are whether the states are immune as a result of the Eleventh Amendment to the Constitution, and whether proprietors of copyrights may enforce their copyright protections against states that make and distribute copies in excess of "fair use."

We take a strong stand on these issues that the states, and particularly state entities such as libraries and universities, must recognize the rights of copyright owners. As a result, state agencies must pay royalties and live within the terms and conditions accepted by the agency when acquiring the copyrighted materials for their own use.

Information Handling Services is one of the largest publishers producing technical, engineering, standards and regulatory information for government and commercial customers. Because IHS is not the primary copyright holder for most of the material it publishes, we must represent not only our own interests, but those of the many other organizations with whom we currently have royalty and distribution agreements.

 *Excellence is our Standard®*

Our company utilizes industry and public information to create document collections to which we add value by indexing, updating, organizing and distributing. Our indexes, generally substantial paper volumes created entirely by our own proprietary intellectual efforts and our microfilm formats, are copyrighted. These products cover manufacturers' catalogs and technical specifications, military and federal specifications and standards, industry technical standards, and government regulations.

A major portion of the lessors of our document services are state and local governments and libraries. In accordance with the "fair use" concept, we have never placed a limit upon the access of our collections by secondary users at a subscriber's location, and have supported search and printing of specific document pages needed by users through provision of microfilm copy printing equipment.

Since state libraries and universities represent a technical and knowledge resource to state residents, paid for by state tax dollars, residents (and non-residents perhaps as well) should be able to utilize such facilities for their intended purpose.

What we see today, however, is the emergence of intra-state and multi-state library networks that are intended to enable rapid transmission and sharing of resources, but which, in fact, are beginning to use their facilities to copy information for wholesale distribution. To exchange bibliographic and catalog information for searching is one thing, a necessary finding aid in today's complex information world. To allow unfettered copying of intellectual property for redistribution to other locations distant from the source is tantamount to chaos.

For example, the document collections of Information Handling Services are typically on roll microfilm or microfiche. A single 4"x6"x7" mil microfiche typically contains 98 page images in our environment, but can contain hundreds of images if greater reduction ratios are used. (DoD uses 48X, for instance, compared to our 24X.) A single microfiche card can be reproduced for 10 cents. The cost of reproducing an entire set of historical case decisions may be $63, while the effort that went into collecting, organizing, indexing, enhancing, mastering and maintaining the collection may be hundreds of thousands of dollars on an annual basis. Thus, mere duplication bears minor expense relative to the value of the intellectual effort that has gone into the set.

Much of IHS' work relates to maintaining the currency of the documents in the collection. By allowing states to disregard copyright in a wholesale manner, duplicate sets of the IHS collections could be redistributed to all units in the state university network, for instance. These recipients may or may not receive notice of the monthly or bi-monthly updates that are necessary to assure users of current information. Since IHS bears a certain product liability burden with respect to the content of its services, how would the secondary recipients of unauthorized copies be treated if data were corrected or new data were released? Would IHS be subject to suit for negligence or liability if the wrong data were used by a secondary unauthorized consumer of the information? Such liability does not presently exist because the appropriate instructions to users are clearly presented in the indexes and at the primary sites...but these directions potentially would not pass through to unauthorized users of microfilm sets who do not have the related indexes.

These practical questions present only a few specific problems to the enforcement or authorization of copyright immunity for the states, and their agencies. Authors, publishers, editors, and abstracters aim to spread the use and utility of their intellectual efforts, but they cannot be expected to bear the cost for states who would misappropriate information without fair compensation. Just as "fair use" offers the user some reasonable right, "fair recompense" is the right of the copyright holder. Just as the user can expect reasonable care on the part of the publisher, the publisher of continuing (updated) services must be able to know his customers to fulfill his product responsibility.

We ask that you propose quick and responsive action to clarify the law such that states, their agencies and instrumentalities are made clearly subject to the copyright provisions of the law.

Sincerely,

Michael J. Timbers
President

MJT/rlg



Comment Letter
RM 87-5
No. 42

GENERAL COUNSEL
OF COPYRIGHT
FEB 1 9 1988
RECEIVED

February 17, 1988

Office of the General Counsel          FEB. 18. 1988
Copyright Office
Library of Congress
Department 100
Washington, DC 20559

Gentlemen:

    Re:  Copyright Office Request for Information,
        Docket No. RI 87-5, 52 Federal Register 42045,
        November 2, 1987

    Enclosed are ten copies of SESAC's comments on the above.
We hope that they will be of meaningful assistance to the
Copyright Office in its consideration of the subject issue.

    I would also like to take this opportunity to thank you
for the many courtesies extended to Steve Gordon in connection
with extending SESAC's time to submit its comments.

                     Sincerely,

                     John Koshel
                     Assistant to the Chairman

afs
Enc.

156 West 56 Street, New York,
55 Music Sq. East, Nashville, TN

## COMMENTS OF SESAC, INC. ON COPYRIGHT
## INFRINGEMENT AND STATES' ELEVENTH AMENDMENT IMMUNITY

### I. Introduction

These Comments are submitted in response to the Copyrigh

Office Request for Information, Docket No. RI 87-5, 52 Federa.

Register 42045, November 2, 1987.

The first part of these Comments focuses on the issue of th

legal interpretation of the Eleventh Amendment immunity i

copyright infringement cases, i.e., does the Eleventh Amendmen

bar suits against States for copyright infringement?

The second part of the Comments focuses on:

- The practical problems relative to the enforcemen
  of copyright against state governments;

- The presence, if any, of unfair copyright o
  business practices vis a vis state government
  with respect to copyright issues.

### II. Legal Interpretation of the Eleventh Amendment Immunity
### In Copyright Infringment Cases

A. The Legal Issue and SESAC's Position

The Eleventh Amendment affords immunity to the States fro

suits brought against them in federal court, subject to Congress

authority to abrogate such immunity.

The Amendment provides

The Judicial power of the United States shall not
be construed to extend to any suit in law or equity,
commenced or prosecuted against one of the United

1

States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Amendment by its terms bars only suits against a State in federal court brought by citizens of another State or of a foreign country. Nevertheless, the Supreme Court has found, inherent in the nature of the Amendment, a general principle that States should not be brought before federal tribunals. This principle bars suits brought by citizens of the defendant State (Hans v. Lousiana, 134 U.S. 1, 10-11 (1890)) or by a foreign government (Principality of Monaco v. Mississippi, 292 U.S. 313, 327-32 (1934)), even though questions of federal law are at issue.

Section 501 of the Copyright Act of 1976, enacted pursuant to the Copyright and Patent Clause of Article 1 of the U.S. Constitution, makes liable "anyone who violates any of the exclusive rights of the copyright owner." (Emphasis added).

Since federal courts have exclusive jurisdiction over copyright matters (28 U.S.C. Section 1338 (a)), the question is squarely presented: Does the Eleventh Amendment remove States and their agencies from the set of parties who are subject to suit for copyright infringement?

This has become a serious issue due to a recent spate of federal district court decisions that answer the question affirmatively. BV Engineering v. University of California, Los Angeles, 657 F.Supp 1246 (C.D. Cal. 1987); Richard Anderson Photography v. Radford Univ., 633 F.Supp. 1154 (W.D. Va. 1986); Cardinal Industries v. King, No. 83-1038-CIV-T-13 (M.D. Fla.,

2

9/6/85), aff'd 811 F.2d 609 (11th Cir. 1987), cert. den. 10i S.Ct. 88 (1987); Woelffer v. Happy States of America, Inc., 62( F.Supp 499 (N.D. Ill 1985). If these cases are correct, State are virtually free to use any copyrighted material they wisl without compensating the owner. [1]

All of the above cited cases purport to base thei: conclusion that the Eleventh Amendment bars copyright action against the States on the 1985 Supreme Court case of Atascaderi State Hospital v. Scanlon, 473 U.S. 234, 105 S.Ct. 3142, 8 L.Ed.2d 17l, a case involving the Eleventh Amendment but havin| nothing to do with copyright law.

It is the position of SESAC that these cases are wrongl. decided, and that Congress has validly abrogated the Elevent Amendment with respect to actions arising under the copyrigh law. More specifically, SESAC contends (i) that these cases ar erroneous as they misconstrue Atascadero, and (ii) that t enforce these decisions would result in violating the due proces clause of the Fourteenth Amendment, inasmuch as copyright owner would lose a legally protected property right without bein afforded due process, i.e., the right to sue for money damage for copyright infringement.

B. The Law Prior to Atascadero

Prior to Atascadero just four cases addressed the issue o whether Congress abrogated the Eleventh Amendment with respect t copyright infringement suits. Mills Music, Inc. v. Arizona, 59

3

F.2d 1278 (9th Cir. 1979) and Johnson v. Univ. of Virginia, 606 F.Supp 321 (W.D. Va. 1985) held that it did and that therefore States were amenable to private copyright infringement actions. The action in Mills was brought under the Copyright Act of 1909, which subjected to liability "any person" who infringed another's copyright. The Mills court found that this broad and sweeping laguange authorized suit against the States for copyright infringement and that it was the Copyright and Patent Clause of the Constitution which granted Congress the power to so abrogarte the States' immnuity. After adopting this reasoning, the Johnson court simply went on to find the definition in the 1976 Act of infringer as "anyone who violates any of the exclusive rights of the copyright owner" more inclusive than the "any person" languange of the 1909 Act. Thus, the State could be compelled to pay damages for infringement of plaintiff's copyright.

One of the cases finding that the Eleventh Amendment had not been abrogated in copyright cases, Wihtol v. Crow, 309 F.2d 777 (8th Cir. 1962) simply held without discussion that the Eleventh Amendment barred an action against a local school district, as an instrumentality of the State. In Mihalek Corp. v. Michigan, 595 F.Supp. 903 (E.D. Mich. 1984), aff'd 814 F.2d 290 (6th Cir.), cert. den., 108 S.Ct. 503 (1987), the court found that the congressionally created rights in the Copyright Act must yield to the Eleventh Amendment. The Mihalek court did not, however, address the issue of whether Congress was empowered to abrogate the Eleventh Amendment.

4

## C. The Atascadero Case

A man suffering from certain physical handicaps brought sui against a state hospital and the California Department of Menta Health in federal district court alleging that the hospital ha denied him emplyment as a graduate student assistant recreationa therapist solely because of his physical handicaps, in violatio of Section 504 of the Rehabilitation Act of 1973 (23 U.S.C Section 794). The district court granted the defendants' motic to dismiss the complaint on the ground that the action was barre by the Eleventh Amendment. The Court of Appeals reversec holding that the Eleventh Amendment did not bar the action sinc a state's consent to suit in federal court could be inferred fre its participation in programs funded by the Rehabilitation Ac (735 F.2d 359).

On certiorsi, the Supreme Court, by a five to four decisio reversed. In an Opinion by Justice Powell, it was held that t suit was proscribed by the Eleventh Amendment since t provisions of the Rehabilitation Act fell short of expressi what was now said to be the requisite unequivocal congression intent to abrogate the States' Eleventh Amendment immunity.

### D. Congress has Authority to Abrogate the Eleventh Amendment

Richard Anderson Photography v. Radford Univ., supra, one the recent cases that found that the Copyright Act did n abrogate the Eleventh Amendment immunity of the States, fou

5

that _Atascadero_ held that Congress can only abrogate the Eleventh Amendment when enacting legislation pursuant to the Fourteenth Amendment. _Atascadero_, however, did not so find.

Writing for the Court in _Atascadero_, Justice Powell stated that "the Eleventh Amendment is 'necessarily limited by the enforcement provisions of Section 5 of the Fourteenth Amendment,' that is, by Congress' power 'to enforce, by appropriate legislation, the substantive provisions of the Fourteenth Amendment.'" _Id._, 473 U.S. at 238. While Justice Powell's languange can be read to mean that abrogation is impermissible apart from the Fourteenth Amendment, it certainly does not compel that conclusion. Moreover, since the statute under review in _Atascadero_ was enacted pursuant to the Fourteenth Amendment, the Court's languange, to the extent that it appears to prohibit abrogation in all other contexts, is merely dicta.

Furthermore, the Supreme Court's decision in _Parden v. Terminal Railway_, 377 U.S. 184 (1964) further demonstrates that Congress' power to abrogate States' immunity is not limited to the Fourteenth Amendment. In this leading abrogation case, the Court ruled that Congress had validly abrogated Eleventh Amendment immunity in the Federal Employers' Liability Act (45 U.S.C. Sections 51-60 (1982)). That statute was passed pursuant to Congress' Article I power to regulate interstate commerce. And less than six months after _Adascadero_, Justice Rehnquist's restatement of the test for congressional abrogation omitted any reference to the Fourteenth Amendment, stating only that Congress

6

may act "pursuant to a valid exercise of power." <u>Green v</u>
<u>Mansour,</u> 106 S.Ct. 423, 425-26 (1985).

Just as the Commerce Clause empowers Congress to creat
causes of action against the States, so too does the Copyrigh
and Patent Clause authorize such leglislation. Congress i
specifically empowered in Article I, Section 8, clause 8, t
secure "for limited Times to Authors and Inventors the exclusiv
Right to their respective Writings and Discoveries." Thi
languange vests in Congress the exclusive power to regulate th
copyright and patent fields.[2] The Supreme Court has recognize
that,

> When Congress grants an exclusive right or monopoly,
> its effects are pervasive, no citizen or **State** may
> escape its reach.

<u>Goldstein</u> v. <u>California,</u> 412 U.S. 546, 560, 93 S.Ct. 2303, 37
L.Ed. 163 (1973). (Emphasis supplied). Thus, throug
ratification of of the Copyright and Patent Clause, the State
left Congess free to subject them to liability for copyrigh
infringement.

E.   The Copyright Act Abrogates the Eleventh Amendment

1. Congress' Intent

<u>BV Engineering</u> v. <u>University of California, Lc</u>
<u>Angeles,</u> supra, is another recent case finding that the Copyrigh
Act does not abrogate the Eleventh Amendment. Unlike <u>Radforc</u>
however, the basis for the court's decision did not concern th

source of Congressional power to abrogate the Eleventh Amendment Rather, the BV court focused on whether Congress had provided in the Copyright Act a sufficiently clear statement of its intent to abrogate the States' immunity. The court found that it had not. BV arrived at this conclusion based on the following languange from Atascadero,

> [we] affirm that Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakablably clear **in the languange of the statute.** The fundamental nature of the intersts implicated by the Eleventh Amendment dicates this conclusion. (Emphasis added)

BV, 657 F.Supp at 1249, citing Atascadero. The BV court found that under this languange the Copyright Act failed to abrogate the Eleventh Amendment since the Act does not specifically mention that copyright owners can sue **States.** In support of this conclusion the BV court stated that the Copyright Act, Section 501 (a), "merely says that: '(a) Anyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright.'" Id. at 1250.

The BV case was wrongly decided as it completely failed to consider provisions of the Copyright Act in which Congress did make its intention to abrogate the Eleventh Amendment "unmistakably clear." In at least seven sections of the Act, Congress' intent to include States in the class of infringers is expressly stated.

The statutory scheme of the Copyright Act, is first to grant exclusive rights, 17 U.S.C. sect. 106, then to place limits on

8

those rights and to except certain entities and uses fro
infringement claims under specific circumstances, 17 U.S.C. sect
107 et seq., and lastly to provide that anyone who violates a
unqualified exclusive right is an infringer. 17 U.S.C. sect. 501
Congress demonstrated its clear intention to include States amon
potential infringers in three different ways. First, Congres
made narrow, detailed exemptions for agencies so closel
associated with states without distinguishing between state an
non-state agencies which engage in similar functions, that i
would be irrational to conclude that it intended to immuniz
states.    Second, Congress made explicit references t
governmental bodies in carving out exemptions and only a torture
construction would exclude states from the parameters of thos
bodies.  Finally, in one specific instance, Congress specificall
excluded states themselves from liability while maintainir
liability for state educational institutions.

The fair use provision of the Copyright Act, 17 U.S.C. Sec
107, is an example of Congressional intent to subject states t
liability for copyright infringement. Under Section 107, the u:
of a copyrighted work for certain purposes, may be permissibl
after consideration of four factors, one of which is whether t
use is for commercial or nonprofit educational purposes. In t
course of implementing their public education programs, it go
without saying that states are heavy users of copyrighted worl
in teaching and classroom activities.   But, Congress did nc
distinguish between state and other nonprofit educationa

9

institutions. It follows therefore that, under any reasonable construction of the Copyright Act, Congress intended to include states in the class of users who would be infringers absent the fair use exemption pertaining to teaching and classroom activities.

Another example of Congressional intent to include states as potential infringers by making narrow exemptions for them, is 17 U.S.C. Sec. 108 which allows reproduction of copyrighted works by libraries and archives. Following its statutory scheme, Congress granted copyright owners the exclusive right to make reproductions of their works, but then limited that exclusive right so that library and archive reproduction would not be an infringement under certain circumstances. A large number of libraries and archives in the United States are maintained by states or state agencies. Congress could have had no intent other than to include state libraries and archives within the exemption provided for by Section 108. The expression of that intent is inconsistent with a Congressional intent to relieve States from any liability for copyright infringement.

Section 110(1), 17 U.S.C. sect. 110(1), like Sections 107 and 108 illustrates Congress's concern with the use of copyrighted materials in educational activities. Under Section 110(1), it is not an infringement for teachers and students in an nonprofit educational institution to display or to perform a work in the course of face-to-face teaching activities. Again, no distinction is made between state and non-state institutions

10

indicating a clear Congressional intention that stat

institutions would be liable for section 110(1) activities, bu

for the exemption there provided.

By placing detailed limits on Section 106's exclusive right

for the activities of a class of copyright users which is largel

comprised of state agencies and by providing for specifi

exemptions for employees working in the course of thei

employment, Congress's intent that States would be infringers i

they made or distributed copies or performed or displayed a wor

outside of the scope of these sections was overwhelmingl

indicated in the language of the statute itself.

Congress also demonstrated its intent to include states :

the class of users who, without specific exception, would 1

liable for copyright infringement, by exempting government:

bodies from certain kinds of infringement claims. For exampl

under Section 110(2)(A) of the Copyright Act, the transmission (

a performance or display of a work is not an infringement if

is part of "the systematic instructional activities of

governmental body or a nonprofit educational institution; and.

(C) the transmission is made primarily for (i) reception

classrooms..., or (iii) reception by officers or employees

governmental bodies as a part of their official duties

employment." 17 U.S.C. sect. 110(2)(A) et seq. This secti

makes no distinction among federal, state, county, municipa

etc. governmental bodies and surely includes state government

bodies. The inclusion of them in this exemption from liabili

11

for copyright infringement is inconsistent with any claim that Congress did not expressly intend that states would otherwise be subject to such liability.

Congressional intent to subject states to all sanctions provided by the copyright law is further shown in Section 110(6) of the Copyright Act which provides that the "performance of a nondramatic musical work by a governmental body or a nonprofit agricultural or horticultural organization in the course of an annual agricultural or horticultural fair or exhibition conducted by such body or organization" is not an infringement of copyright. Several conclusions are evident from this section. First, the performance of nondramatic musical works by a governmental body in other circumstances would be an infringement. Second, any other use of a copyrighted work by a governmental body or nonprofit agricultural or horticultural organization at an agricultural or horticultural fair or exhibition would be an infringement. Third, the performance of a nondramatic musical work by a governmental body or nonprofit agricultural or horticultural organization at an agricultural or horticultural fair or exhibition not conducted by the governmental body would be an infringement.

Another example of Congressional exemption of governmental bodies involves secondary transmissions or primary transmissions embodying a performance or display of a work by governmental bodies. See 17 U.S.C. Sec. 111. Section 111(2) allows the secondary transmission of a primary transmission of copyrighted

12

works under the same conditions and for the same purposes as t}
Section 110(2) performances or displays (systematic instruction;
activities of a governmental body).  In addition, Congre:
exempted the secondary transmission of a primary transmission 1
a governmental body where there is no commercial purpose :
charge to the recipients, except charges necessary to cov:
costs.  17 U.S.C. sect. 111(a)(4).  SESAC submits that the·
provisions show a clear Congressional intent that sta'
governmental bodies would be liable for secondary transmissio.
under all other circumstances.

The governmental body exemption is also contained in t:
provision for ephemeral recordings.  17 U.S.C. Sec. 112.  Und
Section 112, it is not an infringement for governmental bodi
and nonprofit educational broadcasters to make a limited numb
of copies of copyrighted works and to use ephemeral recordin
for transmission.  Like Section 110(6), Section 112(b) exemp
governmental bodies and educational broadcasters from both dire
and vicarious liability.

Finally, in 17 U.S.C. Sec. 118,  Congress  granted publ
broadcasters a compulsory license to perform and reprodu·
copyrighted works.  Congress, did not there distinguish betwe
public broadcasters which are private nonprofit corporations a
state owned and operated public broadcasters such as t
Mississippi Educational Television System.  Section 118(d)(
allows. all public broadcasters to perform or display works
accordance with Section 110 and to make reproductions for u

13

during a limited time by a governmental body or nonprofit institution of a transmission program simultaneously with its transmission. Further, this section provides that the public broadcasting entity will not be liable for infringement if it advised the governmental body of its duty to destroy the program and if the governmental body fails to so destroy. This section concludes by stating that if the governmental body fails to destroy the programs, then "it (the body) shall be deemed to have infringed." (Emphasis added). This language is a clear, unequivocal expression of Congressional intent to hold yet another kind of state entity liable for copyright infringement.

Similar Congressional intent is shown in the manufacturing clause of the Copyright Act, 17 U.S.C. Sec. 601 et. seq. Both Section 601 and Section 602 exempt states for uses other than educational uses from the manufacturing clause importation prohibitions. Although the manufacturing clause, by its own terms, expired June 30, 1986, 17 U.S.C. sect. 601(a), it is nonetheless relevant because it is Congress's most direct reference to state liability under the Copyright Act. Section 601 exempts states from infringement liability for importing English language works manufactured outside the United States; Section 602 applies to works acquired outside the United States. It is significant that Congress had distinguished between state educational and noneducational uses and declared that when a state, for educational purposes, imported works covered by the manufacturing clause, it would have been an infringer. But when

14

a state, for other purposes imported a work covered by the manufacturing clause, it would not have been an infringer.

By fashioning three different types of state exemptions fro copyright infringement, and employing them in numerous section of the Copyright Act, Congress indicated its overwhelming inten: in the language of the statute itself, that states would no immune from copyright infringement liability.

## 2. Due Process

Even if it were reasonably possible, which we do not thin. it is, to construe Atascadero as requiring an expression o certain magic words, such as "the Eleventh Amendment is hereb abrogated for the purposes of this statute," the application o this interpretation of Atascadero to the Copyright Act woul violate the due process rights of copyright owners.

With respect to the law under review in Atascadero - th Rehabilitation Act of 1973 - federal jurisdiction is no exclusive. Thus, an agrieved party could sue a State in stat court. Atascadero, therefore, merely stripped away a forum - no a right. Suits for copyright infingement, however, can only b heard in federal court. 28 U.S.C. Section 1338(a) states:

The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, copyrights and trademarks. Such jurisdiction shall be **exclusive** of the courts of the state in patent and copyright cases."

(emphasis added). Thus, if the Copyright did not abrogate th Eleventh Amendment, copyright owners would completely lose thei

15

right to sue a State for money damages for copyright infringememt.

The Fourteenth Amendment prohibits the loss of property without due process of law. Copyright is a property right granted by Congress to creators pursuant to Congress' Article 1 powers. Depriving copyright owners of the right to sue States for money damages when States take their propery without compensation would strip them of their due process protection guaranteed under the Fourteenth Amendment.

   F.   Notwithstanding Congressional Intent, the States have Waived their Eleventh Amendment Immunity for the Purposes of Copyright Infringement Actions

It is well established that States may waive their immunity by participating in a federally regulated activity. See Parden v. Terminal Ry. Of Alabama State Docks Dept., 377 U.S. 184 (1964). In Parden, employees of a state-owned railroad sued Alabama under the Federal Employer's Liability Act, 45 U.S.C. sect. 51, 60 (1982). The Court held that the State's operation of a railroad in interstate commerce, an activity regulated by Congress was beyond the boundaries of traditional state functions. Alabama's engaging in the federally regulated activity operated as a waiver of immunity. Parden, 377 U.S. at 196. By contrast, in such cases as Atascadero State Hospital v. Scanlon, supra and Employees v. Dept. Of Public Health and Welfare, 411 U.S. 279 (1973), the state action involved one of its most traditional functions, accepting, administering and

16

distributing benefits from federal programs.     Bankruptcy is another area where a state's participation in a federally regulated activity may constitute waiver.     See Connecticut Performing Arts Foundation, Inc. v. Brown, 47 B.R. 911 (D. Conn. 1985).   In Connecticut, the state made a claim against the estate of a debtor in bankruptcy and in areas held that by "engaging in an activity that is subject to the bankruptcy power, it is proper for Congress to find that the state has waived its immunity." Id. at 916.

Richard Anderson Photography v. Radford Univ, supra, held that a state's use of copyrighted materials was not a waiver of its Eleventh Amendment immunity.  Under the Radford reasoning, for waiver to exist, the State must have had a choice to act or not to act by a freely made decision to participate in a federally regulated activity.    The court noted that that decision usually involved state participation in federally funded programs whereby acceptance of the benefit was conditioned upon waiver of immunity. The court found however that a State's use of copyrighted materials was not a decision which the state was able to make freely.  Id. at 1159.

SESAC submits that Radford's conclusion is just plain wrong Virginia did have a choice to use or not to use copyrighted materials.   Simply because a state decides that copyrighted materials are better suited to its needs for one reason or another does not mean that the state does not have a choice to use them.  States remain free to create their own materials or to

17

commission materials, just as states remain free not to participate in federal benefits programs and to create or fashion their own programs suited to their individual needs. States could therefore reject the use of copyrighted materials. By freely choosing to use copyrighted materials and thus entering an activity regulated by Congress, states have freely chosen to waive immunity.

The Radford court recognized that in Parden, 377 U.S. 184, another indication of waiver existed in Alabama's decision to operate a railroad (not a traditional state function), and the Anderson court even attempted to decide the case under that theory. But, Radford's conclusion that a State's use of copyrighted materials is a traditional state function is in error. A State's exercises its traditional state functions when it participates in or administers federally funded benefits programs or acts pursuant to its police power or taxing authority. In Radford, however, the state university did not act pursuant to its traditional state functions, but rather, by creating a marketing brochure, engaged in public relations. The state itself recognized that this was not a traditional state function because it saw the need to solicit the services of an outside photographer, rather than to create the work itself. The Anderson court's conclusion that the mere use of property by a state agency is "per force" engagement in a traditional state function is overreaching. The performance or recording of music, the printing of books, the programming of computer software are

18

not traditional state functions, but activities normally performed by the private sector. The ultimate failure of the Radford rationale is its complete failure to recognize that copyright is not a federally funded benefit, nor is the use of works protected by it a traditional state function.

Radford asserts that state university involve daily decision in many areas regulated by Congress, including copyright, that this is a basic and fundamental state function, and, as such, a decision to use copyrighted materials does not waive state immunity. 633 F.Supp. at 1160. The fallacy of this premise is shown by the following analogy.

The enactment and dissemination of laws of one kind or another is clearly a traditional state function as to which a state does not have a choice. (Of course a state has a choice in deciding just what laws will be enacted and how they will be worded, but it would be just unrealistic to say that a state could decide to enact no laws.) To disseminate the laws, it is necessary to print them. However, in order to print the laws, raw materials and labor are necessary. No court would rule that because the printing and dissemation of laws is a traditional state function, the State does not have to pay for the ink, the paper, the printing and the labor necessary to print the laws. Yet, this is what Radford would suggest. According to Radford, since the operation of a university is a traditional state function and since to operate a university states must use copyrighted materials, that use itself is also a state function

19

and the State does not have to pay for the use of those materials. Taken to its ultimate conclusion, Radford would require that when states have need of a textbook, for example, the State could purchase one copy of the textbook and copy as many additional copies as it chose. While the State would pay for paper, printing and binding, it would not pay for the use of the copyrighted materials which constitute the very essence of the finished product!

In addition to engaging in a federally regulated activity outside the scope of traditional state functions, states have waived their immunity in other ways. First, in purchasing mass quantities of copyrighted textbooks and other materials, states have recognized the application of the copyright law to their activities. States have also availed themselves of copyright protection by complying with the registration, deposit and notice requirements of the copyright act. A State that has sought and received these benefits cannot then cloak itself in immunity.

Similarly, a State's having brought a copyright infringement suit should act as a waiver of immunity. This rationale comports with Radford's thesis that a State must have a choice to act or not to act. If a State chooses to act (i.e., in Radford's view, to receive the benefits), then it has consented to the removal of its immunity.

Significantly, at least eight state attorneys general have concluded that States are not immune from infringement liability. See 107 Op. Atty' Gen. Alas. (1983), 366 Inf. Op. Att'y Gen.

Alas. 404 (1982); 187 Slip Op. Att'y Gen. Ariz. 106 (1986); 65
Op. Att'y Gen. Cal. 106 (1982); 64 Op. Att'y Gen. Cal 186 (1981);
82 Op. Att'y Gen. Fla. 148 (1982); Slip Op. Att'y Gen. Kan. 202
(1981); 84 Slip Op. Att'y Gen. La. 436 (1985); 82 Slip. Op. Att'y
Gen. La 662 (1982); Slip Op. Att'y Gen. S.C. (1977); 82 Slip Op.
Att'y Gen. Ut. 03 (1982).

Finally, States have traditionally recognized the rights
of copyright owners by entering into licenses, paying royalties
and otherwise compensating copyright owners. Clearly by
voluntarily entering into and periodically renewing such
agreements, the states have intended to and actually waived their
Eleventh Amendment immunity.

G.    If the States Were Immune from Copyright Infringement
      Liability the Economic Consequences to Copyright Owners
      would be Devestating

If, the States adopted the view that the Eleventh Amendment
bars actions for money damages for copyright infringement, the
negative financial effects on copyright owners would be
disastrous. A variety of copyrighted materials - music, motion
pictures, textbooks, literture, dramatic plays, computer
software, visual art, etc. are used by State universities and
colleges, as well as other state agencies, throughout the
country. Compensation for such use represents an important
source of revenues for a diverse group of copyright owners.

Without the legal capability of sueing for money damages for
copyright infringement, the States would be in a strong positio:

21

to negotiate unreasonably low fees for such use or not to pay at all. That a palintiff may avail himself of injunctive relief against an infringing State or its agencies in no way constitutes adequate protection of his or her copyrights. Many copyrighted materials obtain only brief periods of commercial success. For example, a hit song may go to number one and then drop off the charts within weeks or even days. A record company that secured an order preventing a state agency or college from further unauthorized exploitation of such song would have little to celebrate if it had already dropped from the charts. The revenues that it would have otherwise receieved, and shared with the recording artist and composer pursuant to the company's agreements with those creators, would be gone forever.

E. Recommendation

Even though the Copyright Act clearly abrogates the States' immunity from copyright infringement actions, Congress should amend the Copyright Act to make this even more explicit in order eradicate the confusion caused by cases such as BV and Radford and to avoid any further erroneous decisions.

III. PRACTICAL PROBLEMS ASSOCIATED WITH STATE USES OF COPYRIGHTS

In accordance with the Copyright Office's request for information on the practical problems associated with state use of copyright, SESAC has the following comments. Since the

22

enactment of the Copyright Act of 1976, 17 U.S.C., SESAC has
licensed the public performance of copyrighted musical works at
state colleges and universities, stadia, auditoriums and other
venues. The licenses grant a non-exclusive right to publicly
perform music in the SESAC repertory, set forth a fee structure,
limit the grant to specific facilities and performances and
specify other times. SESAC licenses hundreds of State
universities, colleges, stadia and other venues in all fifty
states. In nearly a decade of licensing under the 1976 Copyright
Act, never has any state agency raised the claim Eleventh
Amendment immunity as a reason for not entering a SESAC
performance license.

## Footnotes

1. The Supreme Court has ruled that the Eleventh Amendment
does not bar suits to prohibit future illegal conduct by state
officials (Ex parte Young, 209 U.S. 123, 159-60 (1908)), and
therefore it may be argued that copyright owners may seek
injunctive relief to prevent future acts of copyright
infringement. However, it many instances that would be tantamount
to closing the barn door after the horse has run off since the
state may have already completed its use of the copyrighted
materials. For further discussion of this point, see Section II
H of these Comments

2. This is not to say that Congress must act in such a way
as to preclude any state involvement these fields. For example,
the Copyright Act of 1909 did not abolish common law copyright,
as to which the law of the state involved had to be examined.
However, the Copyright Act of 1976 did abolish common law
copyright and and pursuant to established authority Congress has
preempted the entire copyright field.

23



GENERAL COUNSEL
OF COPYRIGHT.

FEB 1 9 1988

RECEIVED

Comment Letter

RM    8 7 - 5

No. 42

COMMENTS OF SESAC, INC. IN RESPONSE TO COPYRIGHT OFFICE
REQUEST FOR INFORMATION, DOCKET NO. RI 87-5, 52 FEDERAL
REGISTER 42045, NOVEMBER 2, 1987

John Koshel
Assistant to the Chairman

Laurie Hughes
Attorney

Steven R. Gordon
Attorney

**APPENDIX TO**

COMMENTS OF

NATIONAL MUSIC PUBLISHERS' ASSOCIATION, INC.

MUSIC PUBLISHERS' ASSOCIATION OF THE UNITED STATES, INC.

THE SONGWRITERS GUILD OF AMERICA

BEFORE THE

COPYRIGHT OFFICE OF THE
LIBRARY OF CONGRESS

DOCKET NO. RI 87-5

RE: STATES' ELEVENTH AMENDMENT IMMUNITY
FROM DAMAGE SUITS FOR COPYRIGHT INFRINGEMENT

February 1, 1988

| GENERAL COUNSEL OF COPYRIGHT | Comment Letter |
|---|---|
| FEB 0 4 1988 **RECEIVED** | RM **87 - 5** No. *21* |

January 28, 1988

Dorothy Schrader, Esq.
General Counsel
Copyright Office
Library of Congress, Dept. 100
Washington, D.C. 20559

   Request for Information - Eleventh Amendment
    (52 Fed. Reg. 42045; Nov. 2, 1987)

Dear Ms. Schrader:

   We write on behalf of The National Music Publishers' Association, Inc., The Music Publishers' Association of the United States, Inc. and The Songwriters Guild of America. We are pleased to enclose our comments in response to the request for information on the issue of states' Eleventh Amendment immunity from suit for money damages in copyright infringement cases. Submitted with our comments is an appendix containing two briefs filed by these organizations in the Fourth and Ninth Circuits regarding this issue.

   We look forward to working with the Copyright Office on this matter.

      Respectfully submitted,

      NATIONAL MUSIC PUBLISHERS'
      ASSOCIATION, INC.

      By _Steven B. Rosenfeld_
      Steven B. Rosenfeld, Esq.
      PAUL, WEISS, RIFKIND, WHARTON
      & GARRISON
      1285 Avenue of the Americas
      New York, New York 10019
      (212) 373-3000

THE MUSIC PUBLISHERS'
ASSOCIATION OF THE UNITED
STATES, INC.

By Howard L. Wattenberg

Howard L. Wattenberg, Esq.
Marshall Morris Glinert
Powell Wattenberg & Perlstein
130 West 57th Street
New York, New York 10019
(212) 582-1122

THE SONGWRITERS GUILD OF
AMERICA

By Lewis M. Bachman

Lewis M. Bachman
The Songwriters Guild of
America
276 Fifth Avenue, Room 316
New York, New York 10001
(212) 686-6820

COMMENTS OF

NATIONAL MUSIC PUBLISHERS' ASSOCIATION, INC.

MUSIC PUBLISHERS' ASSOCIATION OF THE UNITED STATES, INC.

THE SONGWRITERS GUILD OF AMERICA

BEFORE THE

COPYRIGHT OFFICE OF THE
LIBRARY OF CONGRESS

DOCKET NO. RI 87-5

RE: STATES' ELEVENTH AMENDMENT IMMUNITY
FROM DAMAGE SUITS FOR COPYRIGHT INFRINGEMENT

February 1, 1988

## INTRODUCTION

The National Music Publishers' Association, Inc.
("NMPA"), The Music Publishers' Association of the United
States, Inc. ("MPA") and The Songwriters Guild of America
("SGA"), respectfully submit the following comments in
response to the Copyright Office's Request for Information
regarding the issue of states' Eleventh Amendment immunity
from suit for money damages in copyright infringement cases.
52 Fed. Reg. 42045 (November 2, 1987).

NMPA is the leading popular music publishers' trade
association, representing approximately 300 music publisher
members throughout the United States. MPA is a nonprofit
corporation representing the interests of its approximately
60 members who publish all types of music, including popular
music, church and sacred music, and concert and educational
music. SGA is a national association of approximately 4,000
songwriters. Its primary functions are to promote the
interests of authors and composers in their dealings with
those who market and use their creative works, and in legis-
lative matters. Each of these organizations -- NMPA, MPA and
SGA -- represent the interests of thousands of copyright
proprietors in the music industry, each of whose livelihood
fundamentally depends on effective enforcement of the copy-
right law. That includes the ability to obtain payment of
royalties for use of their music and to sue for damages

against those -- including state government entities -- who make such use without payment. These organizations have filed amicus curiae briefs in the Fourth and Ninth Circuits on the issue of states' Eleventh Amendment immunity from suits for copyright infringement.$^{1/}$ In addition, NMPA and MPA have filed an amicus brief on this issue in the Sixth Circuit.$^{2/}$

This submission is made by NMPA, MPA and SGA following review of the comments of the American Society of Composers, Authors and Publishers ("ASCAP") and Broadcast Music, Inc. ("BMI") in response to the Copyright Office's request. NMPA, MPA, SGA, ASCAP and BMI share a common interest in enforcing the rights of copyright proprietors in the music industry. ASCAP's and BMI's submissions present certain factual information sought by the Copyright Office with respect to practical difficulties encountered by music copyright owners by virtue of the assertion of Eleventh Amendment immunity by state government entities in copyright

---

1/  BV Eng'g v. University of California, 657 F. Supp. 1246 (C.D. Cal. 1986) (appeal pending); Richard Anderson Photography, Inc. v. Radford University, 633 F. Supp. 1154 (W.D. Va. 1986) (appeal pending). A copy of these briefs is submitted herewith as an appendix.

2/  Mihalek Corp. v. Michigan, 559 F. Supp. 903 (E.D. Mich. 1984), aff'd on other grounds, 814 F.2d 290 (6th Cir.), cert. denied, 56 U.S.L.W. 3414 (1987).

cases. Thus, our comments here focus principally upon the
legal interpretation of Eleventh Amendment immunity in
copyright infringement cases. As we note below -- and as we
have urged in the several amicus briefs we have filed -- the
Eleventh Amendment defense ought not to prevail under current
law. In the event, however, that our position does not
prevail in the courts, we would propose an amendment to the
1976 Copyright Act, discussed in the last section of these
comments, which would reiterate the intent of Congress that
copyright proprietors should be able to enforce all of the
same rights under the Copyright Act against the states as are
available against all other users of copyrighted materials.

I.

## PRACTICAL PROBLEMS OF ENFORCEMENT

As noted, the comments filed by ASCAP and BMI
present the basic factual material concerning the practical
problems encountered by music copyright proprietors in
enforcing the copyright laws against state government infrin-
gers in the face of Eleventh Amendment defenses. Neverthe-
less, we begin these comments by reviewing those problems, in
order to set the legal issues in their proper framework. The
fifty states and their hundreds of agencies and instrumentali-
ties are increasingly significant users of intellectual
property protected by copyrights and patents. States and

their agencies utilize, exhibit, perform and copy these
protected works thousands of times every day. In school and
college music classes, bands and glee clubs, on college and
public radio stations and at school proms, copyrighted music
is repeatedly studied, performed, and played; copyrighted
motion pictures are exhibited on state college campuses and
in state prisons; the latest scientific technology and
electronic know-how are utilized by state instrumentalities
in great profusion. As set forth more particularly in
ASCAP's submission, these kinds of campus performances are
conducted under three kinds of licensing agreements which are
held by approximately 870 state universities around the
country. Moreover, as ASCAP points out, it licenses over 181
noncommercial educational television stations, and countless
radio stations, run by the states or state schools.

Given this widespread use and access to copyrighted
work, there are bound to be instances of unauthorized use of
such works by state entities. We cite just a few examples
here. After music publishers Oxford University Press,
Theodore Presser Co. and Novello & Co., Ltd. obtained evi-
dence that Longwood College, an instrumentality of the
Commonwealth of Virginia, had photocopied a number of musical
compositions without authorization, these music publishers
commenced an action against the college and the Chairman of
its music department for willful copyright infringement.

Pursuant to a settlement agreement between the defendants and plaintiff music publishers dated October 7, 1981, the defendants acknowledged innocent infringement and paid the music publishers' damages as well as attorneys' fees and agreed to refrain from any such further photocopying. In addition, Virginia's Attorney General issued an advisory bulletin cautioning Virginia schools against unauthorized photocopying of copyrighted works that does not fall within the "fair use" exceptions of the Copyright Act.

In another settlement dated June 12, 1984, several music publishing members of NMPA resolved allegations of copyright infringement of printed musical works by the University of Texas at Austin. The NMPA had alleged that the University's department of music had been systematically infringing the music publishers' copyrights by making numerous unauthorized photocopies of their musical works and distributing such copies. The University, as part of the settlement, implemented additional policies and procedures to prevent unauthorized copying by all faculty and staff. In addition, the University distributed a policy statement concerning unauthorized photocopying of copyrighted works. Furthermore, the University agreed to prominently display posters at all duplicating facility locations advising of the penalties for unauthorized photocopying.

In neither of these cases, or in others like them, did the state university resist royalty payments on Eleventh Amendment grounds. But that was before the string of recent district court opinions denying copyright holders the crucial damage remedy against the states. As those cases show, state universities and other state entities are now increasingly raising the Eleventh Amendment defense, making settlements such as those described above impossible. Should the legal position upheld in these cases prevail, music copyright owners would have had no damage claim against the unautho- rized copying by the state entities described above. State- run schools could run off thousands of copies of sheet music without paying royalties; school bands could buy one copy of a hit song, copy it and perform it at public events; glee clubs could do the same, as could school orchestras. Without the possibility of obtaining damages for wrongful copying, copyright proprietors would have much less chance to reach the kind of settlements with state instrumentalities achieved in the cases noted above or to see their damage claims vindicated if settlement were not possible.

In several of the recent cases, it has been argued that injunctive relief against state officials provides ample protection from possible infractions, so that damage suits

and settlements are not necessary.$\underline{3/}$ However, injunctive "relief" is illusory in these circumstances. It is well established that "[t]he sole function of an action for injunction is to forestall future violations," United States v. Oregon State Medical Society, et al., 343 U.S. 326, 333 (1952) (emphasis added), but that is of no help to compensate copyright owners where the most severe damage has already occurred.

Eliminating damage suits against the states would be especially devastating to the economic livelihood of members of NMPA, MPA and SGA. It is no secret that much of today's popular music has a very limited life-span. By the time a copyright owner has discovered that a state agency copied or performed or otherwise had used a current hit song -- and by the time an injunction could be obtained, the

---

3/  Indeed in one recent case, Cardinal Industries, Inc. v. Anderson Parrish Assoc., No. 83-1038, Slip Op. (M.D. Fla. Sept. 6, 1985), aff'd without opinion, 811 F.2d 609 (11th Cir.), cert. denied, 108 S. Ct. 88 (1987), the district court went so far as to hold that injunctive relief sought against individual state officials was actually against the state and barred even that remedy on Eleventh Amendment grounds. This decision is clearly contrary to the weight of authority that the Eleventh Amendment does not bar injunctive relief against state officers. See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 105 (1984). The summary order affirmance of the district court's decision should not be viewed as persuasive authority as to the correctness of its holding.

chances are great that the song will no longer be a "hit" and an injunction against future use will be of little value. Meanwhile, under the recent district court decisions, the state's use of the popular music would be royalty-free, and it may not be sued for the income the music has earned or the losses sustained by the uncompensated use. The ASCAP submission discusses additional reasons why relegating copyright owners to injunctive relief would destroy the deterrent effects intended by Congress. And that in turn would frustrate the entire purpose of granting copyrights: establishing economic incentives to promote creative endeavor.

The Copyright Office has also sought information on problems state governments are having with copyright proprietors who may engage in unfair practices with respect to state governments' use of copyrighted materials. We are unaware of any such practices. Copyright owners are not in business to demand royalties if a state's use of copyrighted materials falls within one of the exemptions to state liability set forth in the Copyright Act. Copyright owners seek only to license uses of their copyrighted works at reasonable fees and royalty rates when such uses are compensable under the Act. Their overriding interest is to encourage the exploitation of copyrighted works by everyone -- including states. There is no reason to believe that copyright owners are engaging in unfair practices either generally, or in

particular with respect to state use of copyrights. Rather, it is in the interest of copyright proprietors to deal fairly with the states and encourage their widespread use of copy-righted works, in return for payment of royalties as provided by the Act. If any "abuses" by some copyright owners are taking place -- and we know of none -- the remedy is to deal with such practices directly, not to immunize the states entirely from the damage remedy which remains the single most effective way of vindicating the rights granted by Congress to all copyright owners against all infringers.

## II.

### THE LEGAL ISSUES

#### A. Background

Prior to 1985, there was little question that states were subject to damage suits for copyright infringe-ment. See, e.g., Mills Music, Inc. v. Arizona, 591 F.2d 1278 (9th Cir. 1979). In fact, states had long accepted their liability and amenability to suit under the copyright laws. Eight state Attorneys General have concluded that the Copy-right Act applies to the States and their agencies.[4/]

---

4/ 107 Op. Att'y Gen. Alas. (1983); 366 Inf. Op. Att'y Gen. Alas. 404 (1982); 187 Slip Op. Att'y Gen. Ariz. 016 (1986); 65 Op. Att'y Gen. Cal. 106 (1982); 64 Op. Att'y
(Continued)

Indeed, these Attorneys General's opinions show the great range of state use of copyrighted materials and the breadth of their expectation that royalty payments are mandated. Thus, the Attorneys General of Alaska, California, Louisiana and Utah have advised that the showing of videocassette tapes of motion pictures to state prison inmates without authorization from the copyright owner constitutes copyright infringement for which the states would be liable. 107 Op. Att'y Gen. Alas. (1983); 65 Op. Att'y Gen. Cal. 106 (1982); 84 Slip Op. Att'y Gen. La. 436 (1985); 82 Slip Op. Att'y Gen. Ut. 03 (1982). The Attorney General of Kansas has specifically concluded that a public school system's duplication of copyrighted musical works "contravenes 17 U.S.C.A. § 107" if done without the copyright owner's permission. 81 Slip Op. Att'y Gen. Kan. 202 at 4 (1981). And Florida's Attorney General has warned that state's Department of Labor that it should not reproduce or distribute copies of any type of copyrighted works without the permission of the copyright owner, since such reproduction would be an infringement of

_____

(Continued)
   Gen. Cal. 186 (1981); 82 Op. Att'y Gen. Fla. 148 (1982);
   81 Slip Op. Att'y Gen. Kan. 202 (1981); 84 Slip Op.
   Att'y Gen. La. 436 (1985); 82 Slip Op. Att'y Gen. La.
   662 (1982); Slip Op. Att'y Gen. S.C. (1977); 82 Slip Op.
   Att'y Gen. Ut. 03 (1982).